G55ASMAHps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   --------------------------------x

3   SMART INSURANCE COMPANY,

4                  Plaintiff,

5           v.                          15-cv-4384 (KBF)

6   BENECARD SERVICES, INC., et al.,

7                  Defendants.

8   --------------------------------x

9                                      New York, N.Y.
                                       May 5, 2016
10                                     9:00 p.m.

11

    Before:
12
                       HON. KATHERINE B. FORREST
13
                                       District Judge
14

15                          APPEARANCES

16  DENTONS US LLP
          Attorneys for Plaintiff
17  BY:  GARY MEYERHOFF, ESQ.

18  DLA PIPER
          Attorneys for Defendants
19  BY:  BRIAN JOHN PENDLETON, JR.
    BY:  RICHARD F. HANS, ESQ.
20       STEVEN R. MARINO, ESQ.

21

    Also Present:  Gina Trimarco, Esq.
22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

G55ASMAHps

1           (In open court)

2           THE CLERK:  In the matter Smart Insurance Company v.

3    Benecard Services, Inc., at al., 15-cv-4384, counsel please

4    state your names for the record.

5           MR. MEYERHOFF:  Gary Meyerhoff from the law firm of

6    Dentons US LLP for Smart Insurance Company, plaintiff.

7           THE COURT:  Good morning, Mr. Meyerhoff.

8           MR. PENDLETON:  Good morning, your Honor.  John

9    Pendleton from DLA Piper.  With me is my partner Rich Hans,

10   Steve Marino, and our former counsel, who is now in-house

11   counsel at UBS, Gina Trimarco.

12          THE COURT:  Good morning, folks.

13          We are here for a hearing on some of the evidentiary

14   issues that underlie the Smart motion for contempt that was

15   filed back early in April, at ECF no. 77, and the purpose that

16   I have for today's proceeding is, as my order set forth, is

17   really to hear from Mr. Pendleton and Ms. Trimarco about

18   everything that they can recall that happened during this phone

19   call with Mr. Reed on January 28, 2016.  And we'll do that in

20   just a moment.  We'll do it separately.  What we'll do is,

21   we'll have one of you step out.  We'll swear one of you, put

22   under oath, have you go through absolutely everything you can

23   recall, and then we're going to have the other one come in and

24   do the same thing.

25          All right.  The concern I have is that when I watched

G55ASMAHps

1    Mr. Reed's deposition, the videotape, it didn't seem that he

2    lacked clarity on the material content of the conversation.

3    Whether the words were precisely the same or not, I don't know.

4    So whether there was, quote, an instruction or not, I don't

5    know what folks might mean by the word "instruction."  So I

6    just need as a result to get to the bottom of it, so that I can

7    make sure that I understand as much as possible about what

8    happened.  And even if people don't remember the words,

9    describe to me what happened.

10        Where we go from there, let me just be absolutely

11   clear, where we go from there is TBD, in all respects.  In

12   other words, there are many results that could follow.  It is

13   not something that I would relish to do -- I would not relish a

14   contempt sanction against two very competent, upstanding

15   lawyers.  And so I'm not aiming a laser sight on that.  This is

16   a fact-finding proceeding with everything else TBD.  And we're

17   not going to TBD today.  What I'm going to do is listen to you

18   folks -- because I don't think today will be that long, to tell

19   you the truth.  I'm going to listen to you folks.  I'm going to

20   go back and I'm going to think hard about that and I'm going to

21   think hard about the next steps.

22        Does that sound like a reasonable plan for people?

23        MR. PENDLETON:  Yes, your Honor.

24        MR. MEYERHOFF:  Yes, your Honor.

25        THE COURT:  All right.  Now, needless to say, I know I

G55ASMAHps

 1   don't have to say this to you folks.  I know that you folks as

 2   lawyers understand exactly what your obligations are under

 3   oath.  But I do urge you to be as forthcoming as possible with

 4   every word, no matter what the words are.  I'm not suggesting

 5   that there are words that are anything other than what's in the

 6   declaration.  But if there were or there were concepts or

 7   anything else, I urge you to be as forthcoming as possible.

 8           And I also know that there must be a great level of

 9   frustration if nothing happened other than what you have

10   indicated in your declaration, construed as broadly as humanly

11   possible.  If nothing else happened, then the very idea of

12   being called here today to do what I'm asking you to do would

13   be infuriating and unnecessarily unnerving.  And to the extent

14   that that is the case, I'm sorry.  The issue for me is, I don't

15   know what happened.  And so having listened and seen the

16   deposition, I am at a point where, before I can resolve this

17   motion, I've got to get some additional facts.

18           So I want to acknowledge on both sides that this is

19   entirely TBD and that such proceedings are things which,

20   frankly, I rarely have these kinds of motions.  I hate these

21   kinds of motions, because they are often difficult and are

22   suggestive of cases, at the very least, cases being down

23   another track other than the merits of the litigation, right.

24   Whether there's something that's really happened or something

25   that's just being accused of that hasn't really happened,

G55ASMAHps                    Pendleton

1   either way, we are on a sidetrack from the main litigation.

2   And so it's not where anybody wants to be.

3          So with all of that said, since we were in agreement

4   that this is going to be a relatively short proceeding for the

5   purpose that I said, what I'd like to do is, why don't we take

6   Mr. Pendleton first.  Ms. Trimarco, if you wouldn't mind just

7   stepping out.  There are a couple of witness rooms to the

8   right, and then there's also the jury room right back there,

9   either place.  And we'll come get you in just a minute.

10         (Ms. Trimarco left the courtroom)

11         THE COURT:  Fantastic.  Mr. Pendleton, we're going to

12  put you under oath so we can have that formality taken care of.

13  I nevertheless just want to assure you that I would never

14  expect that if you were not under oath you wouldn't be entirely

15  truthful.  But we will go ahead and undertake the formality.

16   BRIAN JOHN PENDLETON, JR.,

17     called as a witness, having been duly sworn, testified as

18  follows:

19         THE COURT:  All right, Mr. Pendleton.  Tell me what

20  happened on January 28.

21         THE WITNESS:  Well, I woke up very early in the

22  morning, your Honor, and I got on a plane, and I flew for about

23  three hours.  And I arrived --

24         THE COURT:  I'm going to actually ask you not to look

25  at your notes, only because I -- I tell you what.  You can look

G55ASMAHps                    Pendleton

1    at them at the end.  But I want you just to sort of give me

2    your best recollection as we stand here.  You can look at them

3    at the end to make sure that you've captured everything.

4                THE WITNESS:  OK.  I arrived at my destination at

5    approximately 9 a.m.  Between 9:30 and 10 a.m., I telephoned

6    Gina Trimarco at my office to go over outstanding items in a

7    case called Smart v. Benecard, and there were a number of them,

8    your Honor.  We had just started, as your Honor may remember

9    from the papers that are before you, we had started the process

10   of scheduling depositions and figuring out who was going to be

11   deposed on what schedule.  We had had a very long conference

12   call with Mr. Barnowski.  Apparently Mr. Meyerhoff was on the

13   call.  We did not know that at the time.  But we had a long

14   call with Mr. Barnowski.  And so on Thursday morning, January

15   28, I was going over with Gina where we stood with a number of

16   the potential witnesses, because we needed to determine

17   whether -- a lot of these people were former employees of

18   Benecard.  Mr. Reed was one of those.  And I will tell your

19   Honor, in all candor, that Mr. Reed was not somebody on my

20   radar screen really.  He was a low-level employee who worked

21   there from August of 2012 until the Tuesday before

22   Thanksgiving, which I think was November 20th of 2012, but I

23   probably shouldn't testify under oath to that.  It was the

24   Tuesday before Thanksgiving, according to Mr. Reed's deposition

25   testimony.

1          We had interviewed a number of -- in advance of the

2     litigation, we had interviewed a number of what we thought were

3     the important people at Benecard, both former and current

4     employees.  And Mr. Reed was not one of them.  So when his name

5     came up in the January 26 conference call, I had heard the name

6     before; he was actually a custodian that they wanted e-mails

7     from, "they" being the Smart side, but I really didn't know who

8     he was or what his job had been.  That's truthful, Judge.

9          So we had reached out for him on Tuesday, to find

10    out -- so we were asked by Mr. Barnowski, was he under our

11    control and would we be able to produce him for a deposition.

12    We said we didn't know and we would get back to Mr. Barnowski.

13         So we were reaching out to Mr. Reed.  We first tried

14    to reach him on that Tuesday, left a voicemail message, no

15    response.  So when I called Gina in the office between 9:30 and

16    10 on Thursday morning, I called her about Mr. Reed.  I think

17    there was somebody named Bill Wolfe, and possibly Bruce

18    Shearer.  I don't remember exactly who, all of the people that

19    we went over on that call.  And I said, all right, let's reach

20    out for them again.

21         So the two of us -- me, outside of the office, on my

22    cellphone; Gina I think was in the office but I'm not sure if I

23    called her on her cellphone or at the office, and one goes to

24    the other so you don't really know -- and we called Mr. Reed

25    together, expecting, frankly, your Honor, to get another

1    voicemail message.  And he answered the phone.

2                THE COURT:  So this is in the morning on the 28th.

3                THE WITNESS:  This is in the morning, approximately --

4    again, I don't -- I was hoping that there was -- I couldn't get

5    any records of the length of the phone call.  But I know the

6    phone call was approximately five minutes.

7                We had a very nice, pleasant discussion with Mr. Reed.

8    We introduced ourselves.  We told him that we represented

9    Benecard in a litigation that had been filed against it in the

10   federal court in New York City.  And we explained to him what

11   the case was about.

12               And my recollection, Judge, is that he didn't indicate

13   one way or the other that he knew about the litigation.

14               We explained to him that the other side was interested

15   in taking his deposition.  We explained to him what that would

16   entail, meaning they can go for up to seven hours, you are

17   placed under oath to tell the truth, you are asked questions

18   and the lawyers ask you questions, explained the deposition.

19   And I do recall that we had a discussion in the phone call

20   about where the deposition would take place, because we had

21   talked to Mr. Barnowski, and maybe also Mr. Meyerhoff -- I

22   frankly don't remember that conversation because it was

23   earlier, who it all was with -- but it was our preference if we

24   could get witnesses to come to either New York City or Short

25   Hills, where both Dentons and DLA have offices -- Short Hills

G55ASMAHps                    Pendleton

being in New Jersey -- that it would be better.  And so some of
the Benecard witnesses who work in Harrisburg, Pennsylvania,
had come to the Short Hills location for their deposition.

         So we talked to him about whether he would be willing
to travel to either New Jersey or New York for the deposition,
to obviate the need for all the lawyers to go out there.  And
my recollection is that he told us that he would prefer to have
the deposition taken in Harrisburg.  And so we said fine, we'd
taken a number of depositions in Harrisburg in this case, your
Honor, including his deposition on March 23.  Susan Nafzinger's
deposition was over two days, was completed last Friday,
started on April 8.  And Mr. Jones' deposition was taken last
Wednesday, I think that would have been April 26.  But all
three depositions took place in Harrisburg.

         We also told him during the call that we would be
interested in meeting with him to prepare him for his
deposition.  And he agreed to do that.  And we told him we
would be back to him with dates.  And we didn't -- we weren't
calling him to schedule his deposition yet, because the other
side just merely wanted to know if they were going to subpoena
him or not, and he agreed to forgo the subpoena.  I told him he
was entitled to have them subpoena him, he didn't have to
voluntarily appear, but that they could easily subpoena him and
he would have to appear.  And frankly I told him that the
advantage of doing it voluntarily is, we could prepare him for

G55ASMAHps                    Pendleton

1    his deposition, number one; and, number two, he would have

2    input into the date, and if they subpoenaed him, he may or may

3    not have input into the date.  And so he agreed to appear

4    voluntarily and he agreed to meet with us.

5            And that is about as much as I recall about the phone

6    call.

7            If I didn't say it, we did talk about the background

8    of the case.  I think I mentioned that.  I explained what the

9    case was about.

10           And I hung up the phone.

11           And I logged onto my computer, and I sent him an

12   e-mail confirming the conversation, and asked him in the

13   e-mail -- and the e-mail is before your Honor in our papers.

14   And the e-mail was my attempt to recite what we just discussed,

15   OK.  And I didn't intend to leave anything out.  I intended to

16   cover it as best I recalled.  And so that e-mail was sent at

17   10:40-something that morning, Judge.  So it was sent within a

18   half hour or so of the call.  It may have been sent within five

19   minutes of the call.  I don't remember exactly when the call

20   took place.

21           THE COURT:  All right.  Was there ever a time during

22   the call when, even if you didn't say to Mr. Reed anything

23   regarding communications he might have with Smart, that he

24   mentioned anything to you?  In other words, do you recall

25   whether he said anything along the lines of -- and don't take

G55ASMAHps                    Pendleton

these as sort of the words he had to have used, the concept --

should I be talking to Smart, or do you guys not want me to

talk to Smart, or, what do I do if Smart calls?  Did he say

anything at all that you can recall where he was looking for

direction from you in that regard?

          THE WITNESS:  He did not.  And I remember this clearly

for a couple of reasons.  One, I was very surprised to learn

that he had met with them in May of 2015, because he never

mentioned that during the call.  I would have had -- that would

have -- my ears would have gone up had I heard that, and I --

it would have put a level of concern that he had already spoken

with them.

          Frankly, I, as I said, your Honor, I really didn't

know why anybody would want to take his deposition.  I didn't

know that -- what information he might have.  And, you know,

his role at Benecard, as it turns out, he was what was called a

project manager, and really, if you looked at his entire

deposition, you will have seen that he really just kind of ran

interference and tried to, when the people from Smart said we

need to get an answer to this, he would go to the person at

Benecard and say -- he didn't have any substantive involvement

at all in the issues, or very little.

          So, no, I had no knowledge that he had spoken to

Smart.  And once he had agreed, in my mind -- and this is why

I'm pretty clear about this, Judge.  Once in my mind he had

G55ASMAHps                    Pendleton

told me he would sit down and prepare for us, I communicated

that to Smart's counsel.  And as they themselves have put in

the papers, they were then not going to be in a position to be

able to talk to him.  And nor did I have any sense that they

wanted to talk to him.  So, no, the idea -- my recollection is

that that didn't come up.  And I've wracked my brain, as you

can imagine -- I think your Honor may have slightly understated

it when you said it's -- I wouldn't use the word "infuriating,

but it's unsettling at the very least to be doing what I'm

doing right now.  And I have wracked my brains to try to figure

out why he said that.  And I can speculate, you know, maybe he

asked something like that, Judge.  I don't recall it.  I have

no recollection of it.  So if he did, I might have said -- I

don't know what -- I would never have said -- I'll be clear.  I

would never have instructed him not to talk to them.

          THE COURT:  So you remembered at the time you had that

call, is it fair to say you remembered my prior order in

December of 2015 that said, cease interfering with interviews

by Smart of former employees?

          THE WITNESS:  Yes, I remembered --

          THE COURT:  All right.  It wasn't as if that word had

slipped your mind.

          THE WITNESS:  No.

          THE COURT:  And the instruction in that order was

clear to you, and --

G55ASMAHps                    Pendleton

1          THE WITNESS:  I understand the order.  I have read the

2    December 8th order.  I remembered it because I wasn't -- I

3    didn't think it was necessarily a hundred percent right, but

4    that's the order.  And we gave it our best shot.  And we did

5    submit a letter.  And your Honor adopted our form of the letter

6    to send them.

7          And to be clear about this, as it turns out, the three

8    witnesses -- I didn't know Reed was somebody they ever wanted

9    to interview, but the three witnesses that they claim that, you

10   know, the basis of this motion, they met with all of them, and

11   they talked to all of them, before their depositions.  Each --

12   Jeffrey talked to them in May 2015.  Even though they didn't

13   put it in the moving papers, on the initial moving papers, he

14   had spoken to them.  And this is the other point I wanted to

15   make to your Honor.  He had spoken to them before the

16   deposition.  Mr. Barnowski tells you that he in fact did have a

17   call.

18         Mr. Reed, in his deposition, twice, I believe, twice

19   says he never spoke to them, he only had voicemail messages, he

20   never picked up the phone.

21         And the point to be made here -- and your Honor

22   doesn't yet know all about the merits of the case.  There would

23   be no way for your Honor to know that.  There are a number of

24   points he made --

25         THE COURT:  I know almost nothing about the merits of

1    the case, other than what has been in discovery motions and

2    things.

3              THE WITNESS:  Right.  But my point is, there are a

4    number of facts that he testifies to in his deposition that are

5    inaccurate.  And it's not because Mr. Reed is intentionally

6    misleading anybody.

7              THE COURT:  And I think you laid that out in your

8    opposition papers.

9              THE WITNESS:  I just gave you two examples, about the

10   risk log and the fact that his testimony about when he left,

11   whether he had been offered a job or not, he had said that we

12   offered him a job, but records show that, after he left, a

13   month later -- and he said we offered him a job, in the

14   deposition, but he didn't take it because his wife was ill.

15   And then on cross-examination, I asked him, here's an e-mail

16   that you wrote.  It's a long single-spaced page, e-mail, a

17   proposal that he was making that he come back and be sort of

18   the head of IT at Benecard.  And he wrote it, I think, on

19   December 18, to Michael Perry, who was the president of

20   Benecard.

21             And I asked him in his deposition, did you write this

22   e-mail.  He said, of course, yes, I did.  And I said, so you

23   were seeking a job from Benecard.  And he acknowledged that he

24   was.  And I said, well, wasn't your wife still ill?  And he

25   said, yes.

G55ASMAHps                    Pendleton

1          So there were -- there's another point where he says

2     that there's a person that was a business owner that he was

3     testifying about.  That person doesn't exist.  He actually

4     conflates two different names.

5          There are a number of inaccuracies in his testimony.

6     I didn't put them all in the papers.

7          THE COURT:  Let me just ask you, Mr. Pendleton, I'm

8     looking at your declaration, is that long e-mail -- I don't see

9     it attached, at least anything that's jumping out at me as

10    that.

11         THE WITNESS:  No.  I attached the reference in the --

12    there's a footnote in our brief, Judge, with the reference to

13    the transcript cites.

14         THE COURT:  Right.

15         THE WITNESS:  The e-mail was an exhibit to the

16    deposition.  I did not attach it.  I'm happy to attach it for

17    you.

18         THE COURT:  Why don't you just go ahead and send that

19    to me.

20         THE WITNESS:  I'll do that.

21         THE COURT:  I would like to understand, of course,

22    about Mr. Reed as well, as part of this.  And I do have his

23    deposition, but some of those materials are useful, not in

24    terms of the merits of the parties' claims vis-a-vis one

25    another, but vis-a-vis aspects of him that might come through

1    in an e-mail.

2              But I do want to get to Ms. Trimarco.  And then we can

3    take up other things that you would like to raise.  But go

4    ahead.  Is there something else, Mr. Pendleton?

5              THE WITNESS:  There was one other sort of significant

6    inaccuracy.  In his deposition when he was being questioned by

7    Mr. Meyerhoff, there are documents which your Honor will learn

8    about in this case called CAPs, corrective action plans.  And

9    the CAPs were issued by the plaintiff Smart to Benecard.  Smart

10   would discover that Benecard was doing something wrong or

11   thought it was doing something wrong, and it would issue a CAP,

12   and then Benecard had to respond to the CAP.  And there's a lot

13   of dispute about whether we responded timely, accurately,

14   whatever.  But these are very important documents in the case.

15   And Mr. Reed in his testimony was testifying that Benecard was

16   issuing the CAPs to Smart.  He was completely confused.

17             And my point again is not to disparage Mr. Reed.  He

18   was a low-level employee for three months there, three and a

19   half years ago.  And his recollection of everything and the

20   people there and what happened was clearly not perfect -- as

21   many witnesses' recollections are not perfect.  And his

22   recollection of our conversation -- now, whether or not he and

23   Ms. Nafzinger and Mr. Jones, whether or not -- they say they

24   had not spoken in the few months before their depositions, they

25   had had lunch together a few times, but earlier.  So I don't

G55ASMAHps                    Pendleton

know whether he was somehow aware of the whole issue with

Nafzinger and Jones and in his mind thought maybe he shouldn't

be talking to Smart.

            I think what all three witnesses, when you look at

their deposition transcripts -- and, your Honor, I would

like -- there is some further testimony from Ms. Nafzinger, if

it's OK to put it in the record; it came after the submissions

to the Court -- that she, when she got my November 15th letter,

had no impact on her at all.  She had decided on her own that

she wasn't going to talk to either side.  And Mr. Jones, in

advance of his deposition, had dinner with Mr. Meyerhoff for

two hours, plus, the night before the deposition.  These people

freely spoke.  Ms. Nafzinger gave documents to Mr. Meyerhoff's

office.  They came to her house.  These people all spoke

with -- and we know that Mr. Reed spoke with Mr. Barnowski.  So

to say that there was interference is -- these people didn't

want to speak because they didn't want to get involved.

            And I would just end by saying, my take on Mr. Reed

after his six hours of deposition testimony -- I don't know if

that was the running time, but the deposition started at around

10 and ended at 4-something -- he is the classic witness who

tells Mr. Meyerhoff what he thinks Mr. Meyerhoff wants to hear,

and when I questioned him, he told me what he thought I wanted

to hear.  He wants to please everybody.  And frankly that's

consistent with what other employees at Benecard who worked

G55ASMAHps

1   with him said about him as well.

2           And so I think that putting all stock in his

3   recollection of that -- and he did not -- he did say, in his

4   deposition, when questioned by Mr. Meyerhoff, that there was no

5   threat of anything by anyone, if he spoke with Smart.  He was

6   clear about that.  And I didn't get that answer; they did.

7           And I think he also uses the words -- I just want to

8   get it right so that I don't -- "We don't want you talking to

9   anyone else."  That's one of the quotes from his dep -- that,

10  that his recollection of the conversation.  Now, I wracked my

11  brain about that:  Did we have a conversation about

12  attorney-client privilege?  Did we talk about, you know,

13  anything that we discussed, did you discuss it with anybody

14  else?  Because that is a conversation I typically, I do have

15  with people.  I don't recall having that.  I don't think this

16  conversation got that deep, because we really didn't have a

17  merits discussion.  We didn't talk anything about the merits of

18  the case.  And I think I would have had that conversation with

19  him at the follow-up prep meeting.  That's typically what I do

20  when I meet with clients to prepare them for depositions.

21           (Witness excused)

22           THE COURT:  All right.  Let's get Ms. Trimarco out

23  here --

24           MR. MEYERHOFF:  If I may, your Honor, just a quick

25  question?

1          THE COURT:  A question, yes.

2          MR. MEYERHOFF:  Much of what Mr. Pendleton said had

3     nothing to do with what happened from his recollection of the

4     call.

5          THE COURT:  It does help me put things in context.

6          MR. MEYERHOFF:  I understand.

7          THE COURT:  It does indicate to me that I need to

8     watch the entirety of Mr. Reed's deposition before I would ever

9     sort of rely upon sort of snippets of it, just because it

10    sounds like that -- I didn't watch enough of it to understand

11    whether or not he's a yes man.

12         MR. MEYERHOFF:  I understand, your Honor.  I just,

13    most of what Mr. Pendleton just said was argument, and I just

14    want to know whether I will have the opportunity to respond.

15         THE COURT:  Yes.  At the end of the session, what

16    we'll do is, I will give you -- I will.  And I actually was

17    thinking the same thing in terms of what's occurred.  But I

18    think it was, from my perspective, useful.  And so I didn't

19    want to cut him off unnecessarily, because it puts things in

20    context.

21         Joe, let's go ahead and bring out Ms. Trimarco.  And

22    she can come on over back to her chair.

23         All right, Ms. Trimarco, you can come on over back to

24    your chair.

25         THE COURT:  And I'm going to have you remain standing.

G55ASMAHps                         Trimarco

1   I'm going to have Joe -- what we're going to do is, Joe is

2   going to just undertake the formality of putting under oath.

3   I, again, don't have any reason to believe that if you were not

4   under oath, that you would give me anything other than truthful

5   testimony.  It's just to ensure that our record is as it you

6   had sh be.

7         All right, Joe, go ahead.

8    GINA TRIMARCO,

9      called as a witness, having been duly sworn, testified as

10   follows:

11        THE COURT:  All right, Ms. Trimarco.  I'm going to

12   have you keep your voice -- make sure your voice is up so we

13   can get a good clear record.

14        Tell me what happened during that -- everything you

15   can recall about what happened during that phone call on

16   January 28.

17        THE WITNESS:  So, on January 28 -- I think we had

18   actually tried to reach Mr. Reed on the 26th but were

19   unsuccessful.  And we tried again on the morning of the 28th.

20   I can't remember if I called John or he called me.  He was not

21   in the office.  We got together on the phone.  This was a

22   common practice we had, when I was in the office and he was

23   out, even if he was in.  So I used the office phone,

24   conferenced us all together and tried Mr. Reed again.  I think

25   he happened to just pick up that day.  Typical of these former

G55ASMAHps                    Trimarco

1    employees that we were trying to reach.

2           And it was a really short conversation.  I think it

3    started out -- now, this is the gist, not the exact words --

4    something along the lines of John talking, hi, you know, I'm

5    Mr. Pendleton, I represent your former employer, Benecard,

6    there's a lawsuit, do you recall Smart Insurance Company and

7    the work that Benecard did for them, they're suing us, and I

8    think maybe he told him a little bit about like breach of

9    contract, and just they're looking for a deposition, to take

10   your deposition -- I don't know if he put a date or -- but,

11   we're trying to reach out to you to determine if you would be

12   cooperative in appearing for the deposition, if you would be

13   willing to speak with us ahead of time, you know, go over

14   the -- not the case, but just, you know, your role, your

15   position, your work there, your memory, and, you know,

16   cooperate.

17          And I don't remember anything coming up either way

18   about -- we would not have instructed him not to speak to

19   Smart, absolutely, never.  And not even in connection

20   necessarily with the order.  It's not something -- when we're

21   first reaching out to a former employee and we don't even know

22   if they're going to be cooperative, it's just not something --

23   it's not proper.  If anything -- this is not with Mr. Reed --

24   but other people where we're not sure if they're going to

25   cooperate or kind of feeling out, you know, what this is all

1    about, you know, we would tell them, we're not your attorneys,

2    you're a former employee, if you decided to cooperate, that

3    could change, but right now, you know, you can speak to them,

4    you don't have to -- "them" meaning Smart -- you don't have to

5    speak to either Smart or to us.  You can.  It's your choice.

6    If you decide to come and cooperate and now we're representing

7    you for the deposition, that could be different, but, you know,

8    we get to that down the road.  And we would also try to set up,

9    you know, a further phone interview or, depending on where the

10   person lived, an in-person interview to really try to get to

11   know them and feel them out.

12          And I don't remember this conversation getting into

13   any of that either way.  I remember that Mr. Reed was

14   cooperative, you know, oh, sure, yes, I remember, I remember

15   Smart, I remember Benecard, yes, yes, yes, you know, and maybe

16   even, you know, I remember, you know, I worked there -- but

17   not, like I'm not trying to say he's, you know, he remembered

18   details or anything.  Most people are like, well, I don't

19   remember anything about my work.  They're naturally a little

20   hesitant to -- they don't want to be involved.

21          And I think it just kind of went like that.  And we

22   made plans to make sure we had his contact information, an

23   updated e-mail address, which is part of the reason for me

24   being on the call.  And he would have known that I was on the

25   call.  At the very beginning when John was introducing himself,

G55ASMAHps                      Trimarco

1   he would have said, and I have so-and-so also on the call.

2   Because it's almost a little awkward when you're trying to call

3   people from the two different places.  And it's -- I'll end up

4   having to say something or -- because I'm the one taking down

5   the e-mail address, the information, making sure we follow up,

6   follow through, set up a meeting or whatever.  And I just

7   remember it being a very quick, over with, you know, this is

8   who we are, this is why we're calling you.  And I remember him

9   being like pretty nice and, sure, I'll meet with you.  But, you

10  know, on the other hand, a lot of people have said that and

11  then we can never reach them again.

12          So -- and that's really all I remember about it, you

13  know.  He just, he was like, sure, I'll meet with you.  And

14  then I was the one who tried to follow up with him, and was

15  never able to reach him again.

16          THE COURT:  All right.  So let me just ask a general

17  question.  Do you recall whether he ever said anything

18  generally speaking along the lines of, hey, what if Smart

19  calls, should I be talking to them, or, should I not be talking

20  to Smart, or, what should I do if Smart calls?  Did he ask any

21  questions that --

22          THE WITNESS:  No.

23          THE COURT:  -- sort of threw in your direction, what

24  do I do in that kind of situation?

25          THE WITNESS:  No, I don't recall.  And in fact, I want

1    to say I don't even think we knew he had talked to Smart at

2    that point, like it didn't get into that either way.  And I

3    don't think that we -- I don't think he even gave us a hint

4    that Smart had been reaching for him.  And I'm trying to

5    like -- I hope I'm not misremembering on this.  But I really

6    don't think we ever -- he was not one of the people who we

7    considered like kind of in the middle of the, the actions on

8    this case.  He was kind of -- he was on the custodian list as

9    e-mail custodian, which is how he first came to our attention.

10   He was never somebody -- I was kind of the person who was in

11   charge of the e-discovery, who would sort of escalate, well,

12   these are the sort of people who should know about the case.

13   He wasn't one of them, but he was custodian.  So we had been

14   trying to reach him even prior to this, just because, well,

15   Smart is interesting in him, they're probably going to want to

16   depose him, we should reach out to this person.  Had no luck.

17   We got into a phone conversation that I put in the declaration

18   along with my contemporaneous notes.  I used to carrying my

19   laptop around the office.

20        But -- so we knew that, you know, he was someone of

21   interest coming up.  And -- but I don't think we ever knew that

22   Smart had been reaching out to him.  I don't remember him

23   saying anything about that either way.  Or we might have ended

24   up into more of that conversation.  But, I mean, I can tell

25   you, we had -- the question you asked me about, did Smart --

G55ASMAHps                    Trimarco

1   what do I do if Smart tries to reach me, we've had other

2   witnesses ask that question, and we tell them, you're allowed

3   to talk to them.  You know, it depends; if somebody who is

4   actually to come in, who we're going to prep for a deposition,

5   that might get into a little, OK, so what we talked about when

6   we're preparing for the deposition is attorney-client privilege

7   and you should not repeat that.  I don't think it ever got to

8   that point with him.  With other people, I mean, our standard

9   thing was, of course you could -- you can talk to them.  You

10  just don't have to talk to them.  Just like you do not have to

11  talk to us.  Yes, we're representing your former employers, but

12  you don't have to talk to us.  It's your choice.  Both sides,

13  either way.  And that was our practice, always.

14          THE COURT:  And before this morning, and sort of --

15  but after I issued my most recent orders setting today's

16  hearing, did you and Mr. Pendleton talk about that

17  conversation, in preparation for today?

18          THE WITNESS:  We did.

19          THE COURT:  Directly?

20          THE WITNESS:  Directly.  We tried to, hey, what do you

21  remember, what do you remember, did you -- you know, how could

22  he have said this, did we get into attorney-client privilege or

23  not.  I didn't think we did.  I didn't remember it.

24          THE COURT:  All right.  Thank you, Ms. Trimarco.  Is

25  there anything else that you want to add?

G55ASMAHps

```
1          THE WITNESS:  No.

2          THE COURT:  All right.  Thank you very much.

3          THE WITNESS:  Thank you.

4          (Witness excused)

5          THE COURT:  All right.  I will thank you both of you

6     for undergoing this and giving the Court that information.

7          I did say that I would allow Mr. Barnowski to

8     respond --

9          MR. MEYERHOFF:  It's Mr. Meyerhoff.

10         THE COURT:  I'm sorry.  Mr. Meyerhoff.  I'm sorry.

11         MR. MEYERHOFF:  It's OK.  We're often confused.

12         THE COURT:  -- Mr. Meyerhoff an opportunity to respond

13    with some comments that Mr. Pendleton had made, not the content

14    of -- don't argue about whether or not they're right or wrong

15    in their recollections.  But if there were other things that

16    they added in that were regarding, particularly Mr. Pendleton,

17    about the overall case and other inaccuracies of Mr. Reed that

18    you want to respond to, that's fine.  But I'll determine the

19    facts as to the rest of it.

20         MR. MEYERHOFF:  I'm not going to argue what they swore

21    to under oath with respect to what they said to Mr. Reed.  But

22    a lot of what I remembered, your Honor, is argument of the

23    points that we were making in our briefing and I just want --

24         THE COURT:  From Mr. Pendleton, yes.  And so go ahead

25    and talk about those.
```

1          MR. MEYERHOFF:  I just wanted an opportunity to

2     respond.  But also from Ms. Trimarco, who just said that we

3     would never instruct a witness not to talk to Smart, that's not

4     what we do.  I need to remind the Court that the reason this

5     all happened is because they did exactly that.

6          THE COURT:  OK.  So that's arguing sort of the merits

7     again.  So let's just leave that.  I think whatever

8     Ms. Trimarco said seemed to be directly within the contours of

9     what I had in the order, and I don't want to be arguing that

10    right now.

11         MR. MEYERHOFF:  All right.  I'm not quite sure where

12    the line is drawn, so --

13         THE COURT:  You can talk about anything other than the

14    January 28th phone call.  That's the line.

15         MR. MEYERHOFF:  There's a suggestion in the deposition

16    from Mr. Pendleton that Mr. Reed spoke to Mr. Jones or

17    Mr. Nafzinger and that might be where he got the idea in his

18    head that he wasn't supposed to talk to Smart.  I am very

19    concerned about that assertion by Mr. Pendleton.  I was at all

20    of those depositions.  That did not happen.  Mr. Pendleton has

21    essentially implied that this could have been the reason why

22    Mr. Reed was mistaken, that he got information from one of

23    those other two witnesses.  I asked him to demonstrate that

24    with the testimony.  I do not believe there is any testimony to

25    support that as a possibility for why Mr. Reed was mistaken.

G55ASMAHps

1          THE COURT:  All right.  I'm just, I'm pausing because

2     I don't believe I recall it quite like that.  But I will look

3     back at the transcript from today.

4          MR. MEYERHOFF:  OK.  Mr. Pendleton also suggested that

5     there may have been an attorney-client privileged discussion

6     and --

7          THE COURT:  No, he was saying that there was not.

8          MR. MEYERHOFF:  But that he sometimes does that, and

9     that he created the implication that, even though he doesn't

10    remember it, that might be why Mr. Reed has said what he said.

11         THE COURT:  I think, that's the kind of thing, let's

12    leave that out.  That's all about the January 28th

13    conversation.

14         What I really want you to address is, Mr. Pendleton

15    did make remarks regarding Mr. Reed, generally speaking, saying

16    contradictory things.  I think the most interesting to the

17    Court is whether or not he was just wrong about, for instance,

18    the CAPs issue.  I mean, was he getting things just wrong, not

19    intentionally, as a bad guy.  He may be the kind of guy who

20    gets mixed up sometimes.  And so that kind of thing, if some of

21    those facts which Mr. Pendleton indicated to the Court were in

22    play, if those were wrong, then I would be very interested in

23    that.  But in any event I'm going to go back through the

24    deposition, the whole thing.

25         MR. MEYERHOFF:  I think my response to that, your

G55ASMAHps

Honor, is that there's a qualitative difference between what

Mr. Reed, completely unprepared for the deposition on either

side because he did not see a single document because we had no

time -- we had no opportunity to work with him and

Mr. Pendleton had no opportunity to work with him.  What he

remembers about what happened three years ago and whether he

might have been confused about a particular fact --

        THE COURT:  So he was confused, but you're saying his

recollection -- I'm just trying to figure out whether or not he

was in fact confused about some events three years ago.  It

sounds like he was.  But it sounds like -- I understand your

point, which is, your recollection of six weeks prior might be

better than it would be three years prior.  I understand that

argument.  I just want to find out, really, for me as a

fact-finding proceeding.

        MR. MEYERHOFF:  I understand.  I wouldn't characterize

him as being confused.  I think the testimony will speak for

itself.  And Mr. Pendleton is an aggressive cross-examiner.  If

he had the opportunity to exploit some confusion, it's there,

and the Court can see it.  I think Mr. Reed demonstrated a

clear recollection of facts that we believe are supportive of

Smart's case, specifically, that he was told by his superiors

not to tell the whole truth to Smart.

        THE COURT:  I saw that in your papers and those

arguments in terms of why you might find him to be a useful

G55ASMAHps

witness for you.  That's all on the merits and I understand

that that will come up later in the case.

        MR. MEYERHOFF:  I do think, your Honor, there's a

difference between not remembering whether he had a short

telephone call saying he would attend a deposition and.

Exchanging voicemail to that effect and actually remembering a

fact.  The suggestion that he had a faulty memory, which

Mr. Pendleton argues at length about, that doesn't really

strike me as the same thing that he came up with these facts

and volunteered them.  I think that's a qualitative difference.

That's why we made the motion.  We had many arguments as to why

we think what Mr. Pendleton has said in his papers are

unreliable.  And I think that would apply to most of what was

said today.  And with that I'll sit down, your Honor.

        THE COURT:  All right.  I want to thank you folks for

coming in today and allowing the Court to gather the facts that

are necessary to full resolution of this motion.  And what I'm

going to do is, I want to go back and sit down with the

videotape running in the background, and I want to watch more

of Mr. Reed and try to get a better sense of him.  And then I

now have a better sense from you folks of the conversations as

well.  So it's been very helpful for me.  But I don't think

there's any reason to do anything else today.  And I think

that, unless you folks have something further, I think we're

adjourned.

G55ASMAHps

1                Anything further from you folks?  Mr. Pendleton.

2                MR. PENDLETON:  No, thank you, your Honor.

3                THE COURT:  Mr. Meyerhoff.

4                MR. MEYERHOFF:  No, your Honor.

5                THE COURT:  Thank you.  We are adjourned.

6                                o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25