# Exhibit 2

```
                                                         Page 1
 1
 2    UNITED STATES DISTRICT COURT
 3    SOUTHERN DISTRICT OF NEW YORK
 4    Case No. 1:15-cv-04384(KBF)
      ------------------------------------x
 5
      SMART INSURANCE COMPANY,
 6
                    Plaintiff,
 7
      -against-
 8
      BENECARD SERVICES, INC.,
 9
                    Defendant.
10
      ------------------------------------x
11
                    1251 Avenue of the Americas
12                  New York, New York
13                  July 8, 2016
                    9:30 a.m.
14
15
16            VIDEOTAPED DEPOSITION of JASON L.
17    RUCHABER, CFA, ASA, taken by the Plaintiff,
18    held at the aforementioned time and place,
19    before Sherri Flagg, a Registered Professional
20    Reporter, Certified LiveNote Reporter, and
21    Notary Public.
22
23
24
25
```

Page 154

- J. RUCHABER -

1  could use post-valuation date information in a
2  valuation?
3  
4     A.   I was not aware of this letter.
5     Q.   You do agree that that's what the
6  letter is, though; it's a critique of what
7  the --
8     A.   It's a clarification.
9     Q.   If I could finish, please. Well,
10 I'll use your word. It's a clarification --
11 well, withdrawn.
12          In the second paragraph of the
13 letter, the ASA says -- three lines down
14 starting close to the right, there's a sentence
15 that says "Simply stated." Do you see that,
16 second paragraph, three lines down?
17    A.   Yeah.
18    Q.   I'm going to read it. It says
19 (as read):
20          Simply stated, in business
21       valuation, events subsequent to the
22       effective date of the appraisal are not
23       to be considered unless they are known or
24       knowable.
25          That's what they wrote?

Page 155

- J. RUCHABER -

1  
2     A.   Yep.
3     Q.   And that's pretty much what you
4  said.
5     A.   That's exactly what I said.
6     Q.   So you agree with that?
7     A.   I do, and I also have the caveat
8  that's in the next paragraph. So I agree with
9  everything that's in this and it's consistent
10 with what I said.
11    Q.   Okay. In the next paragraph, it
12 says (as read):
13          Use of subsequent events to
14       confirm trends with one narrow exception
15       is not a recognized practice in business
16       valuation.
17          That's what that sentence says?
18    A.   Yes.
19    Q.   Do you agree with that?
20    A.   Correct.
21    Q.   And your testimony is that's not
22 inconsistent with what you testified to earlier
23 about when it was appropriate to use?
24    A.   Because I use that narrow
25 exception. I think I articulated it fairly

Page 156

- J. RUCHABER -

1  
2  well.
3     Q.   What is your understanding of what
4  the exception is?
5     A.   The exception is, to the extent
6  that those trends were reasonably foreseeable
7  or otherwise known -- should have been known or
8  knowable as of the valuation date, it is okay
9  to consider them in your appraisal.
10    Q.   Well, you put a lot of concepts
11 out there. You said "reasonably foreseeable."
12    A.   Um-hmm.
13    Q.   That's actually the language
14 that's used in this letter, right?
15    A.   Um-hmm.
16    Q.   Then you said that if it's known
17 or should have been known. Is it your
18 understanding that if there's information that
19 should have been known on the valuation date,
20 that that would fall within the exception?
21    A.   Yes.
22    Q.   Where does that come from?
23    A.   Well, I think that's what it says
24 here. But, for example, if you have 2006
25 through 2013 a market that is declining and in

Page 157

- J. RUCHABER -

1  
2  2014, and you have information that says we
3  anticipate 2014 will decline and then, in fact,
4  2014 does decline, it would be reasonable for a
5  2013 valuation date to say: It should have
6  been reasonably foreseeable that the market
7  would continue to decline.
8          And that's consistent with what
9  this says and I think that is consistent with
10 what I stated earlier.
11    Q.   So you have no dispute with what
12 the ASA is saying in here?
13    A.   Well, there's a lot of stuff in
14 here.
15    Q.   I understand that.
16    A.   But the general concept that we've
17 discussed, that you should not use post-
18 valuation date information to do your
19 valuation, with that narrow exception, that's
20 correct.
21    Q.   I'm going to read one of the
22 answers that you gave me. You said -- I read
23 you the first sentence and I said (as read):
24          And that's pretty much what you
25       said.

40 (Pages 154 - 157)

Page 158

1  - J. RUCHABER -
2       ANSWER: That's exactly what I
3  said.
4       QUESTION: So you agree with that?
5       ANSWER: I do, and I also have the
6  caveat in the next paragraph so I agree
7  with everything that's in this and it's
8  consistent with what I said.
9    A.   In the next paragraph.
10   Q.   So "in this" you meant the next
11 paragraph?
12       MR. PENDLETON: No. Objection to
13 form.
14   Q.   Are you comfortable with your
15 answer to the question that I just read?
16   A.   I believe that I am comfortable
17 with the answer that I just -- that you just
18 read.
19   Q.   Did you rely on subsequent events
20 in criticizing Mr. Leary's opinion, events
21 subsequent to the valuation date?
22   A.   Did I rely -- could you point me
23 to one?
24   Q.   Well, you cited sources that were
25 written after 2013 about trends in the industry

Page 159

1  - J. RUCHABER -
2  and used them to criticize Mr. Leary's
3  opinions, correct?
4    A.   Correct.
5    Q.   Is it your testimony that those
6  critiques are consistent with what the ASA says
7  in this letter that it wrote to the Appraisal
8  Standards Board?
9    A.   Yes.
10   Q.   Okay. How do you explain that?
11   A.   Because those documents, whereas
12 they were written subsequent to the appraisal
13 date, they reference information that was known
14 or knowable for periods prior to the valuation
15 date. In fact, they reference 2010, 2007,
16 multiple years.
17       And, in fact, they're a -- in some
18 cases -- and we can talk about specific
19 documents. But they're a continuation of a
20 discussion around industry trends that a
21 participant would have had absolute knowledge
22 of as of August 31, 2013.
23       (Exhibit 4: Letter 3/28/14
24       (#SMT00887851-854), was marked for
25       identification.)

Page 160

1  - J. RUCHABER -
2  BY MR. MEYERHOFF (continuing):
3    Q.   Can I just take a look at that and
4  make sure it's the same thing I have?
5        Do you have Ruchaber Exhibit 4 in
6  front of you?
7    A.   I do.
8    Q.   And you're familiar with this
9  document?
10   A.   I am.
11   Q.   What is it?
12   A.   It is a letter to Smart Insurance
13 Company from Express Scripts discussing the
14 purchase price adjustment.
15   Q.   And the letter's dated March 28th,
16 2014?
17   A.   Correct.
18   Q.   This is the true-up that was done
19 on the Express Scripts deal to adjust the
20 purchase price based on the actual number of
21 members of the Smart plan at year-end, correct?
22   A.   Correct.
23   Q.   And in your report you criticize
24 the projections that Mr. Leary relied upon that
25 he received from management about enrollment

Page 161

1  - J. RUCHABER -
2  numbers, right?
3    A.   Correct.
4    Q.   And don't you use this information
5  to support your opinion that Mr. Leary
6  shouldn't have relied on those projections?
7    A.   Yes.
8    Q.   How is this not post-transaction
9  information that wasn't known or knowable on
10 the date of the transaction?
11   A.   So if you look at the history of
12 projection models that have been put together
13 by management, which Mr. Leary did none, and
14 you look at the consistent fact pattern that
15 they were overestimating what was going to
16 happen with the business, they revised their
17 projections downward on a number of occasions
18 and, in fact, the projection they put together
19 prior to the valuation date which is evidenced
20 here was ultimately proven to be wrong as well.
21       It's a continuation of a fact
22 pattern that shows management was being overly
23 optimistic with their projections, something
24 that should have been known or knowable and
25 investigated by an appraiser.

Page 162

- J. RUCHABER -

2 And, in fact, this is an example
3 of something that the projection that was done
4 on or around the date of the transaction
5 ultimately proved to be overly optimistic as
6 well. So I think it's a continuation of that
7 pattern.
8    Q.   Even though there's no way
9 somebody who was considering buying the company
10 in August 2013 would have any way of knowing
11 the actual information that's in here, you're
12 saying that's an appropriate thing to use in
13 valuing a company on that date?
14        MR. PENDLETON: Objection to form.
15   A.   So let me --
16   Q.   Just my question, please.
17        MR. PENDLETON: He's answering the
18   question. Please allow him to do so.
19   A.   Would you read the question back
20 to me, please.
21        (Requested portion read.)
22   A.   My answer is no.
23   Q.   It's not appropriate to use it in
24 valuing it on that date?
25   A.   That number.

Page 163

- J. RUCHABER -

2   Q.   What number?
3   A.   The actual number of members.
4 Nobody could have known that. But the trend,
5 which is what I'm speaking to and what I use as
6 a support for, is there's a history of overly
7 optimistic projections. And that's played out
8 during the entire time that Smart was in
9 business.
10       So it is incumbent upon the
11 appraiser to say: If I'm going to rely upon
12 something provided by management, I should do
13 the bear minimum amount of work to investigate
14 whether or not I have a reasonable basis to
15 rely on these projections. And that is a
16 situation where using both data that was
17 available leading up to the transaction and
18 this information proves that point.
19   Q.   And you're confident in that point
20 that you just said, that this would be an
21 appropriate thing to do, to use this to show
22 that the trend continued?
23   A.   Correct.
24   Q.   Okay. And are you as confident
25 about that opinion as you are about all the

Page 164

- J. RUCHABER -

2 other opinions in your case?
3   A.   I believe that my opinions that I
4 have made with regard to the critiques of Mr.
5 Leary are well footnoted and well supported and
6 I'll stand by them, yes.
7   Q.   Not my question. I'm asking you
8 if you stand by this opinion that you just gave
9 just as much as you stand by all the other
10 opinions in your case, or are you a little
11 concerned about this one?
12   A.   I'm not concerned about this one.
13        MR. PENDLETON: Objection, asked
14   and answered. You can answer it again.
15   A.   And I apologize for speaking on
16 top of you.
17   Q.   So you're just as comfortable
18 about this opinion as you are with the rest of
19 them in your report?
20        MR. PENDLETON: Objection, asked
21   and answered.
22   A.   Yes.
23        MR. MEYERHOFF: Why don't we take
24   a lunch break.
25        MR. PENDLETON: Do you see

Page 165

- J. RUCHABER -

2 something I don't. They're delivering it
3 and it's supposed to be here momentarily,
4 they told me by 1:00.
5        MR. MEYERHOFF: Then let's keep
6   going.
7        MR. PENDLETON: I mean, if you
8   want me to check on it.
9        MR. MEYERHOFF: No, we'll keep
10  going. I'll use the time.
11       MR. PENDLETON: Let me just check
12  if it's in the other room. Go ahead,
13  Gary.
14 BY MR. MEYERHOFF (continuing):
15   Q.   Your report, did you write every
16 word of it yourself?
17   A.   No, I did not.
18   Q.   Who helped you write your report?
19   A.   The same people that I mentioned
20 previously who were involved in the engagement.
21   Q.   People from BRG?
22   A.   Yes.
23   Q.   Did anybody from DLA Piper help
24 you write your report?
25   A.   No.

42 (Pages 162 - 165)

Page 222

```
1            - J. RUCHABER -
2   you're saying.
3           MR. PENDLETON: Objection.
4       There's no question.
5       Q.   Explain -- there is no question.
6           You do say that the DCF model
7   would have a negative value based on this
8   alone?
9       A.   If you made that single adjustment
10  and with no other change in the model, that
11  assumption alone would change the value under
12  the DCF.
13      Q.   And do you stand by that opinion?
14      A.   That mathematically changing an
15  assumption to be lower would result in this
16  math, yes, I stand by that opinion.
17      Q.   Well, now you're qualifying it.
18      A.   That's what it says.
19      Q.   Do you stand by the opinion that's
20  in bold at the bottom of point 3 in your
21  report?
22      A.   Sure. The statement that's in
23  bold, just to be clear, does say that
24  (as read):
25             With no other changes in the
```

Page 223

```
1            - J. RUCHABER -
2       model, that assumption alone results in
3       losses being incurred and thereby
4       eliminates any value under the DCF model.
5       Q.   Do you stand by that?
6       A.   That statement? Yes, absolutely.
7       Q.   Now, you include a chart on page
8   11, right?
9       A.   I do.
10      Q.   And this shows Mr. Leary's model,
11  two companies in the industry, and the total
12  industry trends. Correct?
13      A.   Correct.
14      Q.   And you include data after the
15  sale date?
16      A.   Correct.
17      Q.   This is post-transaction data that
18  you obtained from information that wasn't
19  available on the transaction date. Correct?
20      A.   Correct. Well, some of it, yes.
21  Certainly other parts of it were available.
22      Q.   All right. The stuff up to 2013
23  was available, right?
24      A.   Correct.
25      Q.   Well, even some of that stuff
```

Page 224

```
1            - J. RUCHABER -
2   might not have been available if it's a
3   full-year information that was published in a
4   report that wasn't published until the end of
5   2013, correct?
6       A.   Fair enough.
7       Q.   And indeed some of the sources
8   that you footnote for this information have
9   dates in your footnotes that are in 2014 and
10  2015. Correct?
11      A.   Correct.
12      Q.   And it's your -- is it your
13  testimony that that doesn't run afoul of the
14  ASA's position on using post-valuation data in
15  a valuation?
16      A.   I think this is illustrative of
17  what everyone expected to happen. There's
18  ample evidence to suggest that the market
19  believed that rates would be going down, and
20  this is illustrative of that assumption
21  actually coming to fruition.
22      Q.   So it was reasonably -- let me
23  make sure I get the standard correct. It was
24  reasonably foreseeable on -- in August 2013
25  what SilverScript's revenue would be in 2015?
```

Page 225

```
1            - J. RUCHABER -
2       A.   Not the specific numbers but
3   directionally.
4       Q.   But you have specific numbers?
5       A.   Correct.
6       Q.   And you put points in them and you
7   show a graph that runs past 2013 and into 2015,
8   correct?
9       A.   Correct.
10      Q.   Are you saying that that data, the
11  data on what those companies -- well, in these
12  opinions -- withdrawn.
13             In these opinions that you're
14  giving in point 3, you're relying on that data
15  to show a trend, data past 2013, correct?
16      A.   Correct.
17      Q.   Now, somebody sitting in a room on
18  the date of the valuation would have no way to
19  know what those numbers are, right?
20      A.   Not specifically, no.
21      Q.   But you say that's within the
22  exception to the restriction of using
23  post-transaction data under ASA's position on
24  that subject?
25      A.   Let's be clear. I'm not using
```

Veritext Legal Solutions
212-279-9424                www.veritext.com                212-490-3430

Page 226

- J. RUCHABER -

1  
2  this data to render an opinion of value for a  
3  company, but I am, in fact, showing what  
4  actually happened in the industry which was  
5  reasonably anticipated and did, in fact, come  
6  to fruition.  
7     Q.   So you're okay to use that data  
8  because you're not valuing the company; is that  
9  what you're saying?  
10       MR. PENDLETON: Objection to form.  
11    A.   It's a graph that is for  
12 illustrative purposes and I think it's  
13 perfectly acceptable to use in this instance,  
14 yes.  
15    Q.   And the reason it's perfectly  
16 acceptable is because you're not doing a  
17 valuation; is that right, and therefore you're  
18 not governed by the ASA rules?  
19       MR. PENDLETON: Objection to form.  
20    A.   This graph is not used in any  
21 capacity to value the company, but it is, in  
22 fact, a chart that shows data that did come to  
23 pass that is consistent with expectations on or  
24 about that time. So, yes, I think it's  
25 appropriate to show it.

Page 227

- J. RUCHABER -

1  
2     Q.   I didn't ask you whether it was  
3  appropriate to show it.  
4     A.   Okay.  
5     Q.   I asked you if you believe that  
6  you are not -- that you can act unfettered from  
7  the ASA rules with respect to this graph  
8  because you're not doing an appraisal, you're  
9  just critiquing an appraisal. What's your  
10 answer to that question?  
11    A.   Well, my answer to that question  
12 is: I didn't speak that I was unfettered to  
13 the ASA rules, which is a generic statement and  
14 overly broad. I'm speaking to a specific rule  
15 that you're alluding to and I'm saying that,  
16 no, you're wrong.  
17    Q.   Let me be more specific, then.  
18 I'm not talking about all the ASA rules. I'm  
19 talking about the ASA rule that we are focused  
20 on right here which is the use of post-  
21 transaction data.  
22    A.   Um-hmm.  
23    Q.   My question is: Is it your view  
24 that you are entitled to use that data because  
25 instead of providing an appraisal, you're

Page 228

- J. RUCHABER -

1  
2  critiquing an appraisal?  
3        MR. PENDLETON: Objection, asked  
4  and answered.  
5     A.   That is not the reason that I'm  
6  stating that it's okay to use this data.  
7     Q.   Are you stating that it's okay to  
8  use this data because it's within the exception  
9  to the ASA rule that we looked at earlier?  
10    A.   Yes.  
11    Q.   So it was -- the data that you're  
12 using here was reasonably foreseeable, that's  
13 the exception that you're using?  
14    A.   Not the specific numbers. But  
15 it's part of a series of discussion around what  
16 was going on in the industry, and this shows  
17 what, in fact, did come to pass which was  
18 reasonably foreseeable as of the date of  
19 valuation.  
20    Q.   How did you pick the two companies  
21 that you chose to put in this chart,  
22 SilverScript and Envision?  
23    A.   Those were the two with the  
24 highest percentage of LIS members and generally  
25 considered the market leaders in that space.

Page 229

- J. RUCHABER -

1  
2     Q.   And SilverScript is the one whose  
3  revenues were declining significantly, right,  
4  as compared to Envision?  
5     A.   Correct.  
6     Q.   Was SilverScript under sanctions  
7  from CMS during that period?  
8     A.   I'm not sure if it was or was not.  
9     Q.   Wasn't that the reason why its  
10 revenues were decreasing, because it was  
11 sanctioned just like Smart was?  
12    A.   I don't know if that's the case or  
13 not.  
14    Q.   So you didn't investigate to see  
15 whether there were any other reasons why  
16 SilverScript's revenues might have been  
17 depressed?  
18    A.   Only to the extent that it's  
19 referenced here in my report.  
20    Q.   If it turned out that that was a  
21 reason why SilverScript's revenues went down,  
22 would you still be comfortable with using it as  
23 an example in this chart?  
24    A.   To the extent that it would  
25 suggest that in order to maintain LIS

58 (Pages 226 - 229)

```
                                              Page 230
 1            - J. RUCHABER -
 2  enrollment, you don't have to decrease revenue
 3  and that's what the entire industry was doing
 4  and there's some reason to believe I could
 5  adjust that, then perhaps I would want to
 6  remove that.
 7      Q.   SilverScript is a big market
 8  player, right?
 9      A.   Um-hmm.
10      Q.   Yes?
11      A.   My apologies, I was drinking.
12  Yes.
13      Q.   So is it possible -- let's just
14  assume for a moment that it was under
15  sanctions. And I think when you check, you'll
16  find out that it was.
17           MR. PENDLETON: Objection to form.
18      Q.   I'll rephrase my question.
19           Is it fair to say that that would
20  have -- the fact that SilverScript, one of the
21  largest market players, was under sanctions and
22  losing revenue, that that would have an impact
23  on the overall industry's revenue?
24           MR. PENDLETON: Are you
25      representing that that was, in fact, the
```

```
                                              Page 231
 1            - J. RUCHABER -
 2      case?
 3           MR. MEYERHOFF: That SilverScript
 4      was under sanctions?
 5           MR. PENDLETON: At that time.
 6           MR. MEYERHOFF: Yes.
 7  BY MR. MEYERHOFF (continuing):
 8      Q.   But that's not my question. My
 9  question isn't based on a representation. I'm
10  saying I'd like you to assume for a moment that
11  SilverScript was under -- withdrawn.
12           I have a different question. Do
13  you know what market share SilverScript had?
14      A.   Off the top of my head, no. But
15  we did look that up, yes.
16      Q.   Fair to say that SilverScript's
17  revenues going down, as you present them in
18  this chart, had an impact on the overall
19  industry's revenues going down?
20      A.   Well, hold on. I think that's a
21  mischaracterization of the data, and I think
22  you could be referring to something that is
23  auto correlated.
24           These are dollars per member. So
25  when the market as a whole is going down, these
```

```
                                              Page 232
 1            - J. RUCHABER -
 2  are competitive bids amounts. The national
 3  average bid amount is going down and has in
 4  every single years essentially since the --
 5  it's not shown here, but since the beginning of
 6  the Part D program.
 7           Those are competitive bids. So
 8  one party being under sanction, the other
 9  parties that are bidding still have to have
10  bids in order to get the LIS auto enrollees
11  that are essentially forced to be low. That's
12  part of the design of the program.
13           So even with SilverScript under
14  sanction, it could still very well be the case
15  that other market participants acting together
16  would force the dollars down in an attempt to
17  gain that market share that SilverScript was
18  losing.
19      Q.   That could be the case, right?
20      A.   It could be the case.
21      Q.   You didn't investigate that,
22  though?
23      A.   No, but that's what you were
24  asking me, to make a spurious or a statistical
25  reference to the causation being one or the
```

```
                                              Page 233
 1            - J. RUCHABER -
 2  other. And I'm saying there's a lot of reasons
 3  why they might not be true.
 4      Q.   And my next question is: You
 5  didn't investigate that, did you?
 6      A.   No, sir.
 7      Q.   Were you in the room at the
 8  deposition of Mr. Leary when he talked about
 9  how patents were expiring with respect to
10  statin drugs like Lipitor?
11      A.   I was.
12      Q.   Did you consider that when you
13  analyzed the trend in revenues or LIS bids?
14      A.   I did not.
15      Q.   Do you know whether that was a
16  onetime event, the fact that this group of
17  patents that was a large portion of the
18  pharmaceuticals that were being used were
19  coming off patent and a lot of generics were
20  coming in?
21           MR. PENDLETON: Objection to form,
22      foundation.
23      A.   So I have some knowledge about
24  that. But the extent to which it's
25  specifically impacting these prices, I do not.
```

Page 234

1     - J. RUCHABER -
2     Q.   Do you know what percentage of the
3   revenues in the industry are made on statins?
4     A.   I do not.
5     Q.   Do you know whether it's higher
6   than 5 percent or 10 percent?
7     A.   I do not.
8         MR. MEYERHOFF:  Why don't we take
9   a break.
10        THE WITNESS:  I was going to ask
11  the same thing.
12        VIDEO TECHNICIAN:  Off the record
13  3:03 p.m.  This is the end of Disk 4 in
14  the deposition of Jason Ruchaber.
15        (Recess taken.)
16        VIDEO TECHNICIAN:  Going back on
17  the record 3:22 p.m.  This is the
18  beginning of Disk 5 of the deposition of
19  Jason Ruchaber.
20  BY MR. MEYERHOFF (continuing):
21    Q.   Mr. Ruchaber, going back to the
22  question that we had a fight about, my question
23  is:  Between the time that you were first given
24  instructions as to the scope of your work by
25  Mr. Pendleton and the time you gave him the

Page 235

1     - J. RUCHABER -
2   first draft of your report, did you have any
3   communications with Mr. Pendleton or anyone
4   from his team in which you got different
5   assumptions to rely on than the ones you had
6   previously received from them?
7     A.   No, not to my knowledge.
8     Q.   So, Mr. Ruchaber, in August of
9   2013, ESI agreed to pay $14.5 million for Smart
10  subject to a true-up adjustment at the end of
11  the year, correct?
12    A.   That's my understanding, yes.
13    Q.   All right.  And at that time Smart
14  was under compulsion to sell?
15    A.   Yes.
16    Q.   And fair to say it was a
17  restricted market?
18        MR. PENDLETON:  Objection, asked
19  and answered.
20    A.   Yes.
21    Q.   Is it fair to assume that ESI
22  considered the fair market value of Smart at
23  that time to be higher than what it was paying,
24  given that Smart was under compulsion to sell
25  and it was a restricted market?

Page 236

1     - J. RUCHABER -
2         MR. PENDLETON:  Objection to form.
3     A.   I don't have a basis for stating
4   that.  It's possible but I don't know if it's,
5   in fact, the case.
6     Q.   Can you think of a reason why ESI
7   would pay more than it had to in August of 2013
8   for the Smart company?
9         MR. PENDLETON:  Objection to form.
10    A.   I don't think in any circumstance
11  somebody would pay more than they had to.
12    Q.   Right.  And yet when given the
13  trends that you spot in the market, your
14  conclusion is that the discounted cash flow
15  model for this company would have a negative
16  value, correct?
17    A.   Not correct.
18        MR. PENDLETON:  Objection to form.
19    Q.   Don't you give multiple opinions
20  in your report where you say that if the inputs
21  you put into a discounted cash flow were
22  adjusted to reflect the market trends that you
23  saw, that those moves alone would result in a
24  discounted cash flow that was a negative
25  number?

Page 237

1     - J. RUCHABER -
2     A.   Well, but, again, it's in
3   isolation so we're doing step-wise analysis,
4   right?  We're taking a look at an analysis that
5   has multiple variables in it and reviewing each
6   assumption and trying to estimate the impact
7   that single assumption would have were it to be
8   changed.
9     Q.   So let's just talk about the one
10  that we've been discussing, revenue.
11    A.   Um-hmm.
12    Q.   According to you, revenue was
13  going down and if you put the inputs into the
14  DCF that reflect the way in which you thought
15  revenue would go down, the DCF model would be a
16  negative number, correct?
17        MR. PENDLETON:  Objection to form.
18    A.   Incorrect.
19        MR. PENDLETON:  Mischaracterizes.
20    Q.   Did ESI make a multimillion dollar
21  mistake in August of 2013 in paying for the
22  Smart assets a number that was north of
23  $10 million?
24        MR. PENDLETON:  Objection to form.
25    A.   I don't have an opinion on that.

Page 238

- J. RUCHABER -

Q. Because you're not offering a valuation for Smart at any time, are you?

A. Well, the reason I don't have an opinion on that is because I don't know if they made a mistake or not.

Q. But you aren't offering a valuation opinion on what Smart was worth in August of 2013?

A. I am not. No, sir.

Q. If you were hired by Express Scripts in August 2013 to do a valuation of Smart, based on what you know, would you advise them to purchase the company or not purchase the company?

MR. PENDLETON: Objection to form, beyond the scope.

A. I don't have sufficient information regarding their strategic motivations or other things, facts and circumstances, so I can't answer that question.

Q. If the DCF model is your mode for valuing the company and you end up with a negative value, that means the company's going to lose money, right?

Page 239

- J. RUCHABER -

A. It does.

Q. So based on your opinion in just point number 3 and the DCF model that would be obtained, if you follow your opinions in point number 3, it would be your opinion that if Express Scripts was offered Smart for free, they shouldn't take it because they'd end up losing money; isn't that right?

MR. PENDLETON: Objection to form.

A. No, that's not right.

Q. Let's look at point number 4. In point number 4 you critique Mr. Leary's work because, in your view, expenses in this industry would grow at a rate higher than 3 percent. Fair to say?

A. Based on the information that's available regarding expenses, it's my opinion that that data suggest a higher growth rate.

Q. In expenses?

A. Expenses, correct.

Q. And in point number 4, you similarly give an opinion at the end of it, page 13, that if Mr. Leary's model was adjusted to comport with the trend as you describe it,

Page 240

- J. RUCHABER -

that would also result in a DCF model with a negative number?

A. Correct.

Q. So you're predicting two trends in the industry that would render Smart -- a DCF of Smart worth less than zero, on both the revenue side and the cost side?

MR. PENDLETON: Objection to form.

A. I'm not suggesting it renders Smart less than zero. I'm suggesting that mathematically it renders the value yielded by the DCF less than zero.

Q. Let's take a step back and talk not about how it would affect the DCF model of Mr. Leary, but let's talk about how it would affect the industry.

Isn't it true that if you're correct that expenses were trending up and that revenues were not only trending down in percentage growth but were actually being reduced, that, if taken to their natural conclusion, the whole industry would have collapsed; isn't that right?

MR. PENDLETON: Objection to form.

Page 241

- J. RUCHABER -

A. Well, not the whole industry but certainly SmartD is a difficult business to be in, and there are many plans that have gone out of business and don't make money.

MR. PENDLETON: Did you mean Medicare Part D?

A. Medicare Part D, excuse me.

Q. But these industry trends aren't SmartD trends; this is an industry trend for SilverScript. SilverScript's trending down and its expenses are trending up. How could it deal with these industry trends on both sides, as you project them, without falling apart?

A. Well, they may not.

Q. So you agree that the natural consequence of the trends that you predict is that no company in the industry could be profitable in the long term because revenues would continue to go down and expenses would continue to go up?

A. So I don't predict these trends, for the record. I'm referencing data that's publicly available in the marketplace from CMS, from MedPAC and from other highly trusted

Page 242

- J. RUCHABER -

```
 2  sources that are doing statistical analyses and
 3  actuarial studies on this information.
 4          So it is just a fact that is
 5  what's being projected by stakeholders in this
 6  industry.
 7      Q.  By the sources that you cite in
 8  your opinions, right?
 9      A.  Those cited by Mr. Leary and those
10  that I have additionally referenced in my
11  opinion, yes.
12      Q.  And it's your conclusion from
13  those sources and the way you interpret them
14  and the way that you interpret the trends
15  implied by them that this industry is headed
16  for cataclysm; isn't that right?
17          MR. PENDLETON: Objection to form.
18      A.  That is not what I'm saying.
19      Q.  But how could any company survive
20  under these conditions?  Put Smart aside.
21      A.  Sure.  Do I have some leeway to
22  answer that question?
23      Q.  Please do.
24      A.  All right.  So, again, based on
25  information that I've referenced about trends
```

Page 243

- J. RUCHABER -

```
 2  in the marketplace, it is apparent that being a
 3  small standalone Medicare Part D business,
 4  particularly one that is heavy in LIS members,
 5  is a very difficult business to be in.  Many of
 6  them have gone out of business.  Part D plans,
 7  since the inception of the program in 2006,
 8  three out of four have gone out of business.
 9          Industry data that I have
10  referenced in my report suggests that on a
11  standalone basis, it's nearly impossible to
12  make a profit given the limited amount of
13  statutory profit you're allowed to make based
14  on the structure and design of Medicare Part D.
15          So what that suggests is that this
16  is a loss leader for a more comprehensive suite
17  of products; or you need to have enhanced
18  members, non-auto enrollee members that elect
19  to pay for a plan that's not below the national
20  bid amount.  You need to have a better mix of
21  product.
22          It doesn't mean the industry's
23  heading for cataclysm.  It simply means that on
24  a standalone basis, it's a very difficult
25  business to be in.  And barring something else,
```

Page 244

- J. RUCHABER -

```
 2  there's a high probability that you will not
 3  make money.
 4      Q.  Okay.  Not really what I was
 5  looking for so let me ask a more specific
 6  question.  Let's forget about Smart and small
 7  standalone businesses.
 8      A.  Sure.
 9      Q.  Explain to me how Express Scripts'
10  Medicare Part D plan and SilverScript's
11  Medicare Part D plan could survive if the
12  expenses are trending up in the way you
13  describe and revenues are drying up.  Explain
14  to me.
15          MR. PENDLETON: Objection to the
16      form.
17      A.  Explain to you how that could come
18  to pass?
19      Q.  How those entities could
20  survive --
21      A.  Sure.
22      Q.  -- based on the trends that you
23  predict in applying them to Smart.
24      A.  Once again, I don't predict these
25  trends.  I reference trends that have been
```

Page 245

- J. RUCHABER -

```
 2  predicted by others.
 3      Q.  I misspoke.  The trends that
 4  you've interpreted from the resources that
 5  you've looked at.
 6      A.  I didn't interpret the trends.
 7      Q.  Oh, sir, you did.
 8      A.  No, they are actually calculated,
 9  presented, many of them in tabular format, that
10  show the actual percentages that the market
11  projects will be there for revenue and for
12  expense.  All I've done is said:  Based on
13  market data presented in specific documents,
14  this would suggest that revenues are declining.
15  I have graphical evidence of that.
16      Q.  We'll play this game at trial.
17  We'll move on now.
18      A.  Okay.
19      Q.  In connection with the valuation
20  that you did in the one group of transactions
21  you can recall that involved an insurance
22  company, do you recall whether you predicted
23  trends in the industry in determining the value
24  of those companies at that time?
25      A.  I didn't predict any trends.  I
```

Page 310

1     - J. RUCHABER -
2  structure, the ideal capital structure?
3          MR. PENDLETON: Objection to form.
4     A.   I don't know, without doing the
5  analysis, and Mr. Leary has presented no
6  arguments to the affirmative that this is an
7  appropriate capital structure to use for Smart.
8     Q.   Are you familiar with any Part D
9  plans that maintain a capital structure based
10 entirely on equity with no debt?
11         MR. PENDLETON: Standalone
12    Medicare Part D plan?
13    Q.   Any.
14    A.   I don't think that information is
15 available.
16    Q.   So you're not familiar with that?
17    A.   No.
18    Q.   Are you familiar with the concept
19 Mr. Leary talked about yesterday of using
20 surplus notes as a way to obtain debt financing
21 if you're an insurance company, notes secured
22 by cash on the balance sheet?
23    A.   I am generally familiar with that.
24    Q.   Have you ever dealt with that
25 concept in your work experience in any

Page 311

1     - J. RUCHABER -
2  capacity?
3     A.   No, I have not.
4     Q.   So if it was true that Smart could
5  get financing secured by cash on the balance
6  sheet, would that change your opinion about
7  whether or not a debt component should be
8  included in the WACC?
9     A.   It may.
10    Q.   Now, you include a series of
11 charts in your report as exhibits. Correct?
12    A.   A series of charts?
13    Q.   Yeah, with data in it. You did
14 some adjustments to Mr. Leary's exhibits.
15    A.   Sure, yeah.
16    Q.   And you adjusted, in certain ways,
17 Mr. Leary's inputs to the discounted cash flow
18 model and came out with different numbers,
19 correct?
20    A.   Correct.
21    Q.   And the numbers that you came out
22 with show a range of value for Smart of
23 17.9 million to $19.9 million?
24    A.   Well, using the assumptions that
25 I've set in the model, which is a very small

Page 312

1     - J. RUCHABER -
2  subset of the total assumption critiques that I
3  had included in my report.
4     Q.   And with all that, the numbers you
5  came out with are 17.9 million to 19.9 million.
6  Correct?
7     A.   That's what's shown in the
8  exhibits, yes.
9     Q.   Can we call it 18 to 20 million
10 for shorthand? Will you know what I'm talking
11 about?
12    A.   Sure.
13    Q.   And as you say, you reached those
14 numbers by applying some but not all of your
15 opinions on why Mr. Leary's discounted cash
16 flow model is problematic, correct?
17    A.   Correct.
18    Q.   So you applied some of them, and
19 some of the other opinions that you have in
20 your report weren't applied in that analysis,
21 correct?
22    A.   Correct.
23    Q.   For example, you didn't charge
24 Smart for increased PBM expenses in the later
25 years, right?

Page 313

1     - J. RUCHABER -
2     A.   I did not.
3     Q.   That's one of the opinions you had
4  in your report that you stand by, but it's not
5  in your numbers, right?
6     A.   Correct.
7     Q.   Did you do a calculation of how
8  far into the negative numbers your DCF model
9  would go if you relied on all of your opinions
10 critiquing Mr. Leary's model?
11    A.   His model falls apart.
12    Q.   Well, you could see how you could
13 come up with a negative number, right?
14    A.   Well, but that's not how a DCF
15 model works. If a company's nonviable and the
16 assumptions don't support a viable business,
17 there would be no point in doing a DCF model.
18    Q.   That could be done, though,
19 mathematically, right?
20    A.   It could.
21    Q.   You chose not to do it?
22    A.   Correct.
23    Q.   Even though you're not abandoning
24 any of your opinions, correct?
25    A.   Correct.

Page 314
- J. RUCHABER -
Q. Don't you want to know how big a loss it would have been for someone to purchase Smart's assets as of August 2013 based on all your opinions?
A. No.
Q. You don't even have any intellectual curiosity about that?
A. No.
Q. Once it dips below zero, that's it; is that right?
A. No, that's not right. The totality of my rebuttal is: Are the opinions proffered by Mr. Leary supported by evidence, to which they are not.
Q. Do you intend to offer these adjusted exhibits into evidence at trial and explain what you did in them?
   MR. PENDLETON: Objection.
Q. As your opinions?
   MR. PENDLETON: Don't answer the question, calls for attorney-client privilege.
Q. Do you intend to offer an opinion that, based on these adjustments, the value of

Page 315
- J. RUCHABER -
Smart would be between 18 and $20 million?
   MR. PENDLETON: Same objection. Next question.
   MR. MEYERHOFF: You're instructing him not to answer that question?
   MR. PENDLETON: Yes.
   MR. MEYERHOFF: I don't get to know whether he's going to offer an opinion on the exhibits to his report?
   MR. PENDLETON: It's part of his report and that's what his opinion is based on. So he will testify about his report.
   MR. MEYERHOFF: You're really going to instruct him not to answer that question?
   MR. PENDLETON: Well, you're asking him --
   MR. MEYERHOFF: We're going to be back here because I'm not going to call the judge now. We're going to be back here. That's a huge mistake.
   MR. PENDLETON: Why don't we take a break. It's 5:00. How much longer?

Page 316
- J. RUCHABER -
   VIDEO TECHNICIAN: Off the record at 4:52 p.m.
   (Recess taken.)
   VIDEO TECHNICIAN: Back on the record 5:03 p.m.
BY MR. MEYERHOFF (continuing):
Q. Mr. Ruchaber, in your report on page 20, in the Summary of Observations, you discuss the adjustments that you've made and you say that the impact of those adjustments, the indicated value under Mr. Leary's DCF model was 18.84 million. See that?
A. I to.
Q. Do you intend to offer that as an opinion of yours at trial?
   MR. PENDLETON: I'm going to just object to the question. I'm going to allow him to answer it. To the extent that it calls for attorney work product and what the intention at trial is, first of all, I don't know that he can answer that. But he can answer the question to the extent he has any such knowledge about what will happen at trial.

Page 317
- J. RUCHABER -
   MR. MEYERHOFF: So you allowed him to answer 50 questions I've asked exactly the same way about what he intends to offer as opinions, and you're not going to let him answer this one? Are you going to let him answer the question? We don't have to debate it if he's going to answer the question.
   MR. PENDLETON: Let me respond. You asked him questions about opinions that are not in his report, and he told you he didn't intend to offer any opinions beyond his report.
   Now you're asking him if he intends to offer the opinions that are set forth in his report. He can answer the question subject to my prior objection.
   MR. MEYERHOFF: Do you need the question read back?
   THE WITNESS: If you would, please.
   (Requested portion read.)
A. To the extent that I am asked what

80 (Pages 314 - 317)

Page 318

- J. RUCHABER -

the impact of those changes would be to Mr. Leary's opinion or his model, then, yes, I would answer in the affirmative at trial.

Q. You agree that those numbers ignore many of the opinions that you set forth in your report, correct?

MR. PENDLETON: Objection, asked and answered.

A. It doesn't ignore them. It simply presents a subset of them.

Q. It doesn't include an adjustment for valuing Smart as anything other than a going concern, correct?

A. Correct.

Q. It doesn't include your criticisms of using Smart's management projections for revenue for the second half of 2013. No adjustment for that, right?

A. Correct.

Q. And with respect to the claims expense projections, you don't raise expenses to comport with the trend that you discussed in your report, correct?

A. Correct.

Page 319

- J. RUCHABER -

Q. And you don't include, in that $18.84 million analysis, that the projected PBM fees could increase?

A. Correct.

Q. Do you change the beta that Mr. Leary used other than to correct the -- well, withdrawn.

You don't account for this relationship issues with RxAlly or Walgreen's that you cite in your report in the $18.84 million number, correct?

A. Correct.

Q. Is it your opinion, nonetheless, that the number $18.84 million that's set forth at the end of your adjusted analysis is the product of reliable principles and methods?

MR. PENDLETON: Objection to form. You're mischaracterizing what the 18.84 million is. You can answer the question.

A. I'm not sure I understand the question. When you say -- can you rephrase it, please.

Q. Does the calculation that you did

Page 320

- J. RUCHABER -

to reach $18.84 million, in your opinion, rest on principles and methods that you believe to be reliable?

MR. PENDLETON: Objection, form.

A. I'm not exactly sure how to answer that question because it's a broad question.

Q. It's actually the question that determines whether or not you're allowed to express an expert opinion in Federal Court. So my question is -- well, I'll ask it a different way.

MR. PENDLETON: Objection to the characterization. Can you please ask the next question.

Q. I'll ask it a different way.

Would you agree with me that you, yourself, don't believe that a DCF model that ignores the list of factors that I just read to you that you conceded were not included in the analysis that got to 18.84 million couldn't be an analysis that rests on reliable principles and methods?

MR. PENDLETON: Objection to form.

A. I don't agree with that statement.

Page 321

- J. RUCHABER -

Q. How is it possible that your $18.84 million analysis could rest on reliable principles and methods when you criticize multiple principles and methods on which that calculation is based?

MR. PENDLETON: Objection to form.

A. What this number represents is simply taking Mr. Leary's DCF method and changing two assumptions. Those two assumptions which I've explained, one in its entirety, and one I use a lesser assumption. But it elucidates the high sensitivity to changes in the underlying assumptions, and making very conservative changes to those assumptions' results under his model, a reduction in value to $18.84 million.

Q. I understand what you did. Simple question and if you can't answer my question, that's a good answer, as long as it's the truth.

Can you explain to me whether or not the analysis that you conducted that led to the $18.84 million number rests on -- I'm sorry, is the product of reliable principles

81 (Pages 318 - 321)

```
                                                    Page 330
 1              - J. RUCHABER -
 2   I would explain to them why it's not applicable
 3   to that particular entity.
 4       Q.   You wouldn't hide it from your
 5   client, right?
 6       A.   No.
 7       Q.   Why did you do an adjusted
 8   analysis for the comparable companies and
 9   comparable transactions tests using some of the
10   changes that you would advocate in your
11   opinions on those tests?
12       A.   When you say "adjustment using
13   some of the changes," what are you referring
14   to?
15       Q.   I'm referring to page 11 of 19 of
16   the exhibits to your report.
17       A.   Okay.
18       Q.   Here you have not only a
19   discounted cash flow method that gives the
20   range seventeen nine to nineteen nine and a
21   midpoint of 18.84, but you also have numbers
22   for an adjusted guideline company method and
23   adjusted guideline transaction method.
24   Correct?
25       A.   Correct.
```

```
                                                    Page 331
 1              - J. RUCHABER -
 2       Q.   Even though you don't think they
 3   should bear on the valuation at all, you did
 4   this work?
 5       A.   Correct.
 6       Q.   Do you intend to offer opinions at
 7   trial that this -- that this range of values
 8   was the right range of values using the
 9   adjustments that you make?
10       A.   Mathematically or my opinion that
11   that's the value of Smart?
12       Q.   Well, I assume you're not going to
13   offer the opinion that that's the value of
14   Smart. Right?
15       A.   Yes, correct.
16       Q.   Are you going to offer opinions at
17   trial that use these numbers, the numbers that
18   you divined for guideline company method and
19   guideline transaction method?
20       A.   Though I don't know exactly what
21   will be asked of me at trial, to the extent
22   that there are questions regarding the market
23   approach and the adjustments that should have
24   been made to apply it, I would suggest that
25   these are more appropriate ranges of value
```

```
                                                    Page 332
 1              - J. RUCHABER -
 2   under the market approach or market approaches.
 3       Q.   With respect to those -- bear with
 4   me for one second.
 5            Is it your opinion that those
 6   numbers, the numbers that are set -- that you
 7   discuss in the text of your report and are set
 8   forth on page 11 of 19 for the two market
 9   approaches, that those are numbers that are the
10   product of reliable principles and methods?
11            MR. PENDLETON: Objection to form.
12       A.   Again, I've made adjustments to
13   Mr. Leary's model so I'm using his valuation
14   methods. I'm simply making an adjustment to
15   the multiple to reflect the things that I've
16   stated in my report.
17       Q.   After concluding that they
18   shouldn't be used at all?
19       A.   Well, it's a multi-varied
20   analysis, so it's -- if you take that the
21   market approach should be used, here is a more
22   appropriate way to use it.
23            I would suggest it should not be
24   used at all or at least relied upon. I would
25   still do a market approach; I just wouldn't
```

```
                                                    Page 333
 1              - J. RUCHABER -
 2   rely upon it if I were to value a company like
 3   this.
 4       Q.   I'm going to skip ahead to
 5   something else. Did you review the amendment
 6   to Mr. Leary's report?
 7       A.   I did.
 8       Q.   In your report you criticize
 9   Mr. Leary for double counting in the way that
10   he -- in his separate analysis where he adds in
11   enrollees and comes to the 13 to $15 million
12   range, correct?
13       A.   Correct.
14       Q.   You were at his deposition
15   yesterday?
16       A.   I was.
17       Q.   You heard his explanation of why
18   he did it?
19       A.   I did.
20       Q.   Do you still have that opinion
21   that Mr. Leary's double counting?
22       A.   Absolutely.
23       Q.   Have you done any work to come to
24   -- well, do you intend to offer opinions at
25   trial rebutting Mr. Leary's amendment to his
```

84 (Pages 330 - 333)

Page 370

```
 1
 2            I N D E X
 3  EXAMINATION OF
    JASON L. RUCHABER                PAGE
 4
      By Mr. Meyerhoff......................    5
 5  By Mr. Pendleton......................  360
 6
      AFTERNOON SESSION..................   167
 7
      REQUESTED PORTIONS MARKED [Page/Line]:
 8  14/5, 20/18, 170/5, 183/16, 218/7
 9
10
11
              E X H I B I T S
12
    EXHIBIT      DESCRIPTION         PAGE
13
    Exhibit 1: Expert Report of Jason    28
14        Ruchaber
15  Exhibit 2: LinkedIn profile of Jason  47
          Ruchaber
16
    Exhibit 3: Letter 2/19/15           152
17
    Exhibit 4: Letter 3/28/14           159
18        (#SMT00887851-854)
19  Exhibit 5: Presentation slides      177
          3/19/13
20
    Exhibit 6: Excerpt from deposition   184
21        of Anthony Xu 4/20/16
22  Exhibit 7: Book excerpt The Handbook 291
          of Financing Growth,
23        Second Edition, Kenneth
          Marks
24
25
```

Page 371

```
 1
 2          C E R T I F I C A T I O N
 3
 4       I, Sherri Flagg, a Registered
 5  Professional Reporter, Certified LiveNote
 6  Reporter, and a Notary Public, do hereby
 7  certify that the foregoing witness, JASON L.
 8  RUCHABER, was duly sworn on the date indicated
 9  and that the foregoing is a true and accurate
10  transcription of my stenographic notes.
11       I further certify that I am not
12  employed by nor related to any party to this
13  action.
14
15          [signature]
16  Sherri Flagg, RPR, CLR
17
18
19
20
21
22
23
24
25
```

Page 372

```
 1  ERRATA SHEET
    VERITEXT LEGAL SOLUTIONS
 2      330 OLD COUNTRY ROAD
        MINEOLA, NY 11501
 3         800.727.6396
 4  CASE: SMART VS. BENECARD
    DEPOSITION DATE: 7/8/2016
 5  DEPONENT: JASON L. RUCHABER
 6  PAGE LINE(S)   CHANGE          REASON
 7  ____|_____|_____|_____
 8  ____|_____|_____|_____
 9  ____|_____|_____|_____
10  ____|_____|_____|_____
11  ____|_____|_____|_____
12  ____|_____|_____|_____
13  ____|_____|_____|_____
14  ____|_____|_____|_____
15  ____|_____|_____|_____
16  ____|_____|_____|_____
17  ____|_____|_____|_____
18  ____|_____|_____|_____
19  ____|_____|_____|_____
20
21  _____
         JASON L. RUCHABER
22
    SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS _____ DAY OF _____, 20___.
24
    _____    _____
25  (NOTARY PUBLIC)       MY COMMISSION EXPIRES:
```