# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SMART INSURANCE COMPANY,

                              Plaintiff,

         -against-

BENECARD SERVICES, INC.,

                              Defendant.

Case No. 1:15-cv-04384-KBF

---

**MEMORANDUM OF LAW ON BEHALF OF DEFENDANT BENECARD SERVICES, INC. IN OPPOSITION TO PLAINTIFF SMART INSURANCE COMPANY'S <u>DAUBERT</u> MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF FRANCOISE CULLEY-TROTMAN**

---

John M. Hillebrecht
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: (212) 335-4590
Fax: (917) 778-8590

B. John Pendleton, Jr.
DLA Piper LLP (US)
51 John F. Kennedy Parkway, Suite 120
Short Hills, New Jersey 07078-2704
Tel: (973) 520-2561
Fax: (973) 520-2578

Courtney G. Saleski (admitted *pro hac vice*)
DLA Piper LLP (US)
1650 Market Street, Suite 4900
Philadelphia, Pennsylvania 19103-7300
Tel: (215) 656-2431
Fax: (215) 606-2046

*Attorneys for Defendant*

# TABLE OF CONTENTS

**Page**

I.    BACKGROUND ................................................................................ 1

II.   ARGUMENT .................................................................................... 4

    A.   Legal Standard ........................................................................ 4

    B.   Culley-Trotman is Well-Qualified to Provide Her Expert Opinions ................... 5

    C.   Culley-Trotman's Opinions Are Reliably Based on Her Experience in the Medicare Party D Industry ....................................................... 5

    D.   Culley-Trotman's Opinions Are Not Impermissible Factual Narrative ............. 10

    E.   Culley-Trotman's Opinions Are Not Impermissible Legal Opinions................. 11

    F.   Culley-Trotman's Opinions Are Based on Sufficient Data ................................ 14

        1.   Culley-Trotman's Opinion that Benecard Operated in a Manner "Consistent" with Medicare Part D Requirement is Based on Sufficient Data ........................................................................ 16

        2.   Culley-Trotman's Opinion that Smart's Oversight and Monitoring of Benecard was not Dependent on Greater Real Time Access to its System is Supported by Sufficient Data............................ 16

        3.   Culley-Trotman's Opinion Concerning Smart's Oversight of Benecard is Based on Sufficient Data....................................... 18

    G.   Culley-Trotman Will Not Speculate as to Smart's or CMS's State of Mind....... 19

III.   CONCLUSION ................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Ambrosini v. Labarraque,
   101 F.3d 129 (D.C. Cir. 1996) .........................................................................6, 15

Argonaut Ins. Co. v. Samsung Heavy Indus. Co.,
   929 F. Supp. 2d 159 (N.D.N.Y. 2013) ....................................................................5

Barnes v. District of Columbia,
   924 F. Supp. 2d 74 (D.D.C. 2013) ..........................................................................6

Boucher v. U.S. Suzuki Motor Corp.,
   73 F.3d 18 (2d Cir. 1996).........................................................................................4

Brooks v. Outboard Marine Corp.,
   234 F.3d 89 (2d Cir. 2000).............................................................................15, 16

Cary Oil Co. v. MG Refining & Marketing, Inc.,
   No. 99 Civ. 1725, 2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003).....................11, 12

Compton v. Subaru of America, Inc.,
   82 F.3d 1513 (10th Cir. 1996) ...............................................................................10

Daubert v. Merrell Dow Pharms., Inc.,
   509 U.S. 579 (1993).........................................................................2, 4, 6, 10

E.E.O.C. v. Bloomber L.P.,
   No. 07-cv-8383, 2012 WL 3466370 (S.D.N.Y. Aug. 31, 2010)...........................15

Fiataruolo v. U.S.,
   8 F.3d 930 (2d Cir. 1993)........................................................................................12

Figueroa v. Boston Scientific Corp.,
   254 F. Supp. 2d 361 (S.D.N.Y. 2003) ......................................................................5

Highland Capital Mgmt., L.P. v. Schneider,
   379 F. Supp. 2d 461 (S.D.N.Y. 2005) ....................................................................11

In re MTBE,
   No. M21-88, 2008 WL 1971538 (S.D.N.Y. May 7, 2008)..............................11, 12

In re Zyprexa Prods. Liab. Litig.,
   489 F. Supp. 2d 230 (E.D.N.Y. 2007) ......................................................................4

Kumho Tire, Ltd. v. Carmichael,
   526 U.S. 1167 ..........................................................................................................6

Lappe v. American Honda Motor Co.,
  857 F. Supp. 222 (N.D.N.Y. 1994) .......................................................................10

LaSalle Bank Nat. Ass'n,
  No. 08-cv-8426, 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) ................................11

Liriano v. Hobart Corp.,
  949 F. Supp. 171 (S.D.N.Y. 1996) .......................................................................10

Maiz v. Virani,
  253 F.3d 641 (11th Cir. 2001) ...............................................................................6

Media Sport & Arts s.r.l. v. Kinney Shoe Corp.,
  95 Civ. 3901(PKL), 1999 WL 946354 (S.D.N.Y. Oct. 19, 1999) .........................12

Micro Chem. Inc. v. Lextron, Inc.,
  317 F.3d 1387 (Fed. Cir. 2003) ............................................................................18

Nimely v. City of New York,
  414 F.3d 381 (2d Cir. 2005) ...................................................................................4

Pension Committee of Univ. of Montreal Pension Plan v. Banc of Am. Secs.,
  LLC, 691 F. Supp. 2d 448 (S.D.N.Y. 2010) ...............................................5, 10, 12

Pipitone v. Biomatrix, Inc.,
  288 F.3d 239 (5th Cir. 2002) ................................................................................18

Rich v. Tee Bar Corp.,
  No. 1:10-cv-1371, 2013 WL 5442277 (N.D.N.Y. Sep. 27, 2013).........................6

Rondout Valley Cent. School Dist. v. Coneco Corp.,
  321 F. Supp. 2d 469 (N.D.N.Y. 2004) ..................................................................10

Rosco, Inc. v. Mirror Lite Co.,
  506 F. Supp. 2d 137 (E.D.N.Y. 2007) ...................................................................5

S.E.C. v. Johnson,
  525 F. Supp. 2d 70 (D.D.C. 2007) .......................................................................15

SEC v. Lucent Technologies, Inc.,
  610 F.Supp. 2d 342 (D.N.J. 2009) .......................................................................14

SEC v. U.S. Envtl., Inc.,
  No. 94-cv-6608, 2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002)...........................6

Travelers Indem. Co. v. Northrop Grumman Corp.,
  No. 12-cv-3040, 2014 WL 464769 (S.D.N.Y. Jan. 28, 2014) ..............................10

U.S. v. Romano,
   859 F. Supp. 2d 445 (E.D.N.Y. 2012) ...................................................................................4

United States v. Bilzerian,
   926 F.2d 1285 (2d Cir. 1991)..................................................................................................13

United States v. Davis,
   471 F.3d 783 (7th Cir. 2006) .................................................................................................13

United States v. Duncan,
   42 F.3d 97 (2d Cir. 1994)........................................................................................................13

United States v. Universal Rehab. Services, Inc.,
   No. 94-147, 1996 WL 297575 (E.D. Pa. May 31, 1996).......................................................13

Wechsler v. Hunt Health Systems, Ltd.,
   381 F.Supp.2d 135 (S.D.N.Y. 2003)......................................................................................14

**OTHER AUTHORITIES**

Chapter 6. Part D Drugs and Formulary Requirements, Section 20.22 .........................................3

Chapter 9 of the Prescription Drug Benefit Manual-Section 40..................................................2, 7

Fed. R. Evid. 702 ....................................................................................................................4, 5, 10

Fed R. Evid. 705 ............................................................................................................................15

Medicare Marketing Manual Chapter 3, Section 90.18 ..................................................................3

Weinstein's Federal Evidence § 702.02 (Joseph McLaughlin ed.) (2d ed. 2010) ..........................4

Defendant Benecard Services, Inc. ("Benecard") respectfully submits this memorandum of law in opposition to Plaintiff Smart Insurance Company's ("Smart") motion to exclude the opinions and testimony of Benecard's rebuttal expert, Francoise Culley-Trotman.

## I.    <u>BACKGROUND</u>

Smart's motion to exclude Culley-Trotman's opinions and testimony should be denied because she is a well-qualified expert who offers reliable and well-founded opinions that will help the jury evaluate a number of Medicare Part D issues that Smart's liability expert, Erin Costell, has injected into this case. Specifically, Costell has opined that: (1) "Smart conducted oversight of Benecard consistent with CMS' guidelines and industry norms" but the "effectiveness of certain oversight activities was hindered in part because of Smart's lack of complete and reliable real-time access to Benecard's enrollment and claims systems and data"; and (2) "Benecard did not operate in a manner compliant with Medicare Part D Program requirements." (Ex. 1, Costell Report at ¶ 33, ¶ 58).[1] These opinions are referred to as "Opinion B" and "Opinion C" in Costell's report. (<u>Id.</u>).

To rebut Costell's opinions, Benecard has proffered the expert report and testimony of Culley-Trotman, a Medicare Part D industry expert. Culley-Trotman has more than 15 years of experience in the healthcare regulatory compliance industry, including eight years in executive compliance leadership for Medicare and Medicaid managed care organizations. (Ex. 2, Culley-Trotman Report at 2). In particular, she has served as Chief Compliance Officer ("CCO") of three Medicare Part D plan sponsors. (Ex. 3, Culley-Trotman <i>Curriculum Vitae</i> at 1-2; Ex. 4, Deposition Transcript of Culley-Trotman dated July 15, 2016 ("Culley-Trotman Tr.") at 14:3-13). In her role as CCO of these plan sponsors, Culley-Trotman worked closely with the Centers

---

[1]    Exhibits referenced herein are attached to the Declaration of John M. Hillebrecht submitted herewith unless otherwise noted.

for Medicare and Medicaid Services ("CMS") Part D Enforcement Division Leadership to remediate issues resulting from health plan audits and CMS enforcement actions. (Ex. 2, Culley-Trotman Report at 2). She also has extensive experience implementing corrective action plans ("CAPs") for plan sponsors. (Id.).

In response to Opinion B, Culley-Trotman opines that "Smart D did not provide effective oversight of Benecard based on CMS's expectations for delegated entity functions." (Id. at 8). In support of her opinion, she explains that CMS guidance required Smart to perform three essential functions as plan sponsor but that Smart failed in each respect. (Id. (citing Chapter 9 of the Prescription Drug Benefit Manual-Section 40)). Specifically, she opines that Smart failed to effectively: (1) "train and educate" employees of Smart and Benecard; (2) "establish lines of communication within itself and between itself" and Benecard; and (3) "oversee [Benecard's] compliance with Medicare Part C and D requirements." (Id.). In addition to relying on her own experience, Culley-Trotman relied upon CMS guidance, email correspondence, and documents and deposition testimony in support of her opinion. (Id.). She also conducted interviews of Benecard's employees. (Ex. 4, Culley-Trotman Tr. at 36:10-13).

In response to Opinion B, Culley-Trotman also opines that "Smart D's oversight and monitoring of Benecard was not dependent on greater real-time access to its systems." (Ex. 2, Culley-Trotman Report at 9). In this section of her report, she performs an analysis of the "tools" Benecard provided to Smart (e.g., OLE, Cognos Reporting, etc.) and concludes that these tools were "industry standard for health plan reporting and provide[d] access to current and real time data in dashboard format."[2] (Id.). She supports this opinion with Medicare industry publications (id., n. 28) and CMS guidance which states "It is a *best practice to use metrics* to

---

[2] For a detailed discussion of the tools that Benecard provided to Smart, Benecard refers the Court to its Memorandum of Law in Support of its Daubert Motion to Exclude the Testimony and Opinions of Erin Costell. ECF No. 251.

assist in overseeing compliance performance and operational trends." (Id. at 9 (emphasis added)). She also explained CMS's "industry guidelines" regarding appropriate methods of monitoring and oversight:

> CMS does not specify in the guidelines a standard operating procedure, if you will, for Smart D's oversight of its PBM. Instead, it publishes general guidelines for requirements like routine auditing and monitoring and so on, and allows the health plan to come up with a specific operating procedure as to how it's going to oversee the PBM.

(Ex. 4, Culley-Trotman Tr. at 131:5-13; Ex. 2, Culley-Trotman Report at 7 ("Per CMS and industry guidelines, Smart D is allowed to choose its own methods of monitoring the [PBM]")). Culley-Trotman cited CMS's guidelines for routine auditing and monitoring throughout her report. (See generally Ex. 2, Culley-Trotman Report).

In response to Opinion C, Culley-Trotman opines that "Benecard operated in a manner consistent with Medicare Part D program requirements." (Id. at 10). In this section of her report, Culley-Trotman performs an extensive analysis of the services that Benecard provided, including (1) hiring requisite staff to manage its Part D operations; (2) building a customized claims system based on Smart's specifications; (3) implementing policies, procedures and protocols to meet its obligations in the PBMA and CMS requirements; and (4) maintaining transparency and open communications with Smart and CMS. (Id. at 10-12). She cites to email correspondence, documents, deposition testimony and CMS guidance in support of her opinions. (Id. (citing Medicare Marketing Manual Chapter 3, Section 90.18 and Chapter 6. Part D Drugs and Formulary Requirements, Section 20.22)).

Because Culley-Trotman's opinions are well-supported by the facts, industry standards and her extensive experience in the Medicare Part D industry, Smart's motion should be denied. To the extent there are any putative flaws in her analysis or methodology, Smart will have the

opportunity to cross-examine Culley-Trotman at trial regarding everything she did (or allegedly did not do) in reaching her conclusions.

## II.    ARGUMENT

### A.    Legal Standard

This Court's gatekeeping function under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), is governed by a three-part inquiry that assesses (1) the qualifications of the proffered experts; (2) the reliability of the experts' methodology; and (3) the helpfulness of the experts' opinions to the trier of fact.  United States v. Romano, 859 F. Supp. 2d 445, 456 (E.D.N.Y. 2012).  "[A]lthough expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith,' or to be in essence an 'apples and oranges comparison,' other contentions that the assumptions are unfounded go to the weight, not the admissibility of the testimony."  Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) (citation omitted).  As the Court in Daubert explained, the traditional and appropriate means for testing contested expert evidence include "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." 509 U.S. at 596.

The standard for admission of expert testimony is liberal, Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005), with a presumption of admissibility.  In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007); Weinstein's Federal Evidence § 702.02 (Joseph McLaughlin ed.) (2d ed. 2010) ("The presumption under the Rules is that expert testimony is admissible.").  As the 2000 Advisory Committee Notes on Rule 702 observe, "the rejection of expert testimony is the exception rather than the rule."

**B.      Culley-Trotman is Well-Qualified to Provide Her Expert Opinions**

"A court must consider the 'totality of a witness's background when evaluating the witness's qualifications to testify as an expert.'"  Rosco, Inc. v. Mirror Lite Co., 506 F. Supp. 2d 137, 144-45 (E.D.N.Y. 2007).  As set forth above, Culley-Trotman has extensive experience in the Medicare Part D field.  She has served as a compliance officer for several Part D plan sponsors and is intimately familiar with CMS audits.  It is beyond dispute that such relevant experience can qualify a witness to give expert opinion testimony.  Argonaut Ins. Co. v. Samsung Heavy Indus. Co., 929 F. Supp. 2d 159, 172 (N.D.N.Y. 2013) ("Witnesses can qualify as experts under Rule 702 on the basis of practical experience alone . . . .  In assessing expert qualifications, liberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications.").  Culley-Trotman is qualified to give the opinions she has proffered in this case, and Smart does not contend otherwise.

**C.      Culley-Trotman's Opinions Are Reliably Based on Her Experience in the Medicare Party D Industry**

An expert may base her opinions on training and experience, especially when she is opining on the standards of the industry in which she has extensive experience.  See Fed. R. Evid. 702 (providing for testimony by witness "who is qualified as an expert by knowledge, skill, experience, training or education"); Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC, 691 F. Supp. 2d 448, 64 (S.D.N.Y. 2010) ("[T]he reliability of [an expert's] testimony largely depends on whether he has drawn the proffered industry standards from an adequate source—in this case, his experience."); Figueroa v. Boston Scientific Corp., 254 F. Supp. 2d 361, 365 (S.D.N.Y. 2003) ("The reliability requirements do not preclude an expert from testifying on the basis of experience alone or in conjunction with other knowledge, training skill,

or education") (citation omitted).  Indeed, the Supreme Court has held that professional

experience in a particular field may supply a reliable basis for admission of expert testimony.

See Kumho Tire Co., v. Carmichael, 526 U.S. 1167, 1178 ("[N]o one denies that an expert might

draw a conclusion from a set of observations based on extensive and specialized experience.").

Indeed, "several circuits have treated [an expert's experience] as circumstantial evidence

as to whether the expert employed a scientifically valid methodology or mode of reasoning"

under Daubert.  Ambrosini v. Labarraque, 101 F.3d 129, 140 (D.C. Cir. 1996) (citations

omitted); see Rich v. Tee Bar Corp., No. 1:10-cv-1371, 2013 WL 5442277, at *5 (N.D.N.Y.

Sept. 27, 2013) (holding that "experience in conjunction with other knowledge, skill, training or

education. . .  [may] provide a sufficient foundation for expert testimony" and "[i]n certain fields,

experience is the predominant, if not sole, basis for a great deal of reliable expert testimony");

Maiz v. Virani, 253 F.3d 641, 669 (11th Cir. 2001) ("there is no question that an expert may still

properly base his testimony on 'professional study or personal experience'") (citation omitted);

Barnes v. District of Columbia, 924 F. Supp. 2d 74, 96-97 (D.D.C. 2013) ("[p]ersonal experience

is the proper method of assessing the reliability of [proffered expert's] testimony") (internal

quotations and citations omitted).  As Judge Leisure aptly noted:

> Since the conclusions which Lowry arrives at are based on his
> analysis of the trading records and other documents provided to
> him, and the process of comparing the information contained
> therein with his knowledge of the standard practices of the
> securities industry, the reliability of his testimony can be
> sufficiently evaluated by inquiring into Lowry's thirty years of
> experience as a regulator, compliance director, and securities
> consultant.

SEC v. U.S. Envtl., Inc., No. 94-cv-6608, 2002 WL 31323832, at *3 (S.D.N.Y. Oct. 16, 2002).

In this case, Culley-Trotman's opinions that (1) Smart failed to perform effective

monitoring and oversight of Benecard; and (2) Benecard operated in a manner consistent with

Medicare Part D requirements are well-supported by her detailed review of the facts in this case, her experience as a compliance officer of a plan sponsor, and her extensive knowledge of Medicare Part D industry standards, and CMS's guidance.

For example, in concluding that Smart failed to provide effecting monitoring and oversight of Benecard, she cites to and describes CMS's requirements in Chapter 9 of the Prescription Drug Benefit Manual which requires plan sponsors to provide effective (1) training of the plan sponsor and PBM's employees, (2) communication lines between itself and the PBM, and (3) oversight of the PBM's compliance with Medicare Part D requirements. Culley-Trotman reviewed those standards against the evidence in this case and concluded, based on her experience, that Smart failed to perform effective monitoring and oversight of Benecard in accordance with CMS rules and guidance. (Ex. 2, Culley-Trotman Report at 8-9; Ex. 4, Culley-Trotman Tr. at 119:16-24 ("Q: And [those conclusions are based on] your interpretation of CMS guidelines . . .? A: Correct.")).

Smart does not contend that Culley-Trotman's opinions are unreliable on the grounds of lack of experience (which is not surprising considering the positions she has held). (See generally Pl. Br.). Instead, Smart complains that Culley-Trotman's opinions are not reliable because she did not sufficiently explain the "customary practices in the industry" regarding monitoring and oversight or relate them to her experience. (Pl. Br. at 9). Culley-Trotman, however, testified at length at her deposition about industry standards concerning monitoring and specifically related those standards to her own personal experience:

> So the proactive monitoring is definitely a strong thing, having *daily meetings with the PBM* and following up on issues. For example, if Mary Jane didn't get her medications, *it would be my plan's obligation* to reach out to the PBM and say I want evidence that Mary Jane got her medication, if that didn't happen in a particular day. And that's basically setting the tone for *oversight*.

It demonstrates to the PBM that you are actively watching them, you are actively reviewing the operational areas.  And that's, I mean, that's pretty much a consistent expectation for every single operational area until 18 months in when you can have a bit more of a periodic auditing and monitoring.

. . .

So a project demonstrates that there is an ask and something is being done about it.  But the engagement I'm speaking about is actually daily, *hands-on communications with PBM* executives on issues like member medication issues and coverage determinations to start raising visibility at the outset.

. . .

So we talked about *routine monitoring* at the outset, holding the PBM accountable and following up to make sure the member gets their medications, those are the biggest things. Ensuring that the *written policies and procedures* are actually implemented through observation, *training*.

. . .

As a plan sponsor, I've actually conducted, for both startup and established plans, mock calls to the PBM to determine whether their call center lines are working like they're supposed to.

. . .

And then on an ongoing basis, obviously to ensure that the processes you believe are in place continue to exist, you would have to continue that activity, the testing of the PBM's website and the formulary that's posted and all of these things.

(Ex. 4, Culley-Trotman Tr. at 282:12-285:25 (emphasis added)).  Moreover, as explained above, she cited industry publications and CMS guidance throughout her report.

Smart also complains that Culley-Trotman had no basis to opine that Smart "appeared to lack the appropriate clinical experts to provide oversight."  (Pl. Br. at 8-9).  But Culley-Trotman expressly relied upon correspondence from Smart's own compliance advisor, Babette Edgar, who stated that "CMS didn't feel like Smart understood how rigorous PBM oversight has to be and *is not fully staffed* for it."  (Ex. 4, Culley-Trotman Tr. at 107:9-19 (emphasis added)).  She

also relied upon a Work Plan Request dated May 16, 2013, that was issued by CMS to Smart in the wake of CMS's notice of imposition of sanctions against Smart. (Ex. 2, Culley-Trotman Report at n. 19). The Work Plan Request required Smart to take certain actions to remediate its "violations of Part D requirements." (Ex. 6, CMS Work Plan Request dated May 17, 2013 at 1). Specifically, it required Smart to, among other things, "retain consultants" and "increase its staff to include additional call center staff, pharmacists, a Vice President of Clinical Operations, and a new Chief Executive Officer." (Id. at 2). Culley-Trotman's opinion on this subject is further corroborated by the testimony of CMS representative, Gerard Mulcahy, who stated that Smart did not have enough "clinical pharmacists." (Ex. 7, Deposition Transcript of Gerard Mulcahy dated June 29, 2016 at 124:1-6).

Smart also contends that Culley-Trotman had no basis to state that Benecard had the requisite staff to manage its Part D operations because she did not "discuss any standards or customs or CMS rules" concerning the appropriate number of staff. (Pl. Br. at 9-10). CMS guidance, however, does not set forth a specific number of staff or a mathematical equation for determining the appropriate number of staff for a PBM—and Smart does not contend otherwise. (Ex. 5, Medicare Managed Care and Prescription Drug Benefit Manual, Chapters 21 and 9). Culley-Trotman's years of experience in the Medicare Part D industry and her detailed review of the factual record provides a reliable foundation for her opinion that Benecard had a sufficient number of staff.

Smart's argument concerning Culley-Trotman's opinion that Benecard complied with Medicare Part D program requirements is also meritless. (Pl. Br. at 10). Contrary to Smart's assertions, Culley-Trotman relied extensively on CMS guidance in forming her opinion. (Ex. 2, Culley-Trotman Report at 10-13). Indeed, she relied on and cited provisions from the

Prescription Drug Benefit Manual, the Medicare Marketing Manual, and Part D Drug and Formulary Requirements. (Id.). She also reviewed dozens of documents, testimony from witnesses, and conducted interviews to arrive at her conclusion that Benecard satisfied its Medicare Part D obligations.

In sum, Culley-Trotman's experience and knowledge of industry standards in the Medicare Part D field are more than sufficient to render her opinions and testimony reliable.[3]

### D. Culley-Trotman's Opinions Are Not Impermissible Factual Narrative

Smart also criticizes Culley-Trotman's opinions on the grounds that they contain an "improper factual narrative." (Pl. Br. at 7). However, it is perfectly appropriate for an expert to cite facts in her report, and in fact, it is required under the Federal Rules of Evidence. See Fed. R. Evid. 702 (an expert may testify in the form of an opinion if "the testimony is based upon sufficient facts or data"). Indeed, courts routinely permit experts to recite facts provided the facts are "intertwined" with the expert's opinions. Pension Comm. of Univ. of Montreal, 691 F. Supp. 2d at 466-467 ("Although this analysis is brief, it shows that Weiser intends to intertwine his factual narrative with his opinion testimony"); Rondout Valley Cent. School Dist. v. Coneco Corp., 321 F. Supp. 2d 469, 479 (N.D.N.Y. 2004) ("Sansoucy's report and testimony are much more than a recapitulation of those facts"). As set forth above, Culley-Trotman compared the facts of this case with her professional experience and extensive knowledge of Medicare Part D industry standards to arrive at her conclusions.

---

[3]    Smart's argument that Culley-Trotman's opinions should be excluded because she did not employ a specific scientific "methodology" under Daubert is meritless. (Pl. Br. at 7). The Supreme Court in Daubert specifically stated that its requirements are limited "to the scientific context." Daubert, 509 U.S. at 590 n. 8. "Properly understood, the Daubert analysis applies to cases involving unique, untested, or controversial methodologies or techniques." Liriano v. Hobart Corp., 949 F. Supp. 171, 177 (S.D.N.Y. 1996) (citing Compton v. Subaru of Am., Inc., 82 F.3d 1513, 1518-19 (10th Cir. 1996)). Culley-Trotman's expert testimony does not involve scientific analysis, but rather the use of practical experience and fact investigation. There is nothing novel or untested about her testimony. Therefore, she need not have employed a specific scientific methodology in rendering her opinions. Id; see also Lappe v. American Honda Motor Co., 857 F. Supp. 222 (N.D.N.Y. 1994).

The cases Smart cites in support of its argument that Culley-Trotman included improper factual narrative in her report are inapposite. (Pl. Br. at 8). In Travelers Indem. Co. v. Northrop Grumman Corp., No. 12-cv-3040, 2014 WL 464769, at *3 (S.D.N.Y. Jan. 28, 2014), the reports at issue included recitation of evidence on a subject that was "not an issue in th[e] case" and therefore it was wholly unnecessary for the opinions in the report. Similarly, in LaSalle Bank Nat. Ass'n v. CIBC Inc., No. 08-cv-8426, 2012 WL 466785, at *13 (S.D.N.Y. Feb. 14, 2012), the court excluded certain expert testimony because it was "irrelevant" to the claims in the case. The court, however, allowed the expert to discuss certain facts provided that "documentary evidence" from a fact witness was admitted into evidence prior to the expert's testimony on that subject. Id. Furthermore, in Highland Capital Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005), the court excluded an expert's factual narrative because he simply recited the facts without providing any expert analysis of those facts. As set forth above, Culley-Trotman intertwined the facts with her analysis of the issues raised in Costell's expert report.

### E.    Culley-Trotman's Opinions Are Not Impermissible Legal Opinions

While an expert is not permitted to offer legal conclusions, expert witnesses are allowed to testify about "issues that would help the jury understand concepts it needed to know to render a verdict despite the fact that the opinions may encroach on matters of law." Cary Oil Co. v. MG Refining & Mktg., Inc., No. 99 Civ. 1725, 2003 WL 1878246 at *5 (S.D.N.Y. Apr. 11, 2003). Expert opinions based on ultimate facts are not deemed to be legal conclusions. See In re MTBE Prods. Liab. Litig., No. M21-88, 2008 WL 1971538, at *14 (S.D.N.Y. May 7, 2008) (holding that expert witness "permissibly state[d] a factual conclusion supporting a legal argument.").

The Court in Cary Oil drew the critical distinction as follows:

> [A]n opinion which told the jury whether or not a party had the capacity to make a will would be inadmissible because the answer was a conclusion of law that is reserved for the jury to decide, but

> an opinion which discussed whether the evidence showed the party
> had met the three requirements necessary to adjudge that party
> capable of making a will was admissible because it involved
> questions of fact that could be established based on the expert's
> opinion.

Cary Oil., 2003 WL 1878246 at *6; see also Fiataruolo v. United States, 8 F.3d 930, 942 (2d Cir. 1993) (expert testimony that plaintiff was not a "responsible person" as defined in the tax code "was not a simple bald assertion of the law and was not designed to invade the province of the trial court.").

Where it is unclear whether an expert's testimony encroaches into the province of the judge or jury, a limiting instruction at the time is appropriate, not an exclusion of the testimony in its entirety prior to trial. Pension Comm. of the Univ. of Montreal, 691 F. Supp. 2d at 471; In re MTBE, 2008 WL 1971538, at *14 n.121 (noting that if expert attempted to instruct the jury on the law at trial, the court will exclude such testimony at that time).

Smart complains that Culley-Trotman made three statements in her report to the effect that "Benecard complied with the obligations imposed by the PBMA." (Pl. Br. at 11-12). Benecard agrees that under the controlling case law, it would be improper for any expert to testify that Benecard did or did not breach the PBMA. For this reason, Benecard has moved the Court to preclude Smart's expert, Costell, from doing the same. The experts should, however, be permitted to testify about industry standards concerning a plan sponsor's access to a PBM's claims system and the level of monitoring and oversight by a plan sponsor should have—to the extent such industry standard opinions rest on an adequate foundation. Media Sport & Arts s.r.l. v. Kinney Shoe Corp., 95-cv-3901, 1999 WL 946354 at *3 (S.D.N.Y. Oct. 19, 1999) (experts may engage in a "factual discussion regarding the customs and practices of [an] industry, [and] an analysis of whether the conduct of the parties . . . conformed to those customs"). Such an

analysis would not would not cross the boundaries into an opinion that would tell the jury what decision to reach.

Smart's reliance on United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991), actually supports Benecard's position. In Bilzerian, the defendant was charged with securities fraud and making false statements to the SEC. Id. at 1289. The government called Professor John C. Coffee as an expert witness "to testify regarding the requirements of [SEC] Schedule 13D concerning disclosure of the source of funds and arrangements and understandings with others [regarding the purchase of a block of shares]." Id. at 1294. The Second Circuit ruled that the district court properly admitted Professor Coffee's testimony:

> Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts.
>
> . . .
>
> Unlike Scop and Marx, the government's expert in the present case did not give his opinion as to whether Bilzerian's actions violated the securities laws. As the government's first witness, much of Professor Coffee's testimony was general background on federal securities regulation and the filing requirements of Schedule 13D, which he presented by referring to a blank form.

Id.

Similarly, in United States v. Duncan, 42 F.3d 97, 102 (2d Cir. 1994), another case cited by Smart, the court upheld expert testimony "concerning the proper functioning of the tax system and the importance of filing tax returns accurately" because the witness did not "express legal conclusions," but only "explain[ed] sophisticated aspects of a regulatory system for which the witness had expertise."

Other courts have reached the same result. See United States v. Davis, 471 F.3d 783, 789 (7th Cir. 2006) (experts are allowed to testify about "regulations [and] whether transactions

comply with regulations"); <u>see</u> <u>also</u> <u>United States v. Universal Rehab. Servs., Inc.</u>, No. Crim 94-147, 1996 WL 297575, at *10 (E.D. Pa. May 31, 1996) (permitting expert testimony "regarding the Medicare reimbursement system and how it functioned" because "expert testimony is viewed as helpful in cases, like this one, involving complex statutes or issues outside of the general knowledge of the jury" and "[the expert's] testimony assisted the jury in understanding the rules and regulations under which [defendant] submitted its claims for reimbursement").

The same is true here. As the above cases make clear, the type of expert testimony that Culley-Trotman will offer is routinely admitted to assist juries in understanding the issues in a complex case such as this one. She will not attempt to instruct the jury on the law to be followed or how to apply the law to the facts of this case.[4]

### F. Culley-Trotman's Opinions Are Based on Sufficient Data

Contrary to Smart's assertions (Pl. Br. at 12), Culley-Trotman was not required to review the entire factual record in order to render an admissible expert opinion. <u>Wechsler v. Hunt Health Sys., Ltd.</u>, 381 F.Supp.2d 135, 144-46 (S.D.N.Y. 2003) (allowing report and testimony notwithstanding that he relied upon documents provided to him by counsel and did not consider other records and certain deposition testimony); <u>SEC v. Lucent Tech., Inc.</u>, 610 F.Supp. 2d 342, 352 (D.N.J. 2009) (allowing testimony of expert, notwithstanding that "she disregarded certain testimony the defendants find particularly helpful to their cause"). A recent District of Columbia District Court decision speaks to the question of what an expert need review and to the significance of an allegation that the review conducted was somehow one-sided as follows:

> Defendants accuse [the expert] of "cherry picking" evidence in favor of one party, rather than reliably applying an accepted methodology to all the evidence presented . . . In its review of precedent and the Federal Rules, the Court has encountered no

---

[4] As discussed above, to the extent the Court is concerned that Culley-Trotman might provide an ultimate legal conclusion, the Court should give a limiting instruction to the jury rather than exclude her testimony.

> authority rigidly requiring that an expert review all relevant information in a case in order to have his or her testimony admitted into evidence. Indeed, Federal Rule of Evidence 705 specifically 'eliminates the prior practice of requiring an expert to set out, specifically, the facts and data underlying an opinion before allowing the expert to testify.' Failing to review all relevant evidence is not a ground for excluding [the expert's] testimony; rather, it provides subject matter for cross-examination. In short, Defendants' arguments go to the weight of [the expert's] testimony rather than the admissibility.

S.E.C. v. Johnson, 525 F. Supp. 2d 70, 75 -76 (D.D.C. 2007) (citations omitted). To the extent that this Court accepts Smart's argument that Culley-Trotman's review of the record somehow incorporates selection bias (despite the fact that she cites deposition testimony of both Smart and Benecard witnesses in her report), that purported selection bias goes to the weight of her testimony, not its admissibility.

Smart's reliance on E.E.O.C. v. Bloomberg L.P., No. 07-cv-8383, 2012 WL 3466370, at *14 (S.D.N.Y. Aug. 31, 2010) is misplaced. In that case, the court excluded the expert's opinion because he only considered the materials provided to him by the EEOC and did not consider any contrary evidence. Id. Culley-Trotman, however, reviewed the deposition transcripts of Smart's former employees, Tammy Cappadonna and Stephanie Bayer, which contained contrary evidence. (Ex. 2, Culley-Trotman Report at 15).

In Brooks v. Outboard Marine Corp., 234 F.3d 89, 92, (2d Cir. 2000), another case cited by Smart, the Second Circuit upheld the trial court's exclusion of causation testimony in a products liability case because the expert "had never seen the actual boat or motor . . . had never spoken to either of the boys involved in the accident, was unaware of the dimension of the boat and the placement of the seats in relation to the motor, did not know precisely what happened and where the boys were positioned in the time immediately preceding the accident, and had never attempted to reconstruct the accident and test his theory." Id. Here, Culley-Trotman

reviewed approximately 50 documents related to the events in question, conducted interviews of witnesses, reviewed deposition testimony, and analyzed the audit report and sanctions letter issued by CMS.  (Ex. 2, Culley-Trotman Report at 16; Ex. 4, Culley-Trotman Tr. at 145:4-9).  Thus, <u>Brooks</u> is distinguishable.

        **1.**        **Culley-Trotman's Opinion that Benecard Operated in a Manner "Consistent" with Medicare Part D Requirement is Based on Sufficient Data**

Smart argues that Culley-Trotman's opinion that Benecard "operated in a manner consistent with CMS requirements" should be excluded because she testified at her deposition that she did not review all of the policies and procedures created by Benecard, but merely confirmed that they existed.  (Pl. Br. at 13).  Culley-Trotman's opinion, however, is not based solely on the fact that Benecard created and implemented policies and procedures.  It is also based on the fact that Benecard (1) built a customized claims system to handle Part D claims; (2) hired Medicare Part D experts; (3) worked closely with CMS to meet its expectations; and (4) kept open lines of communication with Smart.  (Ex. 2, Culley-Trotman Report at 10-13).  For this reason alone, Smart's argument should be rejected.

More importantly, the fact that Culley-Trotman did not review all of Benecard's policies and procedures in detail is immaterial because Smart's own expert concedes in her report that they were compliant with CMS requirements: "The processes and procedures disclosed in Benecard's P&Ps, desktop procedures, and BRDs that I reviewed include correct content, and *these documents are consistent with CMS requirements*."  (Ex. 1, Costell Report at ¶ 41 (emphasis added)).  Accordingly, there is sufficient data to support Culley-Trotman's opinion that Benecard operated in a manner consistent with Medicare Part D requirements.

2. **Culley-Trotman's Opinion that Smart's Oversight and Monitoring of Benecard was not Dependent on Greater Real Time Access to its System is Supported by Sufficient Data**

In her report, Culley-Trotman opines that it was not necessary for Smart to have greater real-time access than was granted by Benecard in performing its monitoring and oversight duties. (Ex. 2, Culley-Trotman Report at 9). She bases her opinion on the fact that the tools provided by Benecard to Smart (e.g., OLE and Cognos) are "industry standard" for health plan reporting and monitoring. Id. Smart does not contend that Culley-Trotman should be prohibited from testifying as to industry standards. (Pl. Br. at 13-14). As a result, Culley-Trotman should be permitted to opine as to industry standards concerning access in the Medicare Part D industry.

Smart argues that the opinion should be excluded solely on the grounds that Culley-Trotman could not recall at her deposition the data that "was actually available to Smart through OLE and Cognos." (Pl. Br. at 13-14). This argument should be rejected for several reasons.

First, with respect to OLE, Culley-Trotman based her opinion on her review of business requirements documents that discussed the specific levels of access available through OLE. (Ex. 4, Culley-Trotman Tr. at 214:24-214:2 ("I relied on the documentation I saw, which was the list of BRDs to implement specific levels of access to OLE.")). She also reviewed deposition testimony from Smart employees indicating that they had access through OLE. (Id. at 215:17-21). Culley-Trotman also reviewed documents demonstrating that Smart's employees were able to see enrollment and claims information through OLE. (Id. at 218:4-10). Her report also contains a detailed discussion of how OLE works. (Ex. 2, Culley-Trotman Report at 9).

Second, Culley-Trotman's opinion regarding Cognos is based on her review of documents and testimony from witnesses. (Ex. 4, Culley-Trotman Tr. at 218:12-15). She also provides a detailed review of the type of access that Cognos provides in her report. (Ex. 2, Culley-Trotman Report at 9 ("Cognos allows companies to access real time data directly from

their systems without compromising security and privacy standards")).  Culley-Trotman

explained in her deposition that between these two tools, "there was at least sufficient access for

some level of oversight to have occurred."  (Ex. 4, Culley-Trotman Tr. at 234:7-16).

Finally, to the extent Smart believes that Culley-Trotman relied on incomplete data in

rendering her opinion concerning real-time access, Smart is entitled to cross examine her at trial.

See Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003) (trial court

properly admitted expert testimony based on plaintiff's version of contested facts because

expert's damages theory could be tested during cross examination); Pipitone v. Biomatrix, Inc.,

288 F.3d 239, 249-50 (5th Cir. 2002) (expert testimony based on disputed predicate facts should

be presented to the jury).  Her opinion and testimony on this subject should not be excluded by

the Court.[5]

### 3. Culley-Trotman's Opinion Concerning Smart's Oversight of Benecard is Based on Sufficient Data

Smart argues that Culley-Trotman's opinion that Smart failed to provide effective

oversight should be excluded because she relied on insufficient data to support her findings that

(1) Smart "failed to establish effective lines of communication with Benecard" and (2) "Smart

lacked sufficient expertise."  (Pl. Br. at 15-16).  As set forth above, Culley-Trotman's opinion on

this subject is also based on her finding that Smart failed to effectively "oversee [Benecard's]

compliance with Medicare Part C and D requirements."  (Ex. 2, Culley-Trotman Report at 8).

Her finding is supported by CMS's sanctions letter to Smart dated April 23, 2013, which she

relied upon.  (Id. at 5 ("CMS issued intermediate sanctions . . . to Smart D Plan.")).  The

sanctions letter specifically stated that Smart failed to provide effective "monitoring and

---

[5]     Smart's complaints about Culley-Trotman's opinion concerning the fact that Benecard built "a customized benefits system" to "meet Smart's specifications" should be rejected for the same reasons.  Smart concedes that Culley-Trotman reviewed evidence to support her opinion, but claims that there is evidence "contradicting" her opinion.  (Pl. Br. at 15).  Smart can confront Culley-Trotman with any purported contrary evidence at trial.

auditing" and failed "to ensure that the corrective actions taken by First Tier entities were effective." (Ex. 8, CMS Sanctions Letter at 9). As a result, this argument should be outright rejected.

Smart's claim that Culley-Trotman reviewed only ten communications between Smart and Benecard is immaterial. It is not simply the quantity of the evidence that an expert relies on that matters, but also the quality of the evidence. The emails that Culley-Trotman relied upon provide strong evidence that Smart did not acknowledge or accept accountability for its role in actively overseeing Benecard. (Ex. 9, Smart email dated January 15, 2013 (complaining that "we have to tell them what to do"); Ex. 10, Smart email dated January 15, 2013 ("They won't like it cause they will feel *they didn't have direction* but it is what it is") (emphasis added)). Smart also ignores the fact that Culley-Trotman did not simply rely upon ten communications between Smart and Benecard. She also interviewed Benecard's employees and reviewed deposition testimony and documents on this subject.

Smart's argument that Culley-Trotman had no basis to state that Smart lacked sufficient staff is also meritless. As noted above, Smart's own compliance consultant noted that CMS found that Smart was "not fully staffed for" performing monitoring and oversight of Benecard. (Ex. 4, Culley-Trotman Tr. at 107:9-19). Moreover, CMS's Work Plan Request specifically required Smart to "retain consultants" and "increase its staff to include additional call center staff, pharmacists, a Vice President of Clinical Operations, and a new Chief Executive Officer." (Ex. 6, CMS Work Plan dated May 17, 2013). The sanctions letter also stated that "Smart's infrastructure [was] insufficient to ensure effective Part D operations." (Ex. 8, CMS Sanctions Letter at 2 (emphasis added)). There is more than sufficient evidence to support Culley-Trotman's opinion that Smart lacked the appropriate number of staff.

### G. Culley-Trotman Will Not Speculate as to Smart's or CMS's State of Mind

Benecard concedes that certain of Culley-Trotman's statements in her report exceed the parameters of admissible expert testimony by opining on Smart's and CMS's motives and intent. (Pl. Br. at 10-11). Culley-Trotman's testimony at trial will absolutely conform to the requirements of the Federal Rules of Evidence, respecting fully that no expert may usurp the roles of this Court in setting forth the law or the function of the jury in interpreting the evidence.

She should, however, be permitted to opine as to the issues underlying the statements at issue in her report. For example, she should be permitted to opine that Smart relied primarily on real-time access to monitor and oversee Benecard instead of using other accepted methods, that Smart did not properly monitor and oversee Benecard, that CMS took issue with Smart's lack of monitoring, and that CMS held Smart accountable for its own failings. These statements are based on facts, not speculation by Culley-Trotman.

## III. <u>CONCLUSION</u>

For the foregoing reasons, Benecard respectfully requests that the Court deny Smart's motion to exclude certain portions of the opinions and testimony of Francois Culley-Trotman.

Respectfully submitted,

**DLA Piper LLP (US)**

By: /s/ John M. Hillebrecht
John M. Hillebrecht

Dated: August 30, 2016