# Exhibit 2



# EXPERT WITNESS REPORT

## SMART D VS. BENECARD SERVICES INC.

### REBUTTAL OF EXPERT REPORT OF ERIN COSTELL

MAY 25, 2016

Prepared By: Francoise Culley-Trotman

Signed:_____

CULLEY WAGNER LLC
3853 Northdale Blvd, #354 Tampa, FL  33624 ~ 813.846.6424

**Organization of Report**                                    **Page#**

    1. Expert Witness Profile                              2

    2. Issues Addressed                                   3
    3. Background                                         3
    4. Opinions                                           7
    5. Basis/Reasoning                                    8
    6. Conclusion                                        13
    7. Attachments                                       14
       I. Curriculum Vitae
       II. List of Documents Reviewed

Case 1:15-cv-04384-KBF   Document 288-2   Filed 08/30/16   Page 3 of 18

1. **EXPERT PROFILE**

My name is Francoise Culley-Trotman and I have been retained by Benecard Services, Inc. (hereinafter "Benecard," the "PBM," "delegated entity," or "FDR") as a Medicare Advantage Part D Programs expert witness in the matter Smart Insurance Company (hereinafter "Smart D," "Smart," "Smart D plan" or the "health plan") v. Benecard Services, Inc., Case No. 1:15-cv-04384-KBF.

I have more than 15 years of direct experience in the healthcare regulatory compliance industry. My experience includes 8 years in executive compliance leadership for Medicare and Medicaid managed care organizations. I specialize in the development of Compliance and Audit Programs for health plans and their delegated entities. I focus on developing and implementing regulatory, ethics, privacy, and compliance training programs nationwide. I have effectively managed resources including operational and compliance functions in a range of complex environments from start up to Fortune 100 companies.

My specific experience includes working closely with the Centers for Medicare and Medicaid Services ("CMS") Part D Enforcement Division Leadership to remediate issues resulting from health plan audits and CMS enforcement actions. I successfully managed internal remediation plans that led to CMS's release of two (2) health plans from marketing and enrollment sanctions. Both health plans are currently in business as of this date. In my role as compliance executive I also aggressively project managed corrective action plans resulting from a Corporate Integrity Agreement, including the development of training materials and implementation of a compliance platform to summarize and publish new and revised regulatory guidance to business units.

I am currently the Principal of Culley-Wagner Compliance Solutions, LLC a compliance consulting firm that provides regulatory and compliance support to health plans, delegated entities, retail pharmacies, law firms and third party benefit administrators ("TPAs"). My curriculum vitae is attached for your review.

This report is my opinion based on information available to me as of the report date. I reserve the right to supplement this report if further discovery yields any relevant information.

I am being compensated at contractually agreed upon hourly rates for professional services rendered within the scope of this engagement. My compensation is not contingent upon the outcome of this matter.

2. Issues Addressed

I have been asked to render an opinion on the following issues, corresponding to opinions "b" and "c" in the expert witness report of Erin Costell:

   b. **Evaluate whether Smart performed oversight of Benecard as a first tier entity consistent with CMS' guidelines and industry norms.**
   c. **Evaluate whether Benecard operated in a manner consistent with Medicare Part D program requirements.[1]**

In order to objectively and fully answer these questions I examined the facts of the case supported by documentary evidence. A complete list of documents I relied on to support my opinions and conclusions is attached to this report as Attachment II. I also applied my specific knowledge of Medicare Part D regulations, rules and laws and Medicare Part D plan operations, industry best practices and publications to support my position on the issues at hand.

3. Background:

Before rendering an opinion on this case I examined the backdrop against which the parties engaged in business.

   a. Under the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA") CMS enters into agreements with health insurance providers to offer Part D Prescription Drug Plans to Medicare beneficiaries. These providers are named plan sponsors. The MMA regulations allow for plan sponsors to sub-contract with third party providers to assist with plan operational and management services.
   b. CMS defines these third parties as "first tier," "downstream" or "related" entities ("FDRs"). Pharmacy Benefit Managers ("PBM") fall within this designation of FDRs since plan sponsors often designate some or all of its responsibility to manage and administer Part D prescription drug benefits to PBMs. Significantly federal regulations warn that while sponsors may delegate all or some its functions under the contract with CMS; plan sponsors retain responsibility for all obligations under its contract with CMS[2].
   c. CMS is emphatic in its position that plan sponsors are responsible for the lawful and compliant administration of the Medicare Parts C and D benefits under their contracts with CMS, <u>regardless of whether the sponsor has delegated some of that responsibility to FDRs.</u>[3]

---

[1] Expert Witness report of Erin Costell dated April 18, 2016 at page 3
[2] Chapter 9 of the Medicare Prescription Drug Benefit Manual
[3] 42 C.F.R. §§ 422.503(b)(4)(vi)(F), 423.504(b)(4)(vi)(F)

    d. CMS expressly forbids health plans from delegating the responsibility for implementing a compliance program to oversee first tier, downstream and related entities.[4] This oversight is the sole function of the health plan.

    e. Smart D Plan a newly formed Prescription Drug Plan ("PDP") was required to submit its application to become a Medicare Part D plan sponsor by the CMS deadline of February 2012.[5] Smart would also have to subsequently submit "BIDs" to support plan benefits by June 2012.[6] According to the facts Smart D's management did not have prior experience administering benefits for a Medicare Part D plan and therefore contracted with Benecard, a PBM, to provide pharmacy benefit management services to Smart D Plan.

    f. Prior to execution of the final and amended Pharmacy Benefit Management Agreement ("PBMA") on March 19, 2012; Benecard and Smart D executives engaged in discussions regarding their potential agreement as early as the latter part of 2011 regarding Benecard's engagement to provide services to Smart D.[7]

    g. Benecard agreed to configure and build a claims adjudication system to process Part D claims for Smart D. The services rendered were done so pursuant to PBMA[8].

    h. Smart D received CMS approval to operate its Part D Plan on August 20, 2012; the plan was slated to accept its first enrollees on January 1, 2013. Prior to January 2013 Benecard configured and built a benefit and claims adjudication system for Smart D, to address complex Part D requirements including the ability to capture enrollment information, Part D plan specific benefit information and adjudication of claims based on the plan's CMS approved formulary (list of Medicare covered drugs for enrollees included in Part D health plan benefits)[9]. Additionally this customized platform included functionality to interface with software that generated reports, dashboards and facilitate data analysis. Benecard presented Smart D with written requirements for configuring the benefits and claims adjudication system including supporting policies and procedures for review and approval, prior to implementing the systems. Specifically Benecard created and shared with Smart D for review and approval:

    i. A SharePoint intranet site that served as a repository and collaborative space between Smart D and Benecard to facilitate Smart D's review and approval of all plan documents created by Benecard which were accessed by Smart D staff prior to September 2012;[10]

---

[4] Chapter 9 of the Prescription Drug Benefit Manual-Section 40.

[5] Health Plan Management System "Notice of Intent to Apply for Contract Year 2013 Medicare Advantage (Part C) and Prescription Drug Benefit (Part D) Contracts, and Related CY 2013 Application Deadlines," October 21, 2011

[6] SMT00172432- SMT00172435

[7] Kang Dep. 24:1-26:19, March 31, 2016 and Perry Dep. 28:10-29:9, February 24, 2016

[8] PBMA Section 2.1, 2.7, 2.8, SMT00172432-SMT00172435, SMT00886996

[9] Medicare.gov - The Official US Government Site for Medicare: https://www.medicare.gov/part-d/coverage/part-d-coverage.html (last visited May, 23, 2015)

[10] BC 0166897

j. As early as May 2012 the Benecard team began writing business requirements documents ("BRDs") which detailed the specifications for the benefits and claims adjudication system and any subsequent planned changes to the system. On October 25, 2012 Benecard employees draft business requirements to grant reporting access to Smart D and on November 12, 2012 final business requirements for the OLE reporting tool is approved by John Kloss (Smart'S Chief Operating Officer). Benecard ultimately created approximately 100 BRDs for Smart's review and approval.[11]

k. Operational policies and procedures to address delegated functions including coverage determinations, appeals and grievances, enrollment and customer service functions;[12]

l. Created a formulary as agreed on in the PBMA that was presented to Smart D on multiple occasions for review and approval;

m. Tracked status updates and collaborated with Smart to complete the CMS plan readiness checklist which is used to prepare for the upcoming plan year to allow the parties to collaborate on preparing for enrollment for the new plan year;[13] and

n. Implemented internal corrective action plans for operational challenges identified during the course of business.[14]

o. In February 2013 CMS provided Smart D with notice of a planned validation audit scheduled for March 2013. Benecard began preparing its systems and resources to address the areas selected for audit.[15] Benecard executives were unaware that while Benecard prepared for the audit, Smart D was soliciting requests for proposals from potential vendors to replace Benecard as its PBM. Smart admits that it secretly began the process of replacing its PBM on February 1, 2016. Benecard became aware of Smart D's plans via a misdirected communication of a proposed call with CMS (March 9, 2013) in which Smart D schemed to blame Benecard for problems with "benefit management functions". [16]

p. On April 23, 2013 subsequent to the March audit CMS issued intermediate sanctions (suspension of Enrollment and Marketing) to Smart D Plan. Among the stated reasons for issuing the sanctions, CMS noted that "[that Smart's infrastructure is insufficient to ensure effective Part D operations]".[17]

q. Smart D engaged in discussions with CMS during April through July 2013, regarding its plans to change its PBM and Smart D's belief that this would address any remaining concerns CMS had regarding Smart D's ability to properly manage its operations. In a May 30, 2013 email to Smart CMS makes it clear that changing PBMs does not resolve

---

[11] BC 0643260-BC0643262, SMT00019801, SMT00006197- SMT00006203, SMT00038363-SMT00038365
[12] SMT00037254-SMT00037258
[13] BC 0232248-BC 0232256
[14] BC 0385134-BC 0385135, BC 0664713
[15] SMT00335619 - SMT00335621
[16] SMT00332461- SMT00332462, SMT00332265-SMT00332266, BC 0671158
[17] SMT00153807-SMT00153808

        Smart D's problems. Additionally Smart D staff acknowledges that Smart D should be managing its PBM.[18]

  r. CMS did not have confidence in Smart's ability to effectively manage its operations. On May 2, 2013 Smart D engaged Babette Edgar, a compliance consultant, to assist with remediation activities as well as to negotiate with CMS to avoid immediate termination of the health plan's contract. CMS provided notice on May 17, 2013 to Smart that it will consider immediate termination of the plan if plan performance does not improve. CMS further mandated that Smart increase oversight of its PBM.[19] During these negotiations and discussions Babette Edgar advised Smart that CMS was not convinced that Smart D truly understood the rigor of delegated entity oversight and also that Smart lacked sufficient staffing specifically clinical pharmacists.[20] CMS eventually agreed to a novation of Smart D Plan with the provision that Smart D adhere to CMS's deadline for all required documents. A novation agreement is required to transfer the rights and obligations under a Medicare contract from one entity to another entity eligible to contract with Medicare.[21] This process avoids significant impact to enrollees as a result of a change of ownership. Despite several pleas to CMS by Smart D, the determination is that "CMS does not agree with Smart D's assessment of your [Smart D's] level of performance. CMS is in agreement that it is in the best interest of your enrollees to be transitioned to another Smart D sponsor."[22] Smart D Plan terminated its PBMA with Benecard on August 21, 2013. The parties executed a transition service agreement in October 2013 to facilitate Smart's transition to a new PBM. CMS mandates that the sale/novation of Smart D to Express Scripts Holdings be completed by 9/1/16.

---

[18] SMT00000653-SMT00000654, SMT00393053
[19] SD000019
[20] SMT00186715
[21] Medicare Managed Care Manual. Chapter 12, Effect of Change of Ownership.
[22] SD000231

### 4. OPINIONS

*Opinion* - **Evaluate whether Smart performed oversight of Benecard as a first tier entity consistent with CMS's guidelines and industry norms**

Based on my extensive experience managing compliance requirements for Medicare Advantage Part D health plan operations and a detailed review of information, documents and guidance relevant to this matter, my conclusions are as follows:

a. **Smart D did not provide effective oversight of Benecard based on CMS's expectations for delegated entity functions.** Based on extensive evidence from Smart D employee depositions, associated documents and CMS's assessment of Smart D's actions Smart D did not fully understand or accept responsibility for its role in overseeing its PBM nor did it accept ultimate responsibility for compliance with CMS requirements. CMS communicated to Smart D via Smart's compliance advisor Babette Edgar; "CMS didn't feel like Smart understood how rigorous PBM oversight has to be and is not fully staffed for it."[23]

b. **Smart D's oversight and monitoring of Benecard was not dependent on real time access to its systems.** Per CMS and industry guidelines Smart D is allowed to choose its own methods of monitoring the FDR.[24] CMS concerns were however focused on Smart D's lack of daily monitoring of critical activities, which would allow for immediate response to potential issues.[25] CMS did not stipulate that Smart D needed greater access to Benecard's production systems to accomplish effective oversight.

*Opinion* - **Evaluate whether Benecard operated in a manner consistent with Medicare Part D program requirements.**

c. **Benecard implemented policies and procedures to meet Medicare requirements based on Smart D's explicit approval of requirements.** Benecard was familiar with standard CMS requirements for Parts C and D health plans having administered benefits for its EGWP plan; however Benecard did not have prior experience adjudicating Part D benefits and claims. Benecard disclosed to Smart D prior to the execution of the PBMA that Benecard did not have prior experience adjudicating Part D claims. Benecard therefore relied on Smart D to outline specific requirements for Smart D's health plan including configuration of Part D Benefits and clinical requirements such as drug utilization edits. Benecard provided Smart D with written policies and business requirements during the plan's initial start up phase as well as post implementation. Smart D's uncertain decisions and inaction in specific cases impaired Benecard's ability to successfully support the plan.

---

[23] SMT00174579, SD000020, SMT00393053, SMT00154500
[24] Chapter 9 Prescription Drug Benefit Manual Section 40
[25] SMT00153687, SMT00153688

Specifically Smart D instructed Benecard to make several changes to its formulary in the form drug utilization edits that resulted in enrollees being unable to access their medications. These access issues typically result in operational problems such as increased request for coverage determinations, grievances (complaints) and appeals.[26]

### 5. BASIS/ REASONING

The reasoning to support my stated opinions is detailed below:

*Opinion -* **Evaluate whether Smart performed oversight of Benecard as a first tier entity consistent with CMS's guidelines and industry norms**

1. **Smart D did not provide effective oversight of Benecard based on CMS's expectations for delegated entity functions.**
    a. As discussed above and in the regulations noted in footnote 4 CMS expressly stipulates that Smart D shall provide three essential functions in its role as the plan sponsor:
        - Effectively train and educate its governing body members, employees and FDRs;
        - Effectively establish lines of communication within itself and between itself and its FDRs;
        - Oversee FDR compliance with Medicare Part C and D requirements;

        Based on the reasoning offered below I believe that Smart D did not commit to properly meeting any of the above three requirements; therefore Smart D did not properly oversee, monitor nor support Benecard in its implementation of Medicare requirements.

    b. Smart did not acknowledge or accept accountability for its role in actively overseeing Benecard. Instead Smart D employees demonstrated resentment for their obligation to provide training and regulatory guidance to the PBM.
        - In one instance where a Benecard employee reached out for clarification on audit results; Smart D employee Danielle Panich scoffs that Benecard is supposed to be an expert, "But we have to tell them what to do."(SMT00121588).
        - In another instance Tammy Cappadona (another Smart D employee) notes "They won't like it cause they will feel they didn't have direction but it is what it is" (SMT00121587).
        - Similar examples of staff being disgruntled about their role in providing guidance are cited below. [27].

---

[26] SD000043
[27] SMT00033636, SMT00225499, SMT00154500, SMT00121587, SMT00121588, SMT00243238

- Per email documentation and Smart D employee depositions (Stephanie Bayer and Tammy Cappadona) Smart D staff did not establish a collaborative or managerial/oversight relationship with Benecard. Smart D's Compliance Officer conceded during deposition that as early as February 2013 she wrote to her staff describing Benecard "I hate them".
- Earlier emails from January 2013 revealed Ms. Cappadonna stating with regards to Benecard, "Clearly they have to go." (SMT00033636, SMT00263183)
- In addition to angst expressed by Smart D staff for Benecard team members, Smart D's management team experienced serious discord during this period as expressed by Stephanie Bayer, Compliance Officer during deposition. Per Ms. Bayer, Smart D CEO, Pritpal Virdee make inappropriate comments regarding Smart D staff during interviews with CMS which may have negatively impacted CMS perception of the plan (Bayer Dep. 134-137). This tone of uncooperativeness established at the onset of the business relationship from Smart D staff demonstrates the barriers Benecard faced in establishing open communications with Smart D and optimizing its operations.

2. **Smart D's oversight and monitoring of Benecard was not dependent on greater real time access to its systems.**
    a. It was not necessary for Smart D to have more "real time" access than was granted to Smart D, to perform monitoring and oversight of Benecard.
    b. The tools provided by Benecard to Smart D (OLE, Cognos Reporting etc.),[28] are industry standard for health plan reporting and provides access to current and real time data in dashboard format. Cognos software is owned and marketed by IBM (Internal Business Machines™). Cognos allows companies to access real time data directly from their systems without compromising security and privacy standards.
    c. OLE (Open Library Environment) is proprietary software that allows for extracting transactions from platforms and reporting on data in a meaningful way. It also facilitates screen sharing and allows for web based collaborations, whereby multiple users can experience the same interface simultaneously.
    d. These dashboard and performance metric tools are used by Fortune 100 companies and are considered cutting edge technology. These types of software emerged in the healthcare setting during Smart D's initial formation in 2012. [29]
    e. CMS does not specify that Smart D must have unlimited access to Benecard's live production environment in order to accomplish its FDR oversight. CMS specifically

---

[28] HCCA (2014). Building a Compliance Dashboard (PowerPoint Slides). IPRO -Kentucky Department for Medicaid Services. (2013). Kentucky Medicaid Managed Care: Early Periodic Screening, Diagnostic and Treatment Services (EPSDT) Review (PowerPoint Slides)
[29] Ibid.

recommends in compliance guidance that health plans use metrics to oversee FDRs[30]. CMS states, "It is a best practice to use metrics to assist in observing compliance performance and operational trends"[31]. Moreover granting unlimited "real time access" to Benecard's system poses a risk to patient/member data since the information being accessed contains actual point of sale claims data of enrollees who present to the pharmacy to fill medications. CMS is typically adamant that PBMs be present during audits and to navigate through its systems to avoid compromising patient experience and access to medications during audits.

*Opinion* - **Evaluate whether Benecard operated in a manner consistent with Medicare Part D program requirements.**

3. **Benecard implemented policies and procedures to meet Medicare requirements based on Smart D's explicit approval of requirements.**
    a. Benecard possessed the requisite staff to manage its Part D operations (as discussed in footnote 4) and in fact did implement policies, procedures and protocols to meet Medicare requirements for managing a health plan's compliance with Part D requirements.[32] Smart D employees were required to approve and sign off on all requirements for plan operations prior to implementation and per Smart D employee depositions,[33] Smart D was given access to review and approve said policies and procedures.
    b. While Benecard did not have prior experience adjudicating Part D Claims it built a customized benefits and claims adjudication system for Smart D to meet Smart D's specifications.[34]
    c. Further, Benecard leveraged its prior plan management experience to caution Smart D about expanding the scope of its business to include new products in the early stages of the plan's operations. In a communication to Smart D executive John Kloss, Bill Wolfe of Benecard writes, "John, after extensive cross functional review we do not believe it is conducive to completion of implementation activities to introduce the added complexity of administering SPAPs [State Pharmaceutical Assistance Programs] at this time." [35] Benecard acted responsibly to ensure that its entire focus was on correctly implementing the agreed upon services in accordance with the PBMA.

---

[30] Prescription Drug Benefit Manual- Chapter 9 ; Section 40
[31] Ibid.
[32] BC 0285589, BC 02885578- BC 02885580, BC 0232047- BC0232049
[33] Cappadonna Dep. 57:1-25, 60:1-25, 61: 1-25, 62: 1-25, February 23, 2016
[34] SMT00003864
[35] SMT00024409

    d. Benecard implemented policies, procedures and protocols to meet its obligations outlined in the PBMA and CMS requirements. Per the testimony of Tammy Cappadonna, a former Smart D employee, Benecard implemented policies over and above those provided by Smart D. Further Smart D reviewed and approved said policies.[36] Smart's expert witness (Erin Costell) also concedes that her review of the documents resulted in the conclusion that Benecard complied with Medicare requirements.[37] In addition to implementing written policies Benecard sought advice from CMS in cases where clarification on CMS guidance was needed.[38] Benecard promoted transparency as well as obtaining expedient advice from CMS to correct a functional issue with the website in this case. Additionally Benecard immediately expedites CMS's request to Smart D for fulfillment.

    e. Arguably a key element of meeting CMS contractual obligations is maintaining transparency with business partners and with CMS. As previously discussed Smart D was expected per CMS guidance to keep open lines of communication with Benecard. In at least two documented instances Smart D expresses reluctance to share pertinent plan information with CMS.

- Smart D appears upset when Benecard reaches out to CMS for guidance in furtherance of its attempt to comply with Medicare regulations. In one instance Smart D's Compliance Officer Stephanie Bayer instructs staff to not submit a proposed change to the plan's website to CMS for approval.
- In a December 11, 2012 email Ms. Bayer instructs Mark Burnley and Ryan Hunt, "No we are not submitting this change to CMS I don't want to draw attention to it. Just make the change but skip the CMS submission component."[39]
- Notably the regulatory requirement to submit planned changes to the plan's website to CMS for approval is clearly stated in written regulations.[40]
- On August 21, 2013, Smart D's Compliance Officer Ms. Bayer again informs consultant Babette Edgar that she (Ms. Bayer) is considering not submitting a written script for making calls to Medicare members to CMS for approval.[41] Per Ms. Bayer via her email she is considering taking a "slap" from CMS on non-compliance rather than wait for the document to be approved in the requisite CMS ninety day approval period. On June 21, 2013 a Benecard

---

[36] Capadonna Dep. 42: 25, 43: 1-25, 44: 10-25, 45:1-13, February 23, 2016
[37] Expert Witness report of Erin Costell dated April 18, 2016 at page 19
[38] SD00411- SD00412
[39] SMT0002701
[40] Medicare Marketing Manual Chapter 3, Section 90.18
[41] SMT00225692

employee reaches out to CMS for assistance with updating the Smart D site and Smart D staff views this as problematic.[42] Benecard's intent to comply with Medicare requirements and to solicit help where necessary does not garner support from Smart D.

  f. It is clear from the evidence presented that Benecard focused on implementing Part D requirements as designed by CMS and the PBMA with Smart D despite a lack of support from Smart D Plan.
  - In rare cases where Benecard is able to obtain assistance from Smart D Plan, Benecard employees appear to be engage and accept such guidance (via email SMT00172432, SMT00272745).
  - There are specific cases where Smart D Plan exercises its authority to require Benecard to implement certain operational requirements which result in non-compliance with Medicare Part D requirements. According to testimony from Jennifer Fuhrman-Berger, a Pharmacist and Benecard employee, Benecard engaged Smart D Plan in all key decision making activities prior to implementation.
  - Notable examples are requirements such as safety edits to Smart D's formulary and testing of adjudication of claims. On examination of the facts while Benecard implemented benefits based on their client's (Smart D's) approval; Smart D appeared to lack the appropriate clinical experts to provide oversight of plan processes and benefits[43]. This results in missed opportunities to make informed business decisions that could be member friendly for their enrollees. In this case Smart D instructed the PBM to apply certain very restrictive ("hard") safety edits to particular formulary drugs, and then later instructed the PBM to reverse the edits and yet again instructing the PBM to reapply the edits. This type of activity results in inappropriate denial of medications for enrollees.
  - An additional example is Smart D's lack[44] of clinical staff to review or conduct testing of claims to determine whether they should be adjudicated under the Medicare Part B versus Part D benefit.[45] CMS makes it clear that there is no exhaustive list of situations where there is a clear determination of which benefit is to be used in the absence of clear guidance. Plans are expected to implement special compliance procedures to oversee this process. As a result of Smart D's decisions and actions/inactions certain operational processes did not function as designed. Therefore Benecard's coverage determinations and other operational processes which by CMS's

---

[42] SD000397, SD000408, SD000495
[43] SD000043-SD000044
[44] Fuhrman-Berger Dep. 127: 11:13, 129: 2-25, 134: 8-20, March 9, 2016 and SMT00248203
[45] Chapter 6. Part D Drugs and Formulary Requirements, section 20.2.2

own admission was intended to be a "safety net" [46] for cases where the plan's systems and processes were not perfect, became excessively overburdened. This placed significant strain on Benecard's normal operations. In essence while Benecard designed and implemented operational processes to meet Part D requirements, Smart D did not make informed choices or perform oversight because it lacked the necessary expertise to effectively oversee its health plan.

6. **Conclusion**

Benecard performed its obligations under the PBMA as agreed on. Benecard implemented Medicare Part D requirements in keeping with CMS specifications and despite a lack of oversight and guidance form Smart D. Smart D did not effectively utilize the tools provided by Benecard for operational monitoring but instead focused solely on obtaining "real time" access to Benecard's systems as a solution. Further Smart D staff expended significant energy in a combative relationship with Benecard its service provider while neglecting its accountability as a plan sponsor.[47] As a result of Smart D's lack of proper oversight and involvement in its role as sponsor of a Part D plan, it never established transparency and open communications with Benecard and did not assume accountability for health plan operations. Ultimately CMS, its key client expressed lack of confidence in Smart D's ability to continue to successfully operate its health plan, and not in Benecard's ability to address Medicare program requirements.

---

[46] Notice of Immediate Imposition of Intermediate Sanctions (Suspension of Enrollment and Marketing) for Prescription Drug Plan Contract Number: S0064, p. 5.
[47] Prescription Drug Benefit Manual-Chapter 9, section 40.

# 7. ATTACHMENTS

Attachment I – CURRICULUM VITAE.

ATTACHMENT II

LIST OF DOCUMENTS REVIEWED

**Deposition and Expert Reports**

1) Expert Report of Erin Costell filed on April 18, 2016
2) Deposition of Tammy Cappadonna on February 23, 2016
3) Deposition of Stephanie Bayer on March 2, 2016
4) Deposition of Jennifer Fuhrman-Berger on March 9, 2016
5) Deposition of Michael Perry on May 24, 2016
6) Deposition of Jeff Kang on March 31, 2016

**Public Documents**

1) Chapter 9 of the Medicare Prescription Drug Benefit Manual
2) Health Plan Management System "Notice of Intent to Apply for Contract Year 2013 Medicare Advantage (Part C) and Prescription Drug Benefit (Part D) Contracts, and Related CY 2013 Application Deadlines," October 21, 2011
3) Chapter 12 of the Prescription Drug Benefit Manual
4) Medicare Managed Care Manual. Chapter 12, Effect of Change of Ownership.
5) HCCA (2014). Building a Compliance Dashboard (PowerPoint Slides). IPRO -Kentucky Department for Medicaid Services
6) (2013). Kentucky Medicaid Managed Care: Early Periodic Screening, Diagnostic and Treatment Services (EPSDT) Review (PowerPoint Slides)
7) Medicare Marketing Manual Chapter 3, Section 90.18
8) Chapter 6. Part D Drugs and Formulary Requirements, section 20.2.2

**Electronic Citations:**

1) Medicare.gov - The Official US Government Site for Medicare: https://www.medicare.gov/part-d/coverage/part-d-coverage.html (last visited May, 23, 2015)
2) Centers for Medicare and Medicaid Services

   https://www.cms.gov/Medicare/Compliance-and-Audits/Part-C-and-Part-D-Compliance-and-Audits/Downloads/Smart-Immediate-Sanction-4_23_2013.pdf (last visited May 25, 2016)

**Regulations**

1) **42 C.F.R. §§ 422.503(b)(4)(vi)(F), 423.504(b)(4)(vi)(F)**

**Bates Numbered Documents**

1. SMT00172432- SMT00172435
2. SMT00886996
3. BC 0166897
4. BC 0643260-BC 0643262, SMT00019801, SMT00006197- SMT00006203, SMT00038363-SMT00038365
5. SMT00037254-SMT00037258
6. BC 0232248-BC 0232256
7. BC 0385134-BC 0385135, BC 0664713
8. SMT00335619 - SMT00335621
9. SMT00332461- SMT00332462,  SMT00332265-SMT00332266, BC 0671158
10. SMT00153807-SMT00153808
11. SMT00000653-SMT00000654, SMT00393053
12. SD000019
13. SMT00186715
14. SD000231
15. SMT00174579, SD000020, SMT00393053, SMT00154500
16. SMT00153687, SMT00153688
17. SD000043
18. SMT00033636, SMT00225499, SMT00154500, SMT00121587,SMT00121588, SMT00243238
19. BC 0285589, BC 02885578- BC 02885580, BC 0232047- BC0232049
20. SMT00003864
21. SMT00024409
22. SD00411- SD00412
23. SMT0002701
24. SMT00225692
25. SD000397, SD000408, SD000495
26. SD000043-SD000044
27. SMT00393053
28. SMT00121587-SMT00121588
29. SMT00272745
30. SMT00263183