# Exhibit 4

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
 3    SOUTHERN DISTRICT OF NEW YORK
 4    Index No. 1:15-cv-04384(KBF)
 5    ------------------------------------x
 6    SMART INSURANCE COMPANY,
 7            Plaintiff,
 8
           - against -
 9
10    BENECARD SERVICES, INC.,
11            Defendant.
12    ------------------------------------x
                    July 15, 2016
13                  10:02 a.m.
14
15       Videotaped Deposition of FRANCOISE
16    CULLEY-TROTMAN, taken by Plaintiff,
17    pursuant to Notice, held at the offices of
18    DLA Piper LLP, 1251 Avenue of the Americas,
19    New York, New York, before Todd DeSimone, a
20    Registered Professional Reporter and Notary
21    Public of the State of New York.
22
23
24
25
```

| Page 14 | Page 16 |
|---|---|
| 1        F. CULLEY-TROTMAN<br>2     A.    Correct.<br>3     Q.    Have you been employed by a<br>4  Part D plan before?<br>5     A.    Yes.<br>6     Q.    Which ones on your resume are<br>7  Part D plans?<br>8     A.    All of those companies are what<br>9  are called Medicare Advantage Part D plans.<br>10  Some of them offer Medicare Advantage and<br>11  Part D plans, some of them offer<br>12  prescription drug program plans that only<br>13  have a Part D benefit.<br>14           So in all of those companies,<br>15  I've worked for companies that offered a<br>16  prescription drug plan.<br>17     Q.    Have you ever worked on behalf<br>18  of a PBM before?<br>19     A.    I have not represented a PBM<br>20  before.<br>21     Q.    Of the Part D plans that you've<br>22  worked for before, how many of them have<br>23  engaged a third party to act as a PBM while<br>24  you were there?<br>25     A.    All of them. | 1        F. CULLEY-TROTMAN<br>2  to be the services in the contract.<br>3     Q.    Fair enough.<br>4           You do agree, however, that in<br>5  the administration of its obligations under<br>6  a contract, the PBM needs to cooperate in<br>7  the carrying out of its obligations with<br>8  the sponsor, correct?<br>9           MR. BUNN:  Objection to form.<br>10     A.    I think it's a basic<br>11  expectation that if I contract with<br>12  someone, that, you know, I have an<br>13  expectation to get whatever is in the<br>14  contract.<br>15     Q.    Well, this is more than just a<br>16  basic contract expectation, isn't it,<br>17  because it is a regulated entity with CMS<br>18  oversight, correct?<br>19           MR. BUNN:  Objection to form.<br>20     A.    I believe a contract is a<br>21  contract, and it doesn't matter whom the<br>22  two parties are.<br>23           There are certain expectations<br>24  that are set out for both parties, and<br>25  specifically in the PBM contracts there is |

| Page 15 | Page 17 |
|---|---|
| 1        F. CULLEY-TROTMAN<br>2     Q.    Can you tell me who the PBMs<br>3  were?<br>4     A.    Express Scripts, OptumRx<br>5  offered by United Health Plans, Envision<br>6  PBM, CVS Caremark.  Those are the ones that<br>7  I recall that come to mind.<br>8     Q.    Do you agree that when you have<br>9  worked at a Part D plan which has employed<br>10  a PBM, an outside company as a PBM, that<br>11  the sponsor expects the PBM to cooperate in<br>12  the administration of the plan?<br>13           MR. BUNN:  Objection to form.<br>14     A.    Can you please repeat that?  It<br>15  is a longer question.<br>16     Q.    It is a long question.  I<br>17  apologize.<br>18           When you have worked on behalf<br>19  of a Part D plan, do you agree that the<br>20  plan has expected the sponsor -- I'm sorry,<br>21  the PBM to cooperate in the administration<br>22  of the plan?<br>23     A.    I believe that both parties are<br>24  expected to cooperate to accomplish what<br>25  they contracted, you know, what they agreed | 1        F. CULLEY-TROTMAN<br>2  a reason that it is set out that way,<br>3  because one cannot perform without the<br>4  other, you know, sort of delivering or<br>5  cooperating and providing whatever<br>6  information, data sets, that they are<br>7  supposed to.<br>8           So I don't see that as a<br>9  one-sided relationship.<br>10     Q.    I didn't -- go ahead, I'm<br>11  sorry.<br>12     A.    So I think my statement stands<br>13  that it has to be both parties have<br>14  expectations and the one is not able to<br>15  deliver without the other.<br>16     Q.    I understand.  I'm not asking<br>17  you about what the sponsor's obligations<br>18  are.<br>19           I'm asking you, just simply in<br>20  the carrying out of its duties, you do<br>21  agree that a PBM must cooperate with the<br>22  sponsor in the administration of the plan?<br>23     A.    Yes.<br>24     Q.    And there is an expectation<br>25  both from the sponsor and from CMS that the |

5 (Pages 14 - 17)

Page 34

1    F. CULLEY-TROTMAN
2        MR. BUNN: Do you understand
3    that?
4        THE WITNESS: I do.
5    Q.   Can you answer it?
6    A.   It was regarding the case.
7    Q.   When did you start working on
8    your expert report in the case?
9    A.   I would say probably February
10   of 2016, requesting documents.
11       MR. BUNN: Excuse me, he didn't
12   ask you what the work was. He asked you
13   for a date.
14       THE WITNESS: Okay. I'll try
15   to be more careful.
16   Q.   When you started working on --
17   strike that.
18       Your expert report at least
19   states that it is rebutting the expert
20   report of Ms. Costell; is that your
21   understanding of what you've written?
22   A.   Yes.
23   Q.   Did you start working on your
24   expert report in the case after Ms. Costell
25   submitted her expert report in the case?

Page 35

1    F. CULLEY-TROTMAN
2    A.   My focused arguments --
3        MR. BUNN: Excuse me, that is a
4    yes or no question.
5    A.   Yes.
6    Q.   Did you do any other work that
7    you considered or relied upon in writing
8    your expert report before you started
9    writing the report?
10   A.   No.
11       MR. BUNN: These are yes or no
12   questions.
13       THE WITNESS: Got it.
14   Q.   Have you had any meetings with
15   anyone at Benecard?
16   A.   Yes.
17   Q.   Tell me who. You know what,
18   strike that. Tell me when.
19   A.   Sometime in April are the ones
20   that I actually do remember, and it was --
21       MR. BUNN: His question is
22   when.
23       THE WITNESS: Okay.
24   Q.   Where was that meeting? Strike
25   that.

Page 36

1    F. CULLEY-TROTMAN
2    A.   I'm trying to remember the
3    exact date. I don't.
4    Q.   Roughly April?
5    A.   Yeah.
6    Q.   Were there any other meetings
7    you've had with people at Benecard?
8        Strike that. Let me ask that
9    clearer.
10       Were there any other meetings
11   you've had with employees or former
12   employees of Benecard?
13   A.   Yes.
14   Q.   When?
15   A.   I really do not recall.
16   Q.   Was it after the April meeting?
17   A.   Probably prior to the April
18   meeting.
19   Q.   Was it in 2016?
20   A.   Yes.
21   Q.   How many?
22   A.   No, I'm sorry.
23   Q.   That's okay.
24   A.   It may have been 2016, but at
25   this point I honestly do not recall the

Page 37

1    F. CULLEY-TROTMAN
2    actual dates of those meetings.
3    Q.   How many meetings have you had
4    with employees or former employees of
5    Benecard?
6    A.   Two or three.
7        Can I ask a question? By
8    meetings, these are teleconferences. I
9    just want to be clear.
10   Q.   I appreciate that
11   clarification. I would consider those
12   meetings. But that's a helpful
13   clarification.
14       So you had phone calls with
15   them?
16   A.   Yeah.
17   Q.   Who was on those phone calls?
18   A.   I think Jennifer Fuhrmann, Dave
19   Slonac. Those are at least two of the
20   people that I remember. And, again, I
21   don't remember the entire list.
22   Q.   Was Michael Perry on any of
23   those calls?
24   A.   No.
25   Q.   Were the lawyers on any of

10 (Pages 34 - 37)

Page 106

F. CULLEY-TROTMAN

Q. And technically, each time it's denied, if that denial is improper, each one is improper; you agree with that?
A. Yes, technically, yes.
Q. And when I talk about 50,000 claims, I'm not including those kind of denials. If a claim was denied once, I'm not talking about attempts to put it back through. Do you understand that?
A. I understand your explanation.
Q. So my question is, with that definition of what an improper denial is, not counting repeated denials of the same claim being put through, have you worked with plans that have suffered in a six-month or less period more than 50,000 improper claim denials at the point of sale?
A. Yes.
   MR. BUNN: Objection to form.
Q. And would that be true of both WellCare and Universal?
A. WellCare.
Q. And WellCare had well more than

Page 107

F. CULLEY-TROTMAN

100,000 members?
A. Yes, and well more than 50,000 inappropriate rejections.
Q. Turn to page 7 of your report. This is where your opinions start, correct?
A. Correct.
Q. You say, at the end of paragraph 4(a), which is the first paragraph of your opinions, that "CMS didn't feel like Smart understood how rigorous PBM oversight has to be and is not fully staffed for it."
   Then you cite SMT 174579 for that proposition, correct?
   MR. BUNN: Objection to form.
A. Yes, I cite four documents to support that proposition.
Q. Well, let me ask you, I had a hard time following what you were trying to do in your citations. It's not a criticism. I'm just being honest, I didn't understand.
   I assumed that when you listed

Page 108

F. CULLEY-TROTMAN

a bunch of documents after a paragraph that had a bunch of sentences, that the different documents supported different propositions in the paragraph.
   Is that an incorrect assumption?
A. All of the documents together, yes, supported the paragraph on a whole.
Q. Do you know which document in this footnote supports --
A. No.
   MR. BUNN: Wait.
A. Sorry.
Q. That's okay. Let me start over. Strike that.
   Do you know which document in this footnote supports your assertion that CMS didn't feel like Smart understood how rigorous PBM oversight has to be and is not fully staffed for it?
A. It is an e-mail communication between Babette Edgar, who was relaying this information to SmartD plan.
   I obviously did not commit

Page 109

F. CULLEY-TROTMAN

Bates number documents to memory. But I will be happy to take a look at it.
   (FCT Exhibit 3 marked for identification.)
Q. I'm handing you what I have marked as FCT Exhibit 3, which is SMT 174576 to 79, which is the first document cited in that footnote.
   I believe that is the document you are referring to, but you tell me if my assumption is correct.
   (Witness perusing document.)
A. It is correct.
Q. And just to be clear, this document is Steph Bayer reporting what Babette Edgar said to Ms. Bayer about what CMS said to her, correct?
A. Correct.
Q. You and I don't know what CMS really said, do we?
A. I think it is very reasonable that this was being reported almost verbatim.
Q. Let me ask you my question

Page 118

```
 1           F. CULLEY-TROTMAN
 2      Q.   No, that's not what I asked.
 3           I asked, can you and I agree
 4   that it makes it harder for a plan sponsor
 5   to oversee the administration of its plan
 6   if the party to whom it has delegated
 7   responsibility for carrying out the day to
 8   day activities isn't cooperating?
 9      A.   I think it would be a
10   challenge, but it doesn't relieve the plan
11   sponsor of its obligation.
12      Q.   I understand.  But it makes it
13   harder, doesn't it?
14      A.   Yes.
15      Q.   Do you think it makes sense for
16   a PBM to refuse to cooperate in the
17   administration of a plan, but then turn
18   around and complain that the sponsor didn't
19   oversee it enough?
20           MR. BUNN:  Objection to form.
21      A.   Do I think it makes sense if a
22   PBM does what?
23      Q.   Do you think it makes sense for
24   a PBM to refuse to cooperate in the day to
25   day administration of a plan, but then turn
```

Page 119

```
 1           F. CULLEY-TROTMAN
 2   around and complain that the sponsor didn't
 3   oversee it enough?
 4           MR. BUNN:  Objection to form.
 5           THE WITNESS:  Am I answering
 6   this question?
 7           MR. BUNN:  Yes, you answer any
 8   question unless I instruct you not to.  But
 9   you give me enough time to give an
10   objection, and if an instruction is
11   warranted, give me enough time to give you
12   that, too, which you are not doing.
13           THE WITNESS:  Okay.
14      Q.   You can answer.
15      A.   I can't opine on that.
16      Q.   You say in paragraph 4(a) of
17   your report that "Smart did not provide
18   effective oversight of Benecard consistent
19   with CMS guidelines," correct?
20      A.   Yes, it's stated.
21      Q.   And that's your interpretation
22   of CMS guidelines, not the contract between
23   Smart and Benecard, correct?
24      A.   Correct.
25      Q.   Now, the contract between Smart
```

Page 120

```
 1           F. CULLEY-TROTMAN
 2   and Benecard required Benecard to comply
 3   with CMS rules and guidelines and
 4   regulations, correct?
 5           MR. BUNN:  Objection to form.
 6      Q.   Do you recall that?
 7      A.   Correct.
 8      Q.   CMS actually forces sponsors to
 9   include a provision like that in all
10   contracts with FDRs, doesn't it?
11      A.   Correct.
12      Q.   By law?
13           MR. BUNN:  Objection to form.
14      A.   It's a CMS requirement that
15   that clause be included in the contract.
16      Q.   Does the contract also include
17   a provision that requires -- and when I say
18   the contract, I mean the PBMA -- does it
19   include a provision that requires Smart to
20   comply with CMS rules and regulations in
21   its relationship with Benecard?
22           MR. BUNN:  Objection to form.
23      A.   Can you repeat the question,
24   please?
25      Q.   Sure.
```

Page 121

```
 1           F. CULLEY-TROTMAN
 2           Does the PBMA include a
 3   provision that also requires Smart to
 4   comply with CMS rules and regulations in
 5   its relationship with Benecard?
 6           MR. BUNN:  Same objection.
 7      Q.   If you know.
 8      A.   I don't recall.
 9      Q.   And then you state in your
10   report, this opinion that we've just been
11   talking about "is based on extensive
12   evidence from SmartD employee depositions,
13   associated documents, and CMS's assessment
14   of SmartD's actions," correct?
15      A.   Correct.
16      Q.   I want to break that down.
17           With respect to the SmartD
18   employee depositions, you read three,
19   right?
20      A.   Correct.
21      Q.   Bayer, Cappadonna and Kang?
22      A.   Correct.
23      Q.   You haven't read the deposition
24   of Danielle Panich?
25      A.   I cited the depositions that
```

31 (Pages 118 - 121)

Page 130

F. CULLEY-TROTMAN

2 but -- I know they are Smart employees.
3  Q.  And with respect to the
4 associated documents you read, is that a
5 reference to what's listed in your report?
6  A.  Yes, they are the e-mails
7 cited, the e-mail.
8  Q.  So 30 documents?
9  A.  Yeah.
10  Q.  And with respect to the CMS
11 assessment of SmartD's actions, that's a
12 reference to the sanctions letter?
13  A.  I'm referring to CMS's comments
14 in letters or e-mails that I saw.
15  Q.  The ones listed in your report?
16  A.  Yes.
17  Q.  So documents within the 30
18 documents we just talked about?
19  A.  Yes.
20  Q.  Look at paragraph 4(b) of your
21 report now.
22      You say there that "Per CMS and
23 industry guidelines, SmartD is allowed to
24 choose its own methods of monitoring the
25 FDR."

Page 131

F. CULLEY-TROTMAN

2      Do you see that?
3  A.  Correct.
4  Q.  What do you mean by that?
5  A.  CMS does not specify in the
6 guidelines a standard operating procedure,
7 if you will, for SmartD's oversight of its
8 PBM.  Instead, it publishes general
9 guidelines for requirements like routine
10 auditing and monitoring and so on, and
11 allows the health plan to come up with a
12 specific operating procedure as to how it's
13 going to oversee the PBM.
14  Q.  And Smart is the plan sponsor,
15 it owes responsibilities to CMS for the
16 operation of its plans, right?
17  A.  Correct.
18  Q.  And as we talked about earlier,
19 it is responsible to CMS if something goes
20 wrong with the administration of the plans
21 even if the issue has been delegated or the
22 responsibility has been delegated to
23 someone else, right?
24  A.  Can you repeat that?
25  Q.  It is responsible, the sponsor,

Page 132

F. CULLEY-TROTMAN

2 to CMS if something goes wrong with the
3 plan even if what went wrong involved an
4 area that had been delegated to an FDR,
5 correct?
6  A.  Yes, the plan sponsor has
7 ultimate responsibility.
8  Q.  And because it's on the hook
9 and because the plan is its plan, Smart has
10 the right to decide, in your words, its own
11 methods of monitoring the FDR, correct?
12  A.  Yes, as long as they are
13 effective, yes, it can determine that.
14  Q.  And per CMS and industry
15 guidelines, the FDR is supposed to
16 cooperate in that effort, correct?
17  A.  Correct.
18  Q.  Now, in that same paragraph you
19 say that "CMS did not stipulate that SmartD
20 needed greater access to Benecard's
21 production systems to accomplish effective
22 oversight."
23      Do you see that?
24  A.  I see that.
25  Q.  What does that mean, "did not

Page 133

F. CULLEY-TROTMAN

2 stipulate"?  What did you mean by that?
3  A.  So in the written CMS
4 guidelines in the chapter, there is not a
5 specific rule that states that -- that
6 specifies what level of system access is
7 required for SmartD to perform effective
8 oversight.
9  Q.  Well, this statement, though,
10 is a little bit more specific.  You say
11 that "CMS did not stipulate that SmartD
12 needed greater access to Benecard's
13 production systems to accomplish effective
14 oversight."
15      You are talking specifically
16 about what CMS said about Smart and
17 Benecard, right?
18  A.  I'm speaking specifically about
19 what CMS outlines in the guidelines as a
20 continuation of the paragraph, as what is
21 appropriate or effective oversight.
22  Q.  Why is it important to you that
23 CMS did not stipulate that SmartD needed
24 greater access to Benecard's production
25 systems --

Page 142

1        F. CULLEY-TROTMAN
2        MR. BUNN: Wait until he
3    finishes his question.
4    Q.   You are adding the phrase
5    "supported my testimony."
6    A.   Yes.
7    Q.   But I'm not including that
8    phrase. I'm asking you point blank, yes or
9    no, if you reviewed a document that relates
10   to the subject matter of your testimony,
11   did you include it in your list of reviewed
12   documents --
13       MR. BUNN: Objection to form.
14   Q.   -- even if it didn't support
15   what you wrote here?
16   A.   You are asking if I reviewed a
17   document, period, but it has, in my view,
18   nothing to do with any of the points listed
19   in my report, is it listed in the list of
20   reviewed documents?
21   Q.   No, I'm not asking you that at
22   all. I don't think my question is
23   complicated. Maybe it is. Let me break it
24   down.
25       If you reviewed a document that

Page 143

1        F. CULLEY-TROTMAN
2    relates to the subject of your report, the
3    Smart/Benecard relationship, the CMS audit
4    of Smart, the topics that are covered in
5    your report, if you reviewed a document
6    related to those topics, did you list it in
7    your list of documents reviewed? Yes or
8    no.
9        MR. BUNN: Objection to form.
10   A.   I really think that that
11   question is not clear.
12   Q.   What's not clear about it?
13   A.   I wrote a subject -- a subject
14   matter expert report. In the subject
15   matter expert report, various topics are
16   covered. In the list of documents that I
17   listed, I listed the documents that covered
18   all of the things that I referenced.
19   Q.   Okay. So if you reviewed a
20   document that relates to the Benecard/Smart
21   relationship, the CMS audit of Smart, the
22   CMS sanction of Smart, documents related to
23   Smart or Benecard, if you reviewed it, did
24   you list it?
25   A.   If it is referenced in my

Page 144

1        F. CULLEY-TROTMAN
2    report, I listed it.
3    Q.   No, I'm not asking you that.
4    I'm not asking you that. And I think my
5    question is clear, and I don't understand
6    why I cannot get an answer.
7        I'm asking you point blank, if
8    you reviewed a document related to this
9    subject matter, did you list it as a
10   document you reviewed? Yes or no.
11       MR. BUNN: Objection to form.
12   Q.   There is a question pending.
13   A.   I know. And, again, my answer
14   is all of the documents that I reviewed to
15   support my report is listed here.
16   Q.   What if they didn't support
17   your report?
18   A.   If they had no bearing or I
19   wasn't addressing those subjects, then it's
20   not in there.
21       There are documents that I saw
22   in passing -- when I list documents I
23   reviewed, I actually went through the
24   document, read every page, reviewed it in
25   its entirety, and I don't believe I can say

Page 145

1        F. CULLEY-TROTMAN
2    I reviewed a document because I simply
3    looked at it in passing.
4    Q.   So did you read the CMS audit
5    report, or not?
6    A.   I read it.
7    Q.   When did you read it?
8    A.   At some point during this
9    exercise. Again, it's a public document.
10   Q.   Why is it not listed in the
11   list of documents that you reviewed, then?
12   A.   Because I didn't reference it.
13   Q.   Because you didn't cite it?
14   A.   Exactly, I did not specifically
15   cite that. And it is one of the few
16   documents --
17       MR. BARNOWSKI: We need to take
18   a break, then. I need to know what she
19   reviewed in writing this report. If she
20   reviewed documents that she thinks
21   conflicted with her testimony or don't
22   support her, I'm entitled to know what she
23   reviewed.
24       MR. BUNN: You are entitled to
25   ask her those questions.

37 (Pages 142 - 145)

Page 214

1      F. CULLEY-TROTMAN
2          MR. BUNN: That's a yes or no
3  question.
4      A.    No.
5      Q.    Were there any follow-up
6  questions at all?
7      A.    No.
8      Q.    Page 9 of your report, you
9  state that "Smart's oversight and
10 monitoring was 'not dependent on greater
11 real-time access to Benecard's systems,'"
12 and then you offer a number of opinions
13 about OLE and COGNOS.
14         You do agree -- strike that.
15         Did you ask Benecard to show
16 you what information was made available to
17 Smart via OLE in the first three months of
18 2013?
19     A.    No, I did not.
20     Q.    So can you and I agree you have
21 no idea what information was made available
22 to Smart via OLE in the first three months
23 of 2013?
24     A.    I relied on the documentation I
25 saw, which was the list of BRDs to

Page 215

1      F. CULLEY-TROTMAN
2  implement specific levels of access to OLE.
3      Q.    And did those BRDs indicate
4  that they had been closed out, completed?
5      A.    I do not recall. They are
6  included in the documentation.
7      Q.    Are you aware that Benecard was
8  working, or at least claimed to be working,
9  on a build-out of OLE that would make even
10 more information available to Smart that
11 was not closed out?
12     A.    I'm not.
13     Q.    So you don't know, of the BRDs
14 you looked at, whether any of that
15 information was actually made available to
16 Smart, correct?
17     A.    I relied on the additional
18 documentation that I cited in here where
19 Smart's employees were saying that they did
20 have access to OLE and COGNOS, but it was
21 not so efficient, including deposition.
22     Q.    So you relied on documents and
23 deposition testimony stating that they had
24 some access to OLE, but that it was
25 insufficient, and some access to COGNOS,

Page 216

1      F. CULLEY-TROTMAN
2  but it was insufficient, correct?
3      A.    And, again --
4      Q.    I'm okay with the "and, again,"
5  but if you can give me an answer to the
6  "correct" first and then give me the "and,
7  again."
8          So is that correct?
9      A.    The Smart employees were saying
10 they did have access to OLE and COGNOS
11 reporting. The satisfaction that was
12 expressed were the Smart employees stating
13 that they wanted direct access to the
14 system.
15         So my report relied on the fact
16 that it was my opinion that I thought that
17 these tools provided enough access for
18 SmartD to do oversight without waiting on
19 what they considered to be real-time
20 access.
21     Q.    But to be clear, the deposition
22 transcripts you read of the three
23 witnesses, Smart witnesses that you read,
24 where they talk about OLE, were very clear
25 that they believed that the information

Page 217

1      F. CULLEY-TROTMAN
2  given in OLE was not enough, correct?
3      A.    That was the testimony of the
4  employees, yes.
5      Q.    And you've seen contemporaneous
6  written e-mails from the Smart employees
7  repeatedly saying that the OLE they got
8  access to did not provide enough
9  information, correct?
10     A.    There were complaints I saw
11 from the Smart employees.
12     Q.    Over and over and over again,
13 right?
14         MR. BUNN: Objection to form.
15     A.    I wouldn't characterize it as
16 over and over and over again. And, as I
17 stated before, my opinion was that that was
18 used as a crutch to not perform the
19 oversight with the information they were
20 given while awaiting additional access.
21     Q.    You have no idea what
22 information was made available to Smart at
23 any point in time via OLE, correct?
24         MR. BUNN: Objection to form.
25     A.    The e-mails I read outlined

Page 218

1        F. CULLEY-TROTMAN
2  what the employees were able to see or not
3  see.
4     Q.    And what did they say?
5     A.    That they are able to see some
6  claims information, enrollment information,
7  but they wanted more access.
8     Q.    And are those documents cited
9  in the 30 documents that you read in this
10 case?
11    A.    Yes.
12    Q.    And do you have any idea what
13 information was made available via COGNOS?
14    A.    I do not, again, apart from the
15 documents I cited.
16    Q.    Which documents that you cited
17 lay out the information that was made
18 available to Smart via OLE?
19    A.    One moment.
20          (Witness perusing document.)
21    A.    One specific document was BC
22 0166897.
23    Q.    And, I'm sorry, what number is
24 that on your list?
25    A.    It is number 3.

Page 219

1        F. CULLEY-TROTMAN
2     Q.    BC 0166897?
3     A.    I believe so.
4     Q.    Any others?
5     A.    I will continue to look.
6          Please also refer to the
7  documents at footnote 11.  I'm guessing I
8  don't have to read all of those.
9     Q.    Your testimony is that the
10 documents set forth in footnote 11 lay out
11 the information that was available via OLE
12 to Smart?
13    A.    Yes.
14    Q.    Anything else?
15    A.    I can't say with certainty at
16 this time that there are no other
17 documents, but they are included in the
18 documents cited.
19    Q.    Do you agree that in order to
20 do your job with -- strike that.
21          Do you agree that in order to
22 do its job consistent with contractual
23 obligations to CMS, that transparency with
24 business partners is a key element?
25          MR. BUNN:  Objection to form.

Page 220

1        F. CULLEY-TROTMAN
2     A.    And the question is, do I agree
3  that in order to do which job?
4     Q.    Do you agree that in order to
5  do its job consistent with contractual
6  obligations to CMS, that a sponsor's
7  transparency with respect to business
8  partners is key?
9          MR. BUNN:  Objection to form.
10    A.    I agree that a sponsor needs to
11 be transparent with CMS, amongst other
12 things, like maintaining an open
13 relationship and remediating corrective
14 action plans and all of the other things
15 that they have committed to within the
16 scope of the contract.
17    Q.    That's not quite what I asked,
18 though.
19    A.    Okay.
20    Q.    In order to do its job,
21 consistent with its contractual obligations
22 to CMS, a sponsor needs transparency with
23 respect to the FDRs, doesn't it?
24          MR. BUNN:  Objection to form.
25    A.    Is your question whether the

Page 221

1        F. CULLEY-TROTMAN
2  sponsor needs the PBM to be transparent to
3  the sponsor, is that the question?
4     Q.    That's one of the elements,
5  isn't it?
6     A.    I think that's the expectation
7  of any relationship, that both parties be
8  transparent with each other.
9     Q.    And sponsors generally expect
10 full visibility into the delegated entity's
11 performance of its delegated
12 responsibilities, correct?
13          MR. BUNN:  Objection to form.
14    A.    Yes.
15    Q.    And you agree that it wouldn't
16 be industry standard for a sponsor to
17 refuse to -- strike that.
18          It would not be industry
19 standard for a PBM to refuse to allow the
20 sponsor to test the claims adjudication
21 system before plan benefits go live?
22    A.    So your specific question is
23 addressing an area that takes various
24 forms, depending on who your PBM is and who
25 the plan sponsor is.  That's not the only

Page 234

1    F. CULLEY-TROTMAN
2  configured here, do you?
3    A.   No.
4    Q.   Did you ask?
5    A.   I did not have a need to.
6    Q.   Why did you not have a need to?
7    A.   Because in this report, I
8  address two different mechanisms that the
9  PBM was using to attempt to allow SmartD to
10 access its member information.
11       The OLE tool is a tool that
12 allows you to look into the system and acts
13 as sort of a mirror, and that's how I
14 viewed that. Between those two tools,
15 there was at least sufficient access for
16 some level of oversight to have occurred.
17   Q.   But you don't know what the OLE
18 gave access to here, do you?
19   A.   Again, the way the OLE behaves
20 is almost a camera. It looks into the
21 system. And I looked at the BRD and the
22 specific requirements.
23   Q.   That's a critical part of your
24 testimony, right, that OLE functioned like
25 a camera?

Page 235

1    F. CULLEY-TROTMAN
2       MR. BUNN: Objection to form.
3    A.   That is not a critical part of
4  my testimony. My testimony is that between
5  OLE and COGNOS, those two tools should have
6  been sufficient to provide enough
7  information to perform oversight.
8    Q.   Can you and I agree that if OLE
9  gave no relevant information with respect
10 to Part D, that your testimony would
11 change?
12   A.   I would be speculating, so I
13 will not agree to that.
14   Q.   I'm not asking you to
15 speculate.
16       If OLE gave no relevant
17 information with respect to Part D, if it
18 was useless to someone looking for Part D
19 information, would COGNOS be enough?
20   A.   If configured correctly.
21   Q.   But you don't know how it was
22 configured here, right?
23   A.   No.
24   Q.   And you don't know if OLE was
25 useless with respect to Part D fields here,

Page 236

1    F. CULLEY-TROTMAN
2  correct?
3    A.   Again, there was no evidence to
4  suggest that it was useless. In the
5  documentations I reviewed, there was no
6  evidence to suggest that it was useless.
7    Q.   So I take it from that answer
8  that Benecard did not share with you that
9  its own IT staff wrote e-mails in which it
10 said that OLE was useless for the needs
11 that Smart had; is that accurate?
12       MR. BUNN: Objection to form.
13   A.   Again, if I read the testimony
14 in the depositions of the Smart employees,
15 there is no evidence to suggest that OLE
16 was non-Part D, the testimony I relied on.
17       MR. BARNOWSKI: I move to
18 strike that answer as nonresponsive.
19   Q.   My question is simply, I take
20 it from your answer that Benecard did not
21 share with you that its own IT staff wrote
22 e-mails in which it stated, or they stated,
23 that OLE was useless for the needs that
24 Smart had; is that accurate? They didn't
25 tell you that?

Page 237

1    F. CULLEY-TROTMAN
2       MR. BUNN: Objection to form.
3    A.   Are you asking me if Benecard
4  staff shared e-mails with me where the
5  Benecard staff was stating that OLE was
6  useless?
7    Q.   I'm asking if they told you
8  that.
9    A.   I did not ask those questions.
10   Q.   Did they offer that on their
11 own?
12   A.   No.
13   Q.   Would that surprise you to find
14 out?
15       MR. BUNN: Objection to form.
16   A.   Again, this is -- I cannot
17 answer that.
18   Q.   It would not be -- strike that.
19       Benecard needed to do --
20 provide at least OLE and COGNOS, correct?
21       MR. BUNN: Objection to form.
22   A.   In this particular case,
23 Benecard and SmartD seem to have worked
24 together for Benecard to provide COGNOS and
25 OLE in lieu of giving access to their live

60 (Pages 234 - 237)

Page 282

F. CULLEY-TROTMAN

you are actually providing the guidance on the front end. So the PBM can correct the ratios early in the process.

Q. And when you say looking at coverage determination requests, are you again talking about a sampling of coverage determination requests or are you talking about all of them?

A. A sampling of coverage determination requests.

Q. Do you know whether that happened here?

A. I did not find any evidence that the plan sponsor requested that for every operational area.

Q. You don't know that one way or the other, right?

A. No.

Q. What else?

A. So the proactive monitoring is definitely a strong thing, having daily meetings with the PBM and following up on issues. For example, if Mary Jane didn't get her medications, it would be my plan's

Page 283

F. CULLEY-TROTMAN

obligation to reach out to the PBM and say I want evidence that Mary Jane got her medication, if that didn't happen in a particular day.

And that's basically setting the tone for oversight. It demonstrates to the PBM that you are actively watching them, you are actively reviewing the operational areas. And that's, I mean, that's pretty much a consistent expectation for every single operational area until 18 months in when you can have a bit more of a periodic auditing and monitoring.

Q. Do you know whether Smart was meeting daily with the PBM here?

A. I did not ask that question. However, I did see evidence of a project plan, that there were conversations between Smart and Benecard.

Q. Have you seen the request list that existed between Smart and Benecard?

A. A request list?

Q. Yes. There is a request list that was being added to as time went by,

Page 284

F. CULLEY-TROTMAN

and it was hundreds of items long by the end of February. Have you seen that list?

A. I don't recall that with certainty.

Q. Would that show at least some of the kind of follow-up and urgency that you are talking about?

MR. BUNN: Objection to form.

A. So a project demonstrates that there is an ask and something is being done about it. But the engagement I'm speaking about is actually daily, hands-on communications with PBM executives on issues like member medication issues and coverage determinations to start raising visibility at the outset.

Q. Do you know whether those occurred here? You and I can agree you don't know whether they occurred one way or the other?

A. I don't know, yeah, any specific details of meetings, etc.

Q. Anything else?

A. So we talked about routine

Page 285

F. CULLEY-TROTMAN

monitoring at the outset, holding the PBM accountable and following up to make sure the member gets their medications, those are the biggest things. Ensuring that the written policies and procedures are actually implemented through observation, training.

Q. Okay. Anything else?

A. As a plan sponsor, I've actually conducted, for both startup and established plans, mock calls to the PBM to determine whether their call center lines are working like they're supposed to.

Q. You saw testimony from Ms. Cappadonna that that occurred here, correct?

A. I believe that was mentioned. And then on an ongoing basis, obviously to ensure that the processes you believe are in place continue to exist, you would have to continue that activity, the testing of the PBM's website and the formulary that's posted and all of these things.

Page 294

1       F. CULLEY-TROTMAN
2  question that is difficult, just evade the
3  question and tell the member that someone
4  else will call you back?
5       MR. BUNN: Objection to form.
6    A.   If CMS issues a directive to
7  the plan sponsor and the plan sponsor in
8  turn turns to the PBM and says do this,
9  unfortunately PBMs try to keep costs down,
10 so they will sometimes just deploy staff
11 from another area.
12      But yes, the staff should be
13 trained to do what they are doing.
14   Q.   To use your word, that is at
15 least undesirable behavior?
16      You are nodding your head yes.
17   A.   Yes.
18      MR. BARNOWSKI: I have no
19 further questions. I appreciate your time.
20      (Continued on the next page.)

Page 295

1       F. CULLEY-TROTMAN
2       THE VIDEOGRAPHER: We are going
3  off the record, 4:33 p.m. This is the end
4  of disk five and concludes the deposition
5  of Francoise Culley-Trotman.

8       [TIME NOTED: 4:33 p.m.]

12  _____
13      FRANCOISE CULLEY-TROTMAN

16 Subscribed and sworn to before me
17 this _____ day of _____, 2016.
18
19 _____
20       Notary Public

Page 296

2           I N D E X

4 WITNESS       EXAMINATION BY      PAGE
5 CULLEY-TROTMAN    BARNOWSKI       4

8           E X H I B I T S
9 FCT       DESCRIPTION         PAGE
10 Exhibit 1  Expert report of      75
             Culley-Trotman
11 Exhibit 2  SMT00000653-00000654   99
   Exhibit 3  SMT00174576-00174579  109
12 Exhibit 4  CMS 0000352-0000479   151
   Exhibit 5  SMT00866523-00866524  170
13 Exhibit 6  SMT00027008           257

   DIRECTIONS NOT TO ANSWER
17
     Page    Line
18
     30      24
19

   REQUESTS
21
     Page    Line
22
       (NONE)

Page 297

2           CERTIFICATION

4    I, TODD DeSIMONE, a Notary Public for
5  and within the State of New York, do hereby
6  certify:
7    That the witness whose testimony as
8  herein set forth, was duly sworn by me; and
9  that the within transcript is a true record
10 of the testimony given by said witness.
11   I further certify that I am not related
12 to any of the parties to this action by
13 blood or marriage, and that I am in no way
14 interested in the outcome of this matter.
15   IN WITNESS WHEREOF, I have hereunto set
16 my hand this 20th day of July, 2016.

            Todd DeSimone
19          TODD DeSIMONE

75 (Pages 294 - 297)