# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SMART INSURANCE COMPANY,

                    Plaintiff,

       -against-

BENECARD SERVICES, INC.,

                    Defendant.

Case Number 1:15-cv-04384-KBF

---

## MEMORANDUM OF LAW ON BEHALF OF DEFENDANT BENECARD SERVICES, INC. IN OPPOSITION TO PLAINTIFF SMART INSURANCE COMPANY'S <u>DAUBERT</u> MOTION TO EXCLUDE PORTIONS OF THE TESTIMONY AND REPORT OF SUSAN HAYES

---

B. John Pendleton, Jr.
DLA Piper LLP (US)
51 John F. Kennedy Parkway, Suite 120
Short Hills, New Jersey 07078-2704
Tel: (973) 520-2561
Fax: (973) 520-2578

John M. Hillebrecht
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: (212) 335-4590
Fax: (917) 778-8590

Courtney G. Saleski (admitted *pro hac vice*)
DLA Piper LLP (US)
1650 Market Street, Suite 4900
Philadelphia, Pennsylvania 19103-7300
Tel: (215) 656-2431
Fax: (215) 606-2046

*Attorneys for Defendant*

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND ................................................................................................ 2

    A. Monitoring and Oversight – the April 19 Report ................................... 2

    B. Rebuttal to the Report of Smart's Expert, Erin Costell – the May 25 Report ................................................................................................... 3

III. ARGUMENT .................................................................................................... 4

    A. The opinions set forth in the April 19 Report and May 25 Report are reliable because they are based on Ms. Hayes's personal experience ................ 5

    B. The individual opinions set forth in the April 19 Report are admissible ............. 10

        1. Opinions 1 and 8 are proper opinions as to the cause of Smart's alleged injuries ................................................................. 12

        2. Opinions 2-6 are proper opinions as to Smart's deviation from industry standards ................................................................. 13

        3. Opinions 1, 5-6, and 8 are proper opinions as to the cause of Smart's alleged injuries. ................................................................. 14

        4. None of the individual opinions instruct the jury on an ultimate fact issue ................................................................. 15

    C. The individual opinions in May 25 Report are admissible ................................. 16

        1. Ms. Hayes's Opinions regarding systems access are relevant and admissible ................................................................. 17

        2. The access opinions are rebuttal to Smart's Expert Erin Costell ............. 18

        3. Hayes's opinions regarding industry standards on access will help the jury ................................................................. 20

        4. Opinions C-G and M are not improper fact speculation ......................... 22

        5. Opinions A, I, and K do not instruct the jury on any ultimate fact issue and A and B do not instruct the jury on how to interpret the PBMA ................................................................. 23

        6. Opinions C, J, and L are not recitations of underlying facts ................... 24

IV. CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England,
   136 F.3d 82 (2d Cir. 1998)..................................................................................21, 22

Ambrosini v. Labarraque,
   101 F.3d 129 (D.C. Cir. 1996) ...................................................................................5

Brown v. Nat'l Football League,
   219 F. Supp. 2d 372 (S.D.N.Y. 2002)......................................................................21

Cruz v. Kumho Tire Co.,
   No. 8:10-CV-219 MAD/CFH, 2015 WL 2193796 (N.D.N.Y. May 11, 2015) ......................24

Daubert v. Merrell Dow Pharms., Inc.,
   509 U.S. 579 (1993)................................................................................... passim

E.E.O.C. v. Bloomberg L.P.,
   No. 07 CIV. 8383 LAP, 2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010)..................................24

E.E.O.C. v. Beauty Enterprises, Inc.,
   361 F. Supp. 2d 11 (D. Conn. 2005)........................................................................7, 8

Estate of Jaquez v. Flores,
   2016 WL 1060841 (S.D.N.Y March 17, 2016) ...........................................................8

Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.,
   No. 11CV6201 DLC, 2015 WL 685159 (S.D.N.Y. Feb. 18, 2015) .......................................12

Figueroa v. Boston Scientific Corp.,
   254 F. Supp. 2d 361 (S.D.N.Y. 2003)..................................................................5, 6, 7

Harris v. Kem Corp.,
   No. 85 CIV. 2127 (WK), 1989 WL 200446 (S.D.N.Y. Dec. 2, 1989) .....................................12

Hollman v. Taser Intern. Inc.,
   928 F. Supp. 2d 657 (E.D.N.Y. 2013) .......................................................................8

In re Pfizer Inc. Sec. Litig.,
   No. 04CIV.9866(LTS)(JLC), 2010 WL 1047618 (S.D.N.Y. Mar. 22, 2010), as amended (Mar. 29, 2010)..........................................................................12

In re Rezulin Prod. Liab. Litig.,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004).............................................................14, 15, 23

Kumho Tire Co. v. Carmichael,
   526 U.S. 137 (1999)............................................................................5, 8, 24

Liriano v. Hobart Corp.,
   949 F. Supp. 171 (S.D.N.Y. 1996) ...............................................................8

Maiz v. Virani,
   253 F.3d 641 (11th Cir. 2001) .....................................................................5

MBIA Ins. Corp. v. Patriarch Partners VIII, LLC,
   950 F. Supp. 2d 568 (S.D.N.Y. 2013)....................................................20, 24

Mishkin v. Peat, Marwick, Mitchell & Co.,
   744 F. Supp. 531 (S.D.N.Y. 1990) .............................................................21

Nimely v. City of New York,
   414 F.3d 381 (2d Cir. 2005)........................................................................4

Park West Radiology v. CareCore Nat., LLC,
   675 F. Supp. 2d 314 (S.D.N.Y. 2009)........................................................18

Pension Committee of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC,
   691 F. Supp. 2d 448 (S.D.N.Y. 2010)..............................................5, 18, 23

Rich v. Tee Bar Corp.,
   No. 1:10-cv-1371, 2013 WL 5442277 (N.D.N.Y. Sep. 27, 2013)...............5

Rodnor Music Inetern. Inc. v. TVT Records LLC,
   2006 WL 5105272 (C.D. Cal. Aug. 21, 2006).........................................18

Rosco, Inc. v. Mirror Lite Co.,
   506 F. Supp. 2d 137 (E.D.N.Y. 2007) .........................................................5

S.W. v. City of New York,
   2011 WL 3038776 (E.D.N.Y. July 25, 2011) (Go, J.)................................18

Santoro v. Donnelly,
   340 F. Supp. 2d 464 (S.D.N.Y.2004)...........................................................7

Scientific Components Corp. v. Sirenza Microdevices, Inc.,
   2008 WL 4911440 (E.D.N.Y. Nov. 13, 2008)...........................................18

Summit Elec. Supply Co., Inc. v. Int'l Bus. Machines Corp.,
   No. CIV 07-431 MCA/DJS, 2010 WL 11414471 (D.N.M. Sept. 30, 2010) ..............14, 15, 22

Travelers Indem. Co. v. Northrop Grumman Corp.,
   No. 12 CIV. 3040 KBF, 2014 WL 464769 (S.D.N.Y. Jan. 28, 2014)....................15

Travelers Indent. Co. v. Scor Reinsurance Co.,
  62 F.3d 74 (2d Cir. 1995)...........................................................................20

United States v. Bilzerian,
  926 F.2d 1285 (2d Cir. 1991)........................................................................4

Wheeler v. John Deere Co.,
  935 F.2d 1090 (10th Cir.1991) ......................................................................7

Zanett Lombardier, Ltd. v. Maslow,
  29 A.D.3d 495 (1st Dep't. 2006) ..................................................................10

## OTHER AUTHORITIES

FED. R. EVID. 401 ...........................................................................................17

FED. R. EVID. 403 ...........................................................................................17

FED. R. EVID. 702 .................................................................................4, 5, 9, 23

FED. R. EVID. 704 ...................................................................................15, 23

# I.    INTRODUCTION

From approximately February 2012 to September 2013, Benecard Services, Inc. ("Benecard") served as the pharmacy benefit manager ("PBM") for two Part D Medicare plans (the "Part D plans" or "plans") sponsored by the Smart Insurance Company ("Smart").  Under threat of termination from the Centers for Medicare and Medicaid Services ("CMS"), Smart sold those plans to a third party in 2013.  Smart now blames Benecard for $70 million in alleged damages as a result of the forced sale.

Smart's claims will require the jury to assess whether Benecard complied with its obligations under the PBMA and whether Benecard caused any of Smart's alleged losses.  The evidence at trial will include documents and testimony from current and former employees of Smart and Benecard regarding the nearly year-long process through which Smart and Benecard built out the Part D plans, and the efforts undertaken to fix problems with the plans once they went live.  Much of this evidence is beyond the comprehension of persons inexperienced in Medicare Part D.  For this reason, expert testimony will assist the jury in navigating this complicated web of highly technical evidence by explaining industry standards and placing the conduct of the parties within the context of those standards.  To help the jury in analyzing these issues, Benecard retained Susan Hayes, a pharmacy benefits consultant with over three decades of experience in the health-care industry.

Smart's claims that Ms. Hayes's expert opinions are unreliable and will not help the jury are without merit.  Stripped to their essence, each of Smart's arguments boils down to a meritless attack on the weight of Ms. Hayes's opinions.  As such, each of the alleged deficiencies in Ms. Hayes's opinions is more properly addressed during the cross-examination of Ms. Hayes at trial.  Smart's motion should be denied.

## II.     BACKGROUND

Ms. Hayes will offer two principal opinions.  First, Ms. Hayes will opine with respect to

Smart's duties as plan sponsor to oversee and monitor Benecard and the consequences of its

failure to do so (set forth in Ms. Hayes's report dated April 19, 2016 ("April 19 Report"), (Ex.

3)).[1]  Second, Ms. Hayes will opine that the level of access that Benecard provided to Smart was

consistent with recognized industry standards for PBM oversight by plan sponsors (set forth in

Ms. Hayes's report dated May 25, 2016 (the "May 25 Report"), (Ex. 9)).

### A.     Monitoring and Oversight – the April 19 Report.

Ms. Hayes's April 19 Report addresses the role of plan sponsor oversight in connection

with Medicare Part D plans.  See generally, April 19 Report.  This report focuses on CMS's

termination of the Smart Part D plans in the context of Smart's failure to oversee and monitor

Benecard in accordance with accepted industry standards and details all the ways in which Smart

deviated from accepted practices in its role as plan sponsor.  For example, Ms. Hayes opines that

Smart failed to employ adequate clinical staff.  (Id. at 4.)  She also explains how Smart lacked

the expertise necessary to monitor and oversee a Part D plan.  (Id. at 5.)  Finally, Ms. Hayes

identifies a number of CMS findings regarding the Smart plans that bolster her conclusion that

Smart did not meet applicable industry standards.  Among these findings are: Smart failed to

conduct a formal assessment of compliance risks before the January 1, 2013 launch date; and

Smart provided incomplete CAPs to Benecard during the critical part of the audit.  (Id. at 7.)

The opinions expressed in Ms. Hayes's April 19 Report bear directly on claims and

defenses still pending adjudication.  The Court's anticipated dismissal of Benecard's

counterclaim should not, therefore, result in the exclusion of Ms. Hayes's opinions.

---

[1] Exhibits referenced herein are attached to the Declaration of B. John Pendleton, Jr. ("Pendleton Decl.") unless otherwise noted.

**B.    Rebuttal to the Report of Smart's Expert, Erin Costell – the May 25 Report.**

In addition to Ms. Hayes's opinions on Smart's failure and incompetence to oversee and monitor Benecard's performance, Ms. Hayes will also testify in connection with the May 25 Report.  The May 25 Report addresses Smart's claim that Benecard failed to provide Smart the requisite level of access to Benecard's systems in order to allow Smart to monitor and oversee the implementation and performance of the Part D plans, and are offered in rebuttal to the opinions offered by Smart's expert, Erin Costell.

Section 2.11 of the PBMA (Ex. 1, PBMA) at Exhibit A states that Benecard was obligated to provide Smart with "online real-time access to Benecard's drug Claims data base regarding Beneficiaries."  Roughly six months after the parties executed the PBMA, Smart began demanding full access to Benecard's claims adjudication system.  Providing Smart with full login credentials to this system would have given Smart access to the protected health information of thousands of beneficiaries of commercial plans having nothing to do with Smart.  Benecard instead attempted to work with Smart to develop alternative systems to provide Smart with the access and information it needed to effectively oversee and monitor plan operations.

In October 2012, Benecard provided Smart with access to its Online Eligibility System ("OLE"), a proprietary software to allow Smart to test Benecard's enrollment and claims database without live data.  (April 19 Report at 9.)  Because the OLE system, like most of Benecard's other systems, had been designed to handle commercial plans – a fact that Smart was well aware of – the OLE system required some redesign to include additional Medicare-specific fields that Smart had requested.  (Ex. 2, Kevin Hayes Tr. at 232:9-10, 229:1-12.)

To provide complete and accurate information to Smart while this redesign occurred, Benecard and Smart also implemented a workaround known as the "buddy system."  This system utilized webinars through which Smart employees would direct Benecard employees to look up

and share certain information in Benecard's systems. (May 25 Report at 9). This system provided Smart more than 100 hours of access to test Benecard's enrollment and claims systems prior to launch. (Id.)

Finally, after the plan went live in January, 2013, Benecard provided Smart with access to a data base querying tool known as COGNOS. Cognos is an online reporting tool that allowed Smart to access real-time claims and enrollment data at any time. This program permits users to request information from the claims database, which the program then retrieves in the form of a report. (Id. at 12.)

As set forth in the May 25 Report, Ms. Hayes opines that through these three different types of access, Benecard provided Smart with "access to its claims system" in a manner consistent with industry practice and custom. (Id. at 5-6, 7-9.) According to Ms. Hayes, the level of access that Benecard provided to Smart through these three systems was consistent with applicable industry standards. (Id.)

## III. ARGUMENT

Under Federal Rule of Evidence 702, expert testimony is permissible "to help a jury understand unfamiliar terms and concepts[.]" United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991). When a party seeks to introduce expert testimony, the Court serves as a gatekeeper and evaluates the admissibility of the proposed expert. See, e.g., Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993). Courts perform this role by conducting an inquiry into each of the following: (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact. Nimely v. City of New York, 414 F.3d 381, 396–97 (2d Cir. 2005). For the reasons set forth below, Ms. Hayes's opinions satisfy the standards set forth in Rule 702 and Daubert, and should be permitted at trial.

**A. The opinions set forth in the April 19 Report and May 25 Report are reliable because they are based on Ms. Hayes's personal experience.**

Courts throughout this circuit have held that an expert witness's experience is sufficient to render that witness's testimony reliable under Federal Rule of Evidence 702. See, e.g., Pension Committee of Univ. of Montreal Pension Plan v. Banc of Am. Secs., *LLC*, 691 F. Supp. 2d 448, 64 (S.D.N.Y. 2010) ("[T]he reliability of [an expert's industry standards] testimony largely depends on whether he has drawn the proffered industry standards from an adequate source—in this case, his experience."); Figueroa v. Boston Scientific Corp., 254 F. Supp. 2d 361, 365 (S.D.N.Y. 2003) ("The reliability requirements do not preclude an expert from testifying on the basis of experience alone or in conjunction with other knowledge, training skill, or education." (citation omitted)). Indeed, the Supreme Court has held that professional experience in a particular field may supply a reliable basis for admission for expert testimony. See Kumho Tire, 526 U.S. at 150-52, 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). "[S]everal circuits have treated an expert's experience as circumstantial evidence as to whether the expert employed a scientifically valid methodology or mode of reasoning." Ambrosini v. Labarraque, 101 F.3d 129, 134 (D.C. Cir. 1996) (citations omitted); see Rich v. Tee Bar Corp., No. 1:10-cv-1371, 2013 WL 5442277, at *5 (N.D.N.Y. Sep. 27, 2013) (holding that "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony" (quotation omitted)); Maiz v. Virani, 253 F.3d 641, 669 (11th Cir. 2001) ("an expert may still properly base his testimony on 'professional study or personal experience" (citation omitted)).

When assessing the qualification of a proffered expert witness, "[a] court must consider the totality of a witness's background." Rosco, Inc. v. Mirror Lite Co., 506 F. Supp. 2d 137, 144-45 (E.D.N.Y. 2007) (internal citation and quotation marks omitted). Ms. Hayes's

experience in the prescription drug benefit industry is extensive. Ms. Hayes is a pharmacy benefits consultant with over three decades of experience in the health-care industry. (April 19 Report at Exhibit A ("*Curriculum Vitae*").) Throughout her career she has developed particular expertise in pharmacy benefits issues. (Id.) Ms. Hayes has authored six articles on topics including the management of prescription drug programs, auditing prescription drug benefit programs, rebate contracting, and pharmacy case management. (Id. at 4.) She has given more than fifty speeches or industry presentations, primarily on the topic prescription drug benefits, and including titles such as "Building a Better PBM Relationship" and "Managing Internal and External Risk in Medicare Part D." (Id. at 4-8.)

Likewise, Ms. Hayes is specifically well-versed in Medicare Part D. She writes frequently on the topic of PBM audits, of which she has participated in over a dozen. (Ex. 4, Susan Hayes Tr. at 70:8-15.) She provides guidance to plan sponsors on how to best manage the growing costs of pharmacy benefit programs. (Id.) Over the past ten years, her clients have included nearly two dozen Part D plans. (Id. at 12:4-9.)

Ms. Hayes also has extensive experience serving as an expert witness. She has provided expert testimony in over two dozen cases including anti-kickback, false claim, securities fraud and corporate fraud cases. In the Medicare Part D context, she has provided testimony and consulting services in several cases. (Id. 9:9-23.) This experience is more than enough to demonstrate that Ms. Hayes's opinions – which specifically relate to the relationship between a Plan Sponsor (Smart) and a Pharmacy Benefit Manager (Benecard) – are reliable.

Courts throughout this circuit have admitted experts with similar levels of experience in given industries or products. In Figueroa, for example, plaintiff sued the defendant alleging that a vaginal sling she had implanted was defective. 254 F. Supp. 2d at 363. The court admitted the

testimony of Dr. Batich, an organic and physical chemist and professor of engineering regarding the "properties of synthetic materials, of which some vaginal slings are made," because he had "extensive experience, education, and knowledge in the materials science and engineering field and also reviewed relevant literature." Id. at 364-68. Like Batich, Ms. Hayes's opinion is based on familiarity with Medicare Part D, which she gained after years of education and practical experience in the field, and the review of relevant issues in the case. Her experience is no less extensive than that of Batich and her opinions and testimony, for that reason, are reliable. See also, Hollman v. Taser Intern. Inc., 928 F. Supp. 2d 657, 668-69 (E.D.N.Y. 2013) (permitting expert testimony of engineering professor in failure-to-warn case related to death from the use of a Taser due to general expertise in the field of electrical engineering and the effects of electricity on the body, despite having "no specific experience with product warnings"); Wheeler v. John Deere Co., 935 F.2d 1090, 1100 (10th Cir. 1991) ("a lack of specialization does not affect the admissibility of the opinion, but only its weight."); E.E.O.C. v. Beauty Enterprises, Inc., 361 F. Supp. 2d 11, 19-21 (D. Conn. 2005) (denying defense motion to exclude expert testimony where witness "[a]s a result of [his] experience . . . [was] familiar with applicable federal and state safety codes and regulations"); Santoro v. Donnelly, 340 F. Supp. 2d 464, 473 (S.D.N.Y. 2004) ("The question is not whether the engineer is an expert on the exact issues presented in the case, but rather, whether his general engineering experience qualifies him to testify in an area in which he does not have extensive experience.").

Moreover, Ms. Hayes has demonstrated how her experience and methodology led to her opinion. In Figueroa, Batich was permitted to testify, despite having never physically examined the vaginal sling at issue, because of his expertise with the very materials from which vaginal slings are made. Figueroa, 254 F. Supp. 2d at 364-68. Similarly, in Beauty Enterprises, Beauty

Enterprises, Inc. ("BEI") challenged an EEOC witness, Dr. Roseann Dueñas Gonzalez, asserting her testimony should be excluded because, according to BEI, "she did nothing more than observe and analyze the job tasks and that her testimony is merely a factual recounting of what goes on in the workplace." Beauty Enterprises, 361 F. Supp. 2d at 16. The court rejected BEI's contention and held that, in fact, Dr. Gonzales based her conclusions on observation of BEI employees on the job, interviews with individuals who brought the EEOC complaint, and a questionnaire completed by those same individuals. Id. Here, similarly, Smart asserts that Ms. Hayes failed to describe how her training and experience supports her opinions. (Smart. Br. at 9.)

Smart's reliance on this Court's decision in Estate of Jaquez v. Flores, 2016 WL 1060841, *13 (S.D.N.Y March 17, 2016), is misplaced. (Smart Br. at 19). The Court's decision did not discuss the nature of the precluded expert's report and proposed testimony, aside from identifying the expert as a "forensic scientist/ballistic consultant" and noting that the title of his report was "Reconstruction of the Shooting." (Id.) Here, however, Ms. Hayes's analyses are not analogous to that of a ballistics expert needing to engage in forensic reconstruction of a shooting in order to render an opinion. Instead, Ms. Hayes's is an expert steeped in knowledge of Medicare Part D and the pharmacy benefits industry and has rendered opinions based on her comparison of Smart and Benecard's conduct against what she knows to be standard practice within that industry. As the U.S. Supreme Court has held, "the test of reliability is flexible, and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 119 S. Ct. 1167, 1171, 143 L. Ed. 2d 238 (1999).

Moreover, some courts have even held the <u>Daubert</u> factors inapplicable to expert testimony that is formed solely on the basis of the expert's personal experience. For example, in <u>Liriano v. Hobart Corp.</u>, 949 F. Supp. 171, 177 (S.D.N.Y. 1996), Judge Schiendlin observed that

> [i]t is not appropriate to invoke the <u>Daubert</u> test in cases where expert testimony is based solely on experience or training, as opposed to a methodology or technique. Indeed, it would be impossible to do so. Expert opinion based on personal experience cannot always be evaluated on the basis of "rate of error", "peer review" or "general acceptance" in the relevant scientific community. Yet such opinions may be as valuable to the trier of fact as those opinions that can be readily gauged in such terms.

Stated another way, "[wh]ere courts have found an expert opinion to be based on personal experience alone, <u>Daubert</u> has not been applied." (<u>Id.</u>) (citing <u>Compton v. Subaru of America, Inc.</u>, 82 F.3d 1513, 1518 (10th Cir. 1996) ("application of the <u>Daubert</u> factors is unwarranted in cases where expert testimony is based solely upon experience or training")). Instead, courts simply assess whether the expert will "assist[ ] the trier of fact 'to understand the evidence or to determine a fact in issue.'" <u>Id.</u> (quoting FED. R. EVID. 702). Ms. Hayes's opinions are reliable and will assist the trier of fact.

With respect to the April 19 opinion, Ms. Hayes brought her experience to bear on the issues by reviewing deposition transcripts and filings in this action and, like Gonzalez in <u>Beauty Enterprises</u>, interviewing individuals involved. (<u>See</u> April 19 Report, Ex. B; May 25 Report Ex. B; Ex. 4, Susan Hayes Dep. Tr. at 32:7 – 37:6.) Hayes's opinion comes not just from her expertise, but from her specific expertise in pharmacy benefit plans, including years of investigations of possible fraud in this area which gave her exposure to the relationships between various pharmacy benefit plan entities. (<u>See</u> April 19 Report Ex. A; May 25 Report Ex. A.) Ms. Hayes is clearly qualified to opine on the issues of this case, and her reports indicate not only the depth of her experience, but that she used her experience and methodology – including review of numerous documents, e-mails, and deposition transcripts, as well as conversations with Benecard

staff – to form her expert conclusions regarding Smart's breach of contract with Benecard as well as Smart's claims against Benecard.

Moreover, with respect to the May 25 opinion regarding access, Ms. Hayes's considerable experience in the pharmacy benefits industry and with Medicare Part D in particular make her especially suited to offer helpful testimony in this matter. In addition to her broad experience, however, the reliability of Ms. Hayes's opinions on systems access are bolstered by her personal, hands-on experience using some of the very systems at issue here. For example, Ms. Hayes has personal experience using the COGNOS system, an industry-standard tool that Benecard employed to provide Smart with access to Benecard's systems (Ex. 4 , Susan Hayes Tr. 215:19-217:1.) This type of intimate experience with the very systems at the heart of this dispute can assist the jury in forming its conclusions with regard to the sufficiency of the access that Benecard provided to Smart.

**B.      The individual opinions set forth in the April 19 Report are admissible.**

Although Benecard originally offered Ms. Hayes's April 19 Report in support of its counterclaim – which the Court has indicated will be dismissed on summary judgment – Ms. Hayes's opinions remain relevant and should not be excluded. These opinions are directly relevant to elements of Smart's claims for breach of contract and fraud, as well as Benecard's affirmative defenses. For example, Smart's failure to effectively monitor and oversee the plan is relevant to both loss causation and the reasonable reliance element of Smart's fraud claim. (See Benecard's Answer [ECF No. 40], Second Affirmative Defense ("Smart's own damages are attributable to its own comparative fault, contributory negligence, and/or acts or omissions"), Third Affirmative Defense ("Smart's alleged damages are not recoverable based on failure to prove loss causation."); Zanett Lombardier, Ltd. v. Maslow, 29 A.D.3d 495 (1st Dep't. 2006)

(plaintiffs cannot show reasonable reliance when the complained-of condition could have been discovered through reasonable investigation).

Smart identifies eight individual sentences in the April 19 Report, which it presents as the individual "opinions" of Ms. Hayes, and argues for their exclusion (Smart Br. at 5-6):

- "SMART, not Benecard, was primarily responsible for the termination of the SMART D Medicare Part D plan on or about September 1, 2013 by virtue of its failure to adequately monitor and oversee the plan's compliance with applicable CMS regulations." (April 19 Report at 4 (referenced as "Opinion 1" in the Smart Br.).)

- "[There are two primary reasons that SMART was unable to oversee the Part D program: staff and experience." (Id. (referenced as "Opinion 2" in the Smart Br.).)

- "At all relevant times, SMART did not have adequate clinical experience and did not obtain the necessary clinical expertise even as late as June 2013" (Id. (referenced as "Opinion 3" in the Smart Br.).)

- "SMART also did not have adequate experience to monitor and oversee a Medicare Part D plan . . ." (Id. at 5 (referenced as "Opinion 4" in the Smart Br.).)

- "SMART did not have adequate staff to manage a complex, startup Medicare Part D plan. Specifically, there was insufficient and inadequate clinical staff to properly direct Benecard. As a consequence, there were numerous complaints from beneficiaries, resulting in repeated warnings by CMS that ultimately resulted in the novation of the plan." (Id. at 7 (referenced as "Opinion 5" in the Smart Br.).)

- SMART did not have adequate experience and did not take their role as overseers of the Medicare Part D Plan seriously. Specifically, SMART (Bayer) believed it appropriate to simply blame Benecard for its problems, not even realizing that SMART had responsibility for managing the PBM relationship. SMART personnel refused to attend pre-auditing/ preparation conferences." (Id. at 7-8 (referenced as "Opinion 6" in the Smart Br.).)

- The SMART CEO was terminated after the plan was up and running for only four months at the direction of CMS. Smart should have never embarked on a Medicare Part D plan without adequate leadership and adequate managerial and clinical skills." (Id. at 8 (referenced as "Opinion 7" in the Smart Br.).)[2]

- "In summary, SMART, not Benecard, was responsible for the termination of the SMART D Medicare Part D plan on or about September 1, 2013 by virtue of its failure to adequate [sic]

---

[2] If permitted to testify, Ms. Hayes will not opine that Smart's CEO was terminated at the direction of CMS, although the record indicates that Smart terminated Mr. Virdee because it felt "we needed to show CMS that we were taking action." (Ex. 5, Kang Tr. at 144:14-15/) In addition, and for the reasons set forth below, the remainder of this Opinion is admissible and should not be excluded.

monitor and oversee the plan's compliance with CMS regulations." (Id. (referenced as "Opinion 8" in the Smart Br.).)

For the reasons set forth below, each of these opinions is admissible.

**1. Opinions 1 and 8 are proper opinions as to the cause of Smart's alleged injuries.**

It is well-settled that parties may introduce expert testimony on issues of causation. See, e.g., Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc., No. 11CV6201 DLC, 2015 WL 685159, at *4 (S.D.N.Y. Feb. 18, 2015) ("parties may proffer at trial expert opinions regarding loss causation . . ."); Harris v. Kem Corp., No. 85 CIV. 2127 (WK), 1989 WL 200446, at *7 (S.D.N.Y. Dec. 2, 1989) (applying New York law and recognizing that "expert testimony is [sometimes] used to prove causation[.]"). In particular, courts allow experts to testify as to matters of causation on the basis of their personal experience. In re Pfizer Inc. Sec. Litig., No. 04CIV.9866(LTS)(JLC), 2010 WL 1047618, at *6 (S.D.N.Y. Mar. 22, 2010), as amended (Mar. 29, 2010) (allowing expert to hypothesize as to causation in a securities class action because the expert's opinion was "well within [his] field of expertise based on his training, experience, and history of publication.").

Here, Smart alleges that as a result of certain actions taken by Benecard, "CMS forced Smart to either terminate the Plans or sell them in short order, which resulted in a fire-sale of the Plans at a dramatically reduced price." (Complaint, ¶4); see also id. at ¶75 ("Benecard's utter failure to perform its contract obligations and delegated functions harmed Smart and was the primary cause of the sanctions and sale-order imposed by CMS"). The issue of what actions caused the CMS sanctions and related sale of the Plans will be central to this trial and it is entirely appropriate for Benecard to introduce expert testimony on the issue of causation. What Smart refers to as opinions 1 and 8 (which are essentially the same) of the April 19 Report do just that – they provide Ms. Hayes's expert evaluation of the root causes of the actions taken by

CMS against Smart. Both opinions conclude, based on Hayes's decades of experience in the pharmacy benefits and Medicare Part D industries, that Smart was "responsible for the termination of the Smart D" plans. (April 19 Report at 4.) Ms. Hayes should be permitted to provide her opinions and testimony that Smart failed to adequately monitor and oversee the Plan's compliance with CMS regulations and that Smart's failure was the forced sale.

   **2.   Opinions 2-6 are proper opinions as to Smart's deviation from industry standards.**

In its final audit report, CMS identified several problems with the Smart plans. These problems included Smart's failure to complete a formal risk assessment prior to going live, problems prioritizing focus on high-risk aspects of the plans, insufficient monitoring of the PBM, and a lack of direction to the PBM in connection with corrective action plans, which were drafted by Smart and found by CMS to be deficient. (Ex. 6, Final Audit at 8-10.)

Smart attempts to blame all of these failures on Benecard. Opinions 2-6 all reflect Ms. Hayes's broader overall, contrary opinion that Smart lacked both the staff and experience necessary to oversee a Part D plan.[3] For example, Ms. Hayes identifies the "two primary reasons" that Smart failed to oversee the plan: "staff and experience." (Opinion 2.) Ms. Hayes elaborates on these points in her subsequent opinions, such as Opinion 5, in which she hones on particular staffing issues: "Specifically, there was insufficient and inadequate clinical staff to properly direct Benecard."

These opinions are based on Ms. Hayes's experience and knowledge of industry standards. In Ms. Hayes's professional experience, the successful administration of a Part D plan requires significantly more experience and staff than Smart had devoted to its plans. (April

---

[3] Opinion 6 states in part that "SMART . . . did not take their role as overseers of the Medicare Part D plan seriously." To the extent that Smart is challenging this portion of Opinion 6, Benecard agrees that Ms. Hayes will not give this opinion at trial.

19 Report at 7-8.)  As a result, Ms. Hayes concludes that Smarts' failures, not Benecard's, were primarily responsible for the sanctions and sale-order.   These opinions reflect Ms. Hayes's thoughtful application of her experience to the facts of this case.

> **3.** **Opinions 1, 5-6, and 8 are proper as to the cause of Smart's alleged injuries.**

Smart is incorrect that Ms. Hayes's Opinions 1, 5-6, and 8 regard "the intent, motives or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise." In re Rezulin Prod. Liab. Litig., 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004).  Rather, they reflect Ms. Hayes's reasoned judgement, based on decades of personal experience and knowledge of industry standards, regarding the potential causes of the CMS actions against Smart.

In Rezulin, the Court excluded the testimony of certain expert witnesses who opined on the defendant and other third parties' "intent and motive in medical research and patient care." Id. at 545 n. 38.  According to the court, these witnesses were not qualified to testify on the defendant corporation or regulatory agencies' "states of mind" because the opinions lacked any factual basis whatsoever.  Id. at 546.

In contrast, in Summit Elec. Supply Co., Inc. v. Int'l Bus. Machines Corp., , a District Court admitted the testimony of an expert offered to render an opinion as to the meaning of an email "as it would normally be understood by computer industry professionals."  No. CIV 07-431 MCA/DJS, 2010 WL 11414471, at *7-8 (D.N.M. Sept. 30, 2010).  The opinion was admissible because the expert "employed his experience as a computer industry professional to explain a technically-worded email, which the jury [would] not necessarily understand without assistance."  (Id. at *8).  The Court found no indication that the expert was "attempting to state

what the particular recipients of the email believed or internalized, but rather what meaning an average computer professional would understand the language to impart."  (Id.)

Like the expert in Summit Electric, Ms. Hayes does not purport to interpret the state of mind of the CMS employees who participated in the decision to terminate Smart.  Rather, her opinions are limited to explaining the technical situation with respect to the plan that led to CMS sanctions and, later, termination.  Opinions 1 and 8 express Ms. Hayes's reasoned conclusion that Smart's failure to monitor and oversee Benecard led to the conditions that resulted in termination.  In a similar vein, Opinions 5 and 6 set forth Ms. Hayes's application of industry standards to reach the conclusion that Smart staffed the plan inadequately and otherwise lacked the requisite experience demanded by CMS.

Nor is Ms. Hayes "[a]cting simply as a narrator of the facts."  Travelers Indem. Co. v. Northrop Grumman Corp., No. 12 CIV. 3040 KBF, 2014 WL 464769, at *3 (S.D.N.Y. Jan. 28, 2014).  Smart correctly notes that "CMS's decision to terminate the Smart plan is discussed extensively in CMS documents and by a CMS witness . . ." but Ms. Hayes does not opine on the decision to terminate Smart but, rather, the root causes that let to CMS's actions against Smart.

### 4. None of the individual opinions instruct the jury on an ultimate fact issue.

"[I]n deciding whether the proposed testimony will be helpful to the fact-finder, courts in this Circuit analyze the testimony to determine whether it usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."  In re Rezulin Prod. Liab. Litig., 309 F. Supp. 2d at 541 (citing United States v. Lumpkin, 192 F.3d 280, 290 (2d Cir. 1999) (internal quotations omitted)).  An expert may "not tell the jury what result to reach or communicate a legal standard-explicit or implicit-to the jury."  In re Rezulin, 309 F. Supp. 2d at 541 (citations omitted).  But "[a]n opinion is not objectionable

just because it embraces an ultimate issue." FED. R. EVID. 704. Ms. Hayes's opinions regard industry standards within the field of pharmacy benefit plans explain how Smart failed to meet those standards, and opine on the consequences of Smarts failures. None of this testimony goes to the ultimate issue on either of Smart's two claims. (See, e.g., Opinion 1 (Concluding that Smart's "failure to adequately monitor and oversee the plan[]" resulted in termination.)).[4]

Accordingly, the Court should deny Smart's application to exclude Ms. Hayes from testifying in connection the opinions set forth in the April 19 Report.

**C. The individual opinions in May 25 Report are admissible.**

As with the April 19 Report, Smart identifies several independent statements set forth in Ms. Hayes's May 25 Report that it argues are inadmissible:

- "Benecard provided access to its claims system as stated in the Pharmacy Benefit Management Agreement (PBMA) and fulfilled its obligations thereunder." (May 25 Report at 5 (referenced as "Opinion A" in the Smart Br.))

- "Of particular note is that the contractual obligation was NOT to provide Smart access to Benecard's live claims process system, but to provide access to an online reporting tool." (Id. at 6 (referenced as "Opinion B" in the Smart Br.).)

- "Benecard, in fact, provided tools needed to test and review the enrollment and claims processing systems and those tools were consistent with industry standards and sufficient for SMART to perform administrative and oversight tasks under its agreement with CMS. SMART, however, could not adequately use these tools because of either its lack of training expertise or simple failure to adequately test. (Id. at 7 (referenced as "Opinion C" in the Smart Br.).)

- "If proper testing of the system had occurred by SMART, the need for the wide sweeping correction would not have occurred, beneficiaries would not have had claims reject at the levels rejected and the plan might still be functioning today." (Id. at 10-11 (referenced as "Opinion D" in the Smart Br.).)

- "There could only be two reasons why such a vast alteration of the system programming was requested" by SMART. (Id. at 11 (referenced as "Opinion E" in the Smart Br.).)

---

[4] In addition, and as set forth in Point III.C.2, below, Ms. Hayes's testimony is a direct rebuttal to the testimony offered by Smart's expert.

- "There could have been many reasons as to why additional edits were put into place but the most logical reason is that SMART wanted to limit its financial exposure." (<u>Id.</u>) referenced as "Opinion F in the Smart Br.).)

- "The other possible reason is that Benecard input edits into the system incorrectly." (<u>Id.</u> (referenced as "Opinion G" in the Smart Br.).)

- "In either case, SMART failed to meet its obligation to monitor and oversee the plan as required by CMS." (<u>Id.</u> at 12 (referenced as "Opinion H" in the Smart Br.).)

- "After January 1, 2013, SMART had 'online, real time access to Benecard's prescription drug Claims database regarding beneficiaries' through the Cognos system." (<u>Id.</u> (referenced as "Opinion I" in the Smart Br.).)

- "[OLE] access would have provided SMART complete access to the online system to verify that eligibility from CMS to SMART and then to Benecard was being properly maintained." (<u>Id.</u> at 14 (referenced as "Opinion J" in the Smart Br.).)

- "SMART was provided an online and real time system that accessed Benecard's system." (<u>Id.</u> (referenced as "Opinion K" in the Smart Br.").)

- "In addition, SMART was provided the tools to test plan design and eligibility in an industry acceptable manner through the buddy system prior to January 1, 2013 and using the Cognos system after January 1, 2013. (<u>Id.</u> at 15 (referenced as "Opinion L" in the Smart Br.).)

- "Smart 1) did not adequately test Benecard's system prior to the go live date in a manner that would detect if wide sweeping edits were programmed incorrectly because it did not have the expertise or 2) Smart tested Benecard's system but approved programming in conflict from the CMS approved formulary." (<u>Id.</u> (referenced as "Opinion M" in the Smart Br.).)

For the reasons set forth below, each of these opinions is relevant and admissible.

### 1.     Ms. Hayes's Opinions regarding systems access are relevant and admissible.

Under Federal Rule of Evidence 401, "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Nevertheless, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  FED. R. EVID. 403.

As described above, Ms. Hayes's May 25 Report focuses on issues surrounding Smart's access to Benecard's systems. Her opinions tie her experience in Medicare Part D and the pharmacy benefit business to applicable industry standards, and apply those standards to the facts of this case, concluding that Benecard provided Smart with adequate access. Smart argues that industry standards are irrelevant to this action and, therefore, inadmissible. But Ms. Hayes's access opinions are directly relevant as rebuttal to Ms. Costell, whose own opinions on industry standards regarding systems access confirm the relevance of those standards to the claims and defenses in this case.

## 2. The Access opinions are rebuttal to Smart's Expert Erin Costell.

Rebuttal experts may opine on any topic concerning the same subject matter that the plaintiffs addressed in their initial reports. S.W. v. City of New York, 2011 WL 3038776 (E.D.N.Y. July 25, 2011) (Go, J.) (permitting rebuttal testimony); see also Park West Radiology v. CareCore Nat., LLC, 675 F. Supp. 2d 314, 325-26 (S.D.N.Y. 2009); Scientific Components Corp. v. Sirenza Microdevices, Inc., 2008 WL 4911440, at *2 (E.D.N.Y. Nov. 13, 2008) ("technical information . . . that was not previously the subject of expert testimony in this litigation . . . is not out of place in a rebuttal report"). Expert testimony on industry practices is particularly appropriate where, as here, it is offered in rebuttal to expert testimony offered by the opposing party on the same issues. See, e.g., Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 691 F. Supp. 2d 448, 464-65, 470 (S.D.N.Y. 2010) (holding that a qualified expert may draw from his experience to opine on industry customs and practices to support his rebuttal opinion); Rodnor Music Inetern. Inc. v. TVT Records LLC, 2006 WL 5105272 at *7 (C.D. Cal. Aug. 21, 2006) (if plaintiffs introduce expert testimony that defendant's actions were not consistent with custom and practice in the industry, plaintiffs will have opened the door to rebuttal expert testimony on industry practices).

The opinions set forth in Hayes's May 25 Report are a direct rebuttal to the opinions of Smart's expert, Erin Costell. Ms. Costell opines that Benecard did not provide access to its enrollment and claims systems that is typical in the marketplace, and that "online, real-time access" means "access to a PBM's live claims system" in the pharmacy benefits industry. (Ex. 7, Costell Rep. at ¶ 24.) Ms. Costell also claims that "[i]t is an industry norm for PBMs to provide system access so that the plan sponsor can assess compliance with Medicare Part D program requirements." (Id.) Ms. Hayes's testimony addresses these same points, as explained in the following chart:

| Costell Opinion | Hayes Rebuttal Opinion |
|---|---|
| "In the pharmacy benefit industry, 'real-time access' generally means access to the PBM's live claims system." (Ex. 7, Costell Rep. at ¶ 24.) | "After January 1, 2013, SMART had 'online, real time access to Benecard's prescription drug Claims database regarding beneficiaries' through the Cognos system . . . This reporting tool is a standard in the industry and is used by plan sponsors to test whether claims are being processed correctly . . . The tool is 'online and real time' from the sense that the database that is queried is populated by the live system on a real time basis." (May 25 Report at 12.) |
| "It is particularly important to have real-time access prior to the beginning of the plan year so that plan sponsors can test claims and ensure the Part D benefit would be administered properly." (Id.) | "It is typical in the industry to find ways to test a claim before the live date. There is a term, User Accepted Testing or UAT, where a dummy system is available to clients . . . so that the client can test claims[.]" (Id. at 8.) |
| "It is an industry norm for PBMs to provide system access so that the plan sponsor can assess compliance with Medicare Part D program requirements." (Id. at ¶ 25.) | "Benecard offered a tangible solution [for access] which is standard in the industry and that is known as the 'buddy system'" (Id. at 9.) |

As these comparisons demonstrate, Ms. Hayes's opinions are a direct rebuttal to the assertions made by in Ms. Costell's report, and should therefore be deemed admissible.

### 3. Hayes's opinions regarding industry standards on access will help the jury.

Smart's argument that "the industry standard for the provision of access is not relevant . . . the only thing that is relevant here is what the PBMA and CMS require" (Smart Br. at 19) is belied by the fact that Smart's own expert, Erin Costell, opines on the very same subject, as discussed above. In any event, CMS regulations do not specify what kind of access sponsors should have, making actual industry standards particularly relevant.

Moreover, expert testimony regarding applicable industry standards is appropriate in breach of contract cases where "the complained-of conduct took place in the context of an industry that is outside the fact-finder's ordinary experience." MBIA Ins. Corp. v. Patriarch Partners VIII, LLC, 950 F. Supp. 2d 568, 617 (S.D.N.Y. 2013) (citing Tom–Lin Enters. v. Sunoco, Inc., 349 F.3d 277, 283 (6th Cir. 2003) ("there is no evidence indicating the existence of a material factual dispute concerning whether [the defendant's] practices were commercially reasonable" because "[the] record is utterly devoid of any competent and relevant evidence of industry . . . standards, let alone [the defendant's] deviation from those standards")); see also Marcus Dairy v. Rollin Dairy Corp., 2008 WL 4425954, at *9-11 (D. Conn. Sept. 24, 2008) ("'commercial standards [of reasonableness] should be determined by expert testimony'").

The PBMA and applicable CMS regulations do not define the contract provision for "online, real-time access." (Ex. 1, PBMA, §2.11) (requiring Benecard to provide "online real-time access to [its] drug Claims data base regarding Beneficiaries"). It is well-settled that expert testimony may be admitted to assist the jury in interpreting contract terms. MBIA Ins. Corp., 950 F. Supp. 2d at 617; see also Travelers Indent. Co. v. Scor Reinsurance Co., 62 F.3d 74, 79 (2d Cir. 1995) (Applying Connecticut law, court found no abuse by district court in allowing testimony of expert witness interpreting ambiguous provision of contract by providing testimony

as to reinsurance industry custom and practice).   Similarly, courts have admitted evidence

regarding industry custom or practice in cases alleging professional negligence.  <u>See Brown v.

Nat'l Football League</u>, 219 F. Supp. 2d 372, 384 (S.D.N.Y. 2002) ("A plaintiff arguing that a

member of a particular trade or profession behaved negligently in carrying out his duties may

appropriately use as evidence of negligence manuals, regulations, or other materials defining the

reasonable and expected standards of professional practice within that occupation"); <u>Mishkin v.

Peat, Marwick, Mitchell & Co.</u>, 744 F. Supp. 531, 538 (S.D.N.Y. 1990) ("Certainly, deviation

from the standards or guidelines may be some evidence of negligence").

Here, section 2.11 of the PBMA provides that Benecard was to provide Smart with

"online real-time access" to Benecard's system.  This term is ambiguous.  Under New York law,

"[a]n ambiguity exists where the terms of a contract could suggest more than one meaning when

viewed objectively by a reasonably intelligent person who has examined the context of the entire

integrated agreement and who is cognizant of the customs, practices, usages and terminology as

generally understood in the particular trade or business."   <u>Alexander & Alexander Servs., Inc. v.

These Certain Underwriters at Lloyd's, London, England</u>, 136 F.3d 82, 86 (2d Cir. 1998).

This dispute itself shows how the term "real-time access" is subject to multiple

interpretations and should be considered ambiguous.   Importantly, many of Benecard's

witnesses believed that Benecard was supplying Smart with real-time access through OLE, the

buddy system, and COGNOS.  (<u>See, e.g.</u>, Ex. 2, Kevin Hayes Tr. at 282:5 (testifying that the

buddy system "would be done in real time"), <u>id.</u> at 255:8-9 (COGNOS reports were "close to real

time"); Ex. 8, Mulcahy Tr. at 226:11-15 (CMS employee Gerard Mulcahy "couldn't say" what

level of access CMS requires plan sponsors to obtain)).   Thus, in order to assist the jury in

interpreting this term, the court should permit Benecard to submit the testimony of Ms. Hayes,

who is indisputably "cognizant of the customs, practices, usages and terminology as generally understood in [the pharmacy benefits] . . . business." Alexander, 136 F.3d at 86.

### 4. Opinions C-G and M are not improper fact speculation.

The opinions that Smart identifies as C-G and M all relate either to the adequacy of the access tools provided by Benecard, Smart's inability to effectively utilize those tools, or the possible causes of problems in system programming, such as Smart's failure to test the system. Smart's argument that these constitute improper fact speculation is meritless.

In order to assist the jury in navigating the potential causes of Smart's failure to test the claims system properly, the input or removal of coding edits into the system, and the consequences of those errors, Ms. Hayes brings to bear her vast knowledge of Medicare Part D and the pharmacy benefits industry. For example, Ms. Hayes explained how Benecard provided certain electronic files to Smart that would have enabled Smart to effectively test the system: "By comparing daily enrollment files that started in October 2012, with the MARx and DDTR reports, Smart would have been able to trace that beneficiaries were properly added to the OLE." (May 25 Report at 10.) And Ms. Hayes explicitly acknowledged that Benecard may have "input edits into the system incorrectly." (Id. at 11.) But regardless of how the edits were input, Ms. Hayes concluded in her professional judgment that the reason for the systems errors were attributable to Smart. To form these opinions, Ms. Hayes "employed [her] experience as a[n] . . . industry professional[.]" Summit Electric, 2010 WL 11414471, at *8. As a result, these opinions reflect her reasoned conclusions, arrived by applying her industry experience to the record, and do not constitute impermissible speculation.

5. **Opinions A, I, and K do not instruct the jury on any ultimate fact issue and A and B do not instruct the jury on how to interpret the PBMA.**

The Opinions identified by Smart as Opinions A, I, and K relate to whether Benecard provided online real time access to the Benecard system, and whether such access fulfilled Benecard's obligations to Smart under the PBMA. The Opinions identified as A and B discuss Benecard's contractual duties under the PBMA.[5] As an initial matter, as Benecard argued with respect to the opinions of Ms. Costell, the determination of what constituted "online, real time access" to Benecard's systems is a question more properly put to the jury. However, to the extent that the Court permits Ms. Costell to testify with reference to these same terms and opine on their meaning, Ms. Hayes must be permitted to do the same in rebuttal in order for Benecard to have the opportunity to receive a fair trial.

In any event, Ms. Hayes's opinions are otherwise relevant and admissible because they will assist the jury in evaluating Benecard's performance under the PBMA. "[I]n deciding whether the proposed testimony will be helpful, courts in this Circuit analyze whether it usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." In re Rezulin, 309 F. Supp. 2d at 541 (citations omitted). As noted above, however, "[a]n opinion is not objectionable just because it embraces an ultimate issue." FED. R. EVID. 704.

Ms. Hayes does not instruct the jury how to rule on the breach of contract or fraud claims. Rather, Ms. Hayes opines and will testify that the access provided to Smart by Benecard

---

[5] What has been identified as Opinion B is really not an opinion at all, but a statement of fact that supports Ms. Hayes's opinion. It is perfectly appropriate for an expert to cite facts in her report, and in fact, it is required under the Federal Rules of Evidence. See FED. R. EVID. 702 (an expert may testify in the form of an opinion if "the testimony is based upon sufficient facts or data"). Indeed, courts routinely permit experts to recite facts provided the facts are "intertwined" with the expert's opinions. See, e.g., Pension Committee of Univ., 691 F. Supp. 2d at 467 ("Although this analysis is brief, it shows that Weiser intends to intertwine his factual narrative with his opinion testimony")

to its claim system met the industry standard for "on-line real time access."  As discussed above, it is well-settled that expert testimony may be admitted to assist the jury in interpreting contract terms.  <u>MBIA Ins. Corp.</u>, 950 F. Supp. 2d at 617.  Here, "online real time access" is an ambiguous term, and the jury's interpretation of such a term will be helped by Ms. Hayes's testimony regarding the standard definition of the term in the Part D plan industry.  Ms. Hayes will not instruct the jury on how to rule.  Instead, she will testify with respect to industry standards within the field of pharmacy benefit plans and explain how Benecard's systems met those industry standards.

### 6.    Opinions C, J, and L are not recitations of underlying facts.

Finally, Smart's complaints that Opinions C, J, and L – which all relate to Benecard's provision of access to Smart –should be excluded as factual assertions are meritless.  (Smart Br. at 23.)  Smart relies on the decision in <u>E.E.O.C. v. Bloomberg L.P.</u>, No. 07 CIV. 8383 LAP, 2010 WL 3466370, at *14 (S.D.N.Y. Aug. 31, 2010), but in that case the expert's opinions were excluded because of an inherent risk of bias in the information that he reviewed, such that his opinions "simply assumed the validity of the allegations of the claimants[.]"  Smart cannot make the same showing of risk here because any Smart is fully aware of the documents and other evidence considered by Ms. Hayes and any prejudice resulting from opinions that Smart believes to be misleading can be cured easily through cross-examination.   Moreover, questions regarding the factual reliability of an expert's opinion are more appropriately addressed in the context of the expert's credibility.  For example, at least one court has held that where competing expert opinions, such as the opinions of Ms. Hayes and Ms. Costell, are based on personal experience, "[i]t is not for the court to decide which expert opinion is more persuasive."  <u>Cruz v. Kumho Tire Co.</u>, No. 8:10-CV-219 MAD/CFH, 2015 WL 2193796, at *9 (N.D.N.Y. May 11, 2015).

Ms. Hayes based her opinions regarding OLE, the buddy system, and COGNOS on conversations with several Benecard employees, including Michael Perry and Kevin Hayes, Benecard's Senior Vice President of IS/IT. (Ex. 4, Susan Hayes Tr. at 32:7-33:13.) Through these conversations and her review of over 100 documents produced in discovery, Ms. Hayes was able to conclude reliably that (1) Benecard placed no limitations or restrictions on what Smart could access through the buddy system (May 25 Report at 9); (2) what Smart could or could not access through COGNOS (id. at 12-13); and (3) the technical enrollment files Benecard provided Smart through the OLE system (id. at 9-10) allowed Smart to review all eligibility information. To the extent that Smart disputes the reliability of Ms. Hayes's opinions, it is free to seek to highlight any alleged inconsistencies on cross-examination.

## IV.    CONCLUSION

For the foregoing reasons, Benecard respectfully requests that the Court deny Smart's motion in its entirety.

Respectfully submitted,

**DLA Piper LLP (US)**

By: s/B. John Pendleton, Jr.
       B. John Pendleton, Jr.

Dated: August 30, 2016